**SCHIAN WALKER, P.L.C.**
1850 NORTH CENTRAL AVENUE, #900
PHOENIX, ARIZONA 85004-4531
TELEPHONE: (602) 277-1501
FACSIMILE: (602) 297-9633
E-MAIL: ecfdocket@swazlaw.com
DALE C. SCHIAN, #010445
SCOTT R. GOLDBERG, #015082
Attorneys for Timothy H. Shaffer, Chapter 11 Trustee

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| In re: | Case No. 2-11-bk-28944-DPC |
| POTENTIAL DYNAMIX, LLC, | CHAPTER 11 |
| Debtor. | Adv. No. 2-13-ap-00799 |
| TIMOTHY H. SHAFFER, Chapter 11 Trustee, | **RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| Plaintiff, | DATE: July 8, 2015 |
| vs. | TIME: 10:00 a.m. |
| AMAZON SERVICES LLC, | Location: 230 North First Avenue |
| | Phoenix, Arizona |
| Defendant. | Courtroom 603, 6th Floor |

The Trustee[1] files this Response to *Amazon's Motion for Partial Summary Judgment* (the "**Motion**") [DE 56]. The Motion seeks summary judgment on Claims, 3, 4, and 9 of the Complaint.[2] Regarding Claim 9, Amazon contends that summary judgment is appropriate because the economic loss rule bars the Trustee's claims for intentional interference with contract and loss of business expectancy.

---

[1] Unless otherwise defined herein, capitalized terms shall have the same meanings set forth in the Trustee's concurrently filed *Separate Statement of Facts in Support of Motion for Partial Summary Judgment* (the "**TSSOF**"), which is incorporated herein by reference.

[2] The Complaint contains nine claims ("**Claims**"). The Trustee believes that Claim 6 (to enjoin further violations of the automatic stay) and Claim 7 (to compel specific performance) have been rendered moot by the Stay Relief Order (defined below). Also, the Trustee withdraws Claim 8 because it has been subsumed by the remaining Claims. Claims 1, 2, and 5 are not the addressed in the Motion. The Trustee disputes that summary judgment is proper on Claim 3 (breach of contract), Claim 4 (breach of good faith and fair dealing), and Claim 9 (for loss of business expectancy).

As shown below, the economic loss rule does not apply to bar intentional tort claims even when the parties have entered into a contract. Regarding Claims 3 and 4, Amazon alleges that summary judgment is appropriate because *res judicata* bars the Trustee's contract claims. R*es judicata* is not applicable in light of 1) the Stipulated Facts, and 2) because *res judicata* does not apply to summary proceedings such as the Underlying Motions.

Amazon alleges that it is entitled to summary judgment on Claims 3 and 4 because of the absence of disputed facts. The "undisputed" facts that Amazon has asserted are taken almost exclusively from the Gibson Declaration and Althauser Declaration (jointly, the "**Amazon Declarations**") that Amazon had originally filed in support of its motion for relief from the automatic stay [DE 253]. Based primarily upon the Amazon Declarations, Amazon alleges that the following facts are true and undisputed:

(a) Amazon warned the Debtor for years about violating its policies (Althauser Declaration at ¶ 8);

(b) the Debtor sold fifteen Restricted Products during the Subject Period (Gibson Declaration at ¶¶ 9 and 11);

(c) the Debtor's selling privileges were suspended on or about December 25, 2012 without warning (the "**Suspension**" or the "**Suspension Date**") because the Debtor had sold the Maxrize product during the 2012 Period (Gibson Declaration at ¶¶ 9 and 11);

(d) the Debtor committed to the Plan in December, 2012 to avoid the sale of Restricted Products that the Debtor promptly violated (Motion at p.5.);

(e) Amazon terminated the Contract on April 11, 2013 (the "**Termination Date**" or the "**Termination**") because the Debtor sold seven Restricted Products during the 2013 Period (Gibson Declaration at ¶¶ 9 and 11);

(f) the Debtor sold human growth hormone, DMAA, and prescription medical products (Gibson Declaration at ¶ 7); and

(g) Suppression Notices were sent to inform the Debtor that it had violated Amazon's policies, and that continued violations could result in the Termination (Gibson Declaration at ¶10).

The Trustee contests (a) through (g) above, and will show that the Amazon Declarations lack

propriety and veracity. The Response and accompanying Exhibits filed under seal herewith show that that Amazon obtained the Stay Relief Order under false pretenses. The Trustee will also show the presence of the following disputed facts:

(a) Whether the Debtor sold Restricted Products before or after Amazon declared them to be restricted – Amazon cannot treat an approved listing or sale as a policy violation because it changed the status of a product to "restricted" midstream.

(b) Whether the Debtor had fair notice that Amazon had banned a product since the Guidelines are constantly changing and subject to various and reasonable interpretations;

(c) Whether the Debtor repeatedly sold Restricted Products during 2013 Period, when Amazon's own documents indicate otherwise, and when Amazon's "Scorecards" indicate otherwise.

(d) Whether the Termination was proper when it was based upon the sale of allegedly Restricted Products that the Coach, Riley Althauser ("**Althauser**"), and Diana Flores ("**Flores**") recommended to the Debtor that it sell.

(e) Whether the Termination was proper based upon the sale of the products described in paragraphs 7, 9, and 11 of the Gibson Declaration, when those sales did not happen as described.

(f) Whether the Suppression Notices Amazon sent to the Debtor reflected policy violations as Amazon claims, or an alert that the status of a product has changed to "restricted" and can no longer be listed or sold *in the future*.

(g) Whether the Debtor complied with the Suppression Notices by taking the "*Action Required*" within the 48-hour compliance window.

(h) Whether the Suppression Notices *assured* the Debtor that its selling privileges would remain unaffected if it performed the "Action Required" within 48 hours.

(i) Whether the Suppression Notices conflict with the terms of Contract, and whether any such conflict must be construed against Amazon as the party that drafted all documents, and given that the Motion requires that all facts and inferences to be decided against Amazon and in the Trustee's favor.

Two years ago, Amazon filed its motion for relief from the automatic stay and the Trustee filed its competing motion to assume the Contract (the "**Underlying Motions**"). Because a wealth of information has been discovered since then, the Trustee has prepared five graphs to help synthesize and summarize this information.

| Graph | Description |
|---|---|
| 1 | As the Debtor's sales volume dips, the Debtor's receipt of Suppression Notices skyrockets, which is exactly when the Debtor submits its lost inventory claims. Exhibit 1 |
| 2 | Shows Restricted Products sold during the Subject Period, showing that Maxrize accounted for 97% of the sales within the 2012 Period. It also shows the Debtor's compliance with the Plan because of lack of sales during 2013 Period. Exhibit 2 |
| 3 & 4 | Compares the Restricted Products allegedly sold before and after the beginning of the 2013 Period, refuting ¶¶ 7, 9, and 11 of the Gibson Declaration. Exhibits 3 and 4. |
| 5 | Amazon Ranking showing Maxrize and HGH Pro among its highest ranking products in 2012. Exhibit 5. |

This Response is being offered in a greater context that requires that three preliminary points be made. Point 1 - Amazon changes its story. When it filed its motion for relief from the automatic stay, Amazon switched gears. First, it claimed that it had to violate the automatic stay because the Debtor was selling harmful products. Amazon was forced to abandon this justification when it was shown that Amazon was a primary seller of these products. Next, Amazon claimed that it was forced to violate the stay because the Debtor was selling counterfeit products. That justification was abandoned when Amazon realized it had to produce documents to prove its case. Now, the Motion seems to suggest that the Debtor violated Amazon's policies not by selling Restricted Products, but by having *listed* them, whether the Debtor even had them in inventory or whether the Debtor had stopped selling the product. The point is Amazon needs to settle on a position so that the Trustee is given a fair opportunity to respond.

Point 2 - Amazon needs to commit to a set of documents that represent its definitive position in this case. During the "deep dive" dispute, the Debtor and Amazon played the circle game – Amazon would continually "find" new data, and the Trustee would continually show Amazon why its new data was just as bad and wrong as its old data. The Trustee has strong concerns that Amazon will continually find new data as litigation progresses. On May 18, 2015, Amazon finally produced its definitive data set. That data set supports this Response. The Trustee considers Amazon to be bound by it.

The final point concerns Amazon's claim that the Debtor was a reckless seller that abused the "privilege" of selling on the Amazon platform. It is a nice theme at first but there are no facts to support. There was never any "privilege involved. The Debtor entered into the Contract to sell products on the platform on account of which it paid tremendous fees to Amazon, and on account of which Amazon stole its property and destroyed it business. At trial, the Court can determine for itself whether the Debtor is the "bad boy" that Amazon claims it to be, or whether it is Amazon that deserves to be criticized. The Trustee respectfully requests the opportunity to put on his case.

This Response is supported by (i) the attached Memorandum of Points and Authorities, (ii) the Amazon Declarations, (iii) the Trustee's *Motion to Alter or Amend Order* [DE 375] (iv) the Exhibits filed under seal, (v) the Ashworth Declaration, (vi) the TSSOF, (vii) the data sets that Amazon produced on or about May 18, 2015, and (viii) the entire relevant record in this case.

DATED this __22nd__ day of June, 2015.

SCHIAN WALKER, P.L.C.


By__/s/__ SCOTT R. GOLDBERG, #015082
      Dale C. Schian
      Scott R. Goldberg
      Attorneys for the Trustee


## **MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    BACKGROUND**

1.    The Debtor was a rising star among Amazon's FBA sellers for years. The Debtor dominated the sales in Amazon's health and nutritional categories, and paid Amazon a fortune in fees. Furthermore, from 2008 through 2011, the Debtor did not violate Amazon's policies as evidenced by the dearth of Suppression Notices the Debtor received during this period. TSSOF at ¶ 28. Amazon and the Debtor were partners. The Debtor asked for permission to sell products and warned Amazon that other sellers were violating its policies. Exhibit 6.

2. The Gibson Declaration is belied by the Coach, the Althauser List, and the Flores List, which all encouraged the Debtor to sell the products that are described in ¶¶ 9 and 11 of the Gibson Declaration that Amazon says it banned – although it will not say when it banned them and if and when the ban was ever communicated to the Debtor. Amazon says it has sole discretion to ban a product, but this really means that adherence to the Contract is a moving target. What Amazon strongly encourages to be sold one day is banned the next day without fair notice when it suits Amazon's purposes.

3. The Contract provides that "sex products" are excluded products. But Amazon has a "sex product" category so that it can monitor and track its highest ranking and best-selling sex products. Amazon's Guidelines even contradict the Contract. The Guidelines provide that sellers of sex products must be approved by Amazon. Obviously, Amazon knows and wants sex products to be sold on the FBA platform. TSSOF at ¶ 22. There is no escaping the fact that the Coach, Riley Althauser, and Diana Flores all told the Debtor to sell "sex products," including Maxrize, which accounts for 97% of the sales that Amazon is complaining about. Exhibit 2.

4. The relationship between the Debtor and Amazon only turned sour after the Debtor requested that Amazon provide an accounting of the Debtor's inventory. The Debtor made this request at the request of its lenders, and as fiduciary to its bankruptcy estate and its creditors. Exhibit 7. As soon as this request was made, Amazon flooded the Debtor with Suppression Notices. Exhibits 1 and 8. Between December 17, 2012 and April 13, 2013, the Debtor received about *466 Suppression Notices*. This represents **97%** of the total number of Suppression Notices the Debtor received during its entire relationship with Amazon. TSSOF at ¶ 28.

5. When it is not selling them itself, Amazon promotes the sale of Restricted Products. Amazon provides a service to FBA sellers called the Coach. The purpose of the Coach is to encourage FBA sellers to list and to sell certain products that will generate more revenue for Amazon. During the Subject Period, the Coach recommended that the Debtor sell Sexamax, Maxrize, HGH, Pragnyl, Deer Antler, and other alleged Restricted Products. Exhibit 9 and TSSOF at ¶¶ 23 and 35.

6.  The Recommended Products also have a second important feature. The products described within the Coach's distributed notices rank the Recommended Products by sales (the "**Popular Products**"). The popularity ranking is an enormous enticement for FBA sellers to jump on the bandwagon and to offer the product for sale. The FBA seller knows two things when the Coach recommends high ranking products. It knows that its competitors are making a lot of money, and it also knows that Amazon is not only allowing that product to be sold, but is actively encouraging it to be sold.[3] TSSOF at ¶¶ 29 and 35.

7.  Amazon claims that it warned the Debtor that it was violating its policies. Nonsense. Amazon has disregarded the literal text and the context in which the Suppression Notices were sent. The Suppression Notices do not state that policy violations had occurred. The Suppression Notices alerted sellers to the change in a status of a product and warning against listing or selling that product *in the future* (which the Debtor never did). The Suppression Notices provided a 48-hour compliance window, which the Debtor strictly adhered to, and as to which Amazon does not allege differently.

8.  In fact, the Suppression Notices *assured* the Debtor that its selling privileges would remain unchanged it if took the "Action Required" within 48 hours. Exhibit 10 and TSSOF at ¶¶ 25 and 26. To the extent that Amazon and the Trustee dispute the meaning of the Suppression Notices, the Trustee is entitled to the benefit of any doubt and to all reasonable inferences. *In re Shells*, 2015 WL 2194647, *2 (E.D. Cal. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986) (internal citations omitted).

## II. STATEMENT OF FACTS

### Amazon Controls the ASIN of Which There are Millions

9.  Every product sold through the Amazon FBA platform is assigned an ASIN, which is an Amazon creation. Only Amazon can assign an ASIN to a product. Amazon does not assign ASINs to

---

[3] Likewise, when Amazon bans a product, it appears that it will continue to allow that product to be sold. The Gibson Declaration at ¶ 7 provides that Amazon banned DMAA in May 2012 and HGH in late 2011. Yet, DMAA and HGH appear among Amazon's most popular selling products years later. TSSOF at ¶ 40.

Restricted Products. During the relevant time period of 2012 and 2013, the total number of ASINs that Amazon had created and assigned tallied in the tens of millions. The Debtor alone sold products under 25,000 different ASINs. TSSOF at ¶¶ 17 and 18. Amazon is complaining of about fifteen of them. Gibson Declaration at ¶¶ 9 and 11.

### The Suppression Notices, Sales, and the Inventory Claims

10. Between 2008 and 2011, when the Debtor's was selling millions of units per year, the Debtor received between five and ten Suppression Notices. Exhibit 1 and TSSOF at ¶ 28. Most of these were related to product recalls issued by the product's manufacturer. TSSOF ¶ 28. Between December 17, 2012 (the date the Debtor filed its inventory claims) and the Termination Date of April 13, 2013, the Debtor received approximately **466** Suppression Notices. This represents **97%** of the total number of Suppression Notices the Debtor received during its entire relationship with Amazon. TSSOF at ¶ 28.

### The Confusion over Maxrize and the Suspension

11. The alleged sale of Restricted Products can be distilled to the sale of the Maxrize product, which accounts for 97% of the sales that Amazon is complaining about. Exhibit 2. Amazon claims that Maxrize was a Restricted Product. Maxrize does not appear in the Contract as a Restricted Product. TSSOF at ¶ 27. The Contract does ban sex products. Whether Maxrize is sex product is in the eye of the beholder. The Trustee has no record of when Amazon banned Maxrize or of the ban being communicated to the Debtor. TSSOF at ¶ 27. The Coach recommended that the Debtor sell Maxrize countless times. Exhibit 11 and TSSOF at ¶ 27. The Althauser List recommended that the Debtor sell Maxrize. Exhibit 12. The Flores List recommended that the Debtor sell Maxrize. Exhibit 13. *See also* TSSOF at ¶ 29.

12. Amazon has created and designed a "sex and sensuality" category for its most popular products, even though the Contract at section 12 contains an exclusion from sale of "sex products." Almost 10% of Amazon's best-selling products are within the "sex and sensuality" category that

///

Case 2:13-ap-00799-DPC    Doc 72    Filed 06/22/15    Entered 06/22/15 20:24:50    Desc
Main Document    Page 8 of 20

Amazon created, that it is constantly monitoring, and that the Coach is constantly pushing on FBA sellers, like the Debtor, to sell. TSSOF at ¶ 22 and Exhibit 12.

13. On December 13, 2012, without warning, Amazon suspended the Debtor's selling privileges because the Debtor had sold Maxrize. Exhibit 14. On or about December 14, 2012, Amazon told the Debtor that Maxrize was an approved product. Exhibit 15. A few days later, on December 18, 2012, Maxrize was delisted. Exhibit 16. Also on December 18, 2012, the Coach recommended that the Debtor sell Maxrize. Exhibit 17. A few days after that, the Debtor received a Suppression Notice warning it not to list or sell Maxrize in the future. Exhibit 18. Days later, the Coach again recommended the Debtor to sell Maxrize. Exhibit 19 and TSSOF at ¶ 27. Confusion was inevitable because Amazon has two "sex product" categories: one that provides for their exclusion *from sale*, and the other that ranks them by popularity *by sale*, so that the Coach can tell FBA sellers, like the Debtor, to sell them.

### **The Debtor Did Not Violate Its Own Plan**

14. After the Suspension, the Debtor agreed to the Plan, which was intended to prevent the inadvertent sale of Restricted Products. The Debtor fully intended to implement the Plan, and did in fact implement it. *See* ¶ 24 below; *see also* Exhibit 3, and Exhibit 20 (December 18, 2012 e-mail string concerning the Debtor's procedures to eradicate any potential for the inadvertent sale of Restricted Products). Amazon says the Debtor put in place a Plan that it immediately violated. The Plan was, however, large scale, and involved thousands of units, which took a few days to perfect.

15. To be clear, Amazon did not ban a product that the Debtor subsequently shipped to Amazon and then sold. The products were already at Amazon when Amazon banned them and when the Plan was put forth. It takes time to completely remove thousands of products. Moreover, a banned product that was sold and that was subsequently returned by a customer will be placed *back* into the Debtor's inventory by Amazon and, thus, may give the appearance that the Debtor violated its Plan and

///

Amazon's policies. Exhibit 3 shows that once the sales of Maxrize ceased in December 2012, compliance with the Plan was about 100%.

### The Termination of the Contract on April 11, 2013

16. On April 11, 2013, Amazon terminated the Contract. Amazon justified the Termination because of the prior Suspension, which Amazon justified because the Debtor had sold Maxrize, which was a Recommended Product from the Coach, and which appeared on the Althauser List and Flores List. Exhibit 21 and TSSOF at ¶ 29.

17. The Termination also was based upon sale of Restricted Products during the 2013 Period. According to Amazon's May 18, 2015 data production, no sales of Restricted Products took place during the 2013 Period. TSSOF at ¶ 37. Amazon produces Scorecards that measure adherence to its sales policies. The Scorecards show no suppressions for 2013 either. Exhibit 22 and TSSOF at ¶ 36.

### The Underlying Motions are Filed

18. In May, 2013, the Underlying Motions were filed. On September 18, 2013, the Court determined that Amazon had followed the proper procedures to terminate the Contract. It then entered the Stay Relief Order [DE 364], which was premised solely upon the Trustee's stipulated facts (the "**Stipulated Facts**"). The Stay Relief Order resolved competing summary judgment motions on the proper way to interpret the Contract. Therefore, it could not have resolved disputed facts, which were never litigated as *res judicata* requires them to be. On October 2, 2013, the Trustee filed his *Motion to Alter or Amend Order* that was specifically filed to make clear that the Stay Relief Order would not have any preclusive effect on Claims 3 and 4 of the Complaint.

### The Althauser Declaration and the Althauser List

19. Amazon's motion for relief from the automatic stay was supported by the Amazon Declarations, both of which Amazon is using in support of the Motion. The Althauser Declaration at ¶ 8 states "[t]hroughout the lifetime of the Debtor's account, Amazon warned the debtor about policy violations on numerous occasions. Those violations included warnings about selling restricted products

(including products containing prescription drugs, human growth hormone and other steroidal products ad prescription medical devices)." The warnings referred to in the Althauser Declaration do not appear to have been attached to it. The Trustee respectfully requests that Amazon produce these warnings for inspection or explain why they are not available for inspection.

20. In or about June, 2012, the Debtor personally met with Althauser in Seattle, Washington. Althauser graciously provided the Debtor with a list of products that Althauser believed that the Debtor could successfully market and sell on Amazon's FBA platform – the Althauser List. The Althauser List included several of the Restricted Products that Amazon used to justify the Suspension and the Termination, including Maxrize. Exhibit 12.

**The Flores List**

21. Flores was the Debtor's primary contact at Amazon's Seller Central Department. During a meeting between Flores and the Debtor, Flores agreed to provide the Debtor with a list of Amazon's best-selling products that Flores believed could boost the Debtor's sales and that could be sold on the FBA Platform – the Flores List. The Flores List contains the Restricted Products and contains many products that fall within Amazon's popular "sex product" category. Maxrize is contained within the Flores List of approved and recommended products. Exhibit 13 and TSSOF at ¶ 29.

**The Gibson Declaration at Paragraph 9**

22. The Gibson Declaration at ¶ 7 alleges that Amazon banned: (a) DMAA in May 2012, (b) mandibular devices in November 2011, (c) human growth hormone in late 2011, and (d) the damiana herb in October 2012. Ms. Gibson appears to be alleging that the substances described in ¶ 7 are contained within certain of the products described in ¶¶ 9 and 11 of her declaration (HGH Pro, Pragnyl, Deer Antler, Phenadrine, Cloma Pharma and Hypervol), which, according to Ms. Gibson's sworn testimony, the Debtor sold between October 1, 2012 and April 11, 2013 (the "**Subject Period**").

23. The Gibson Declaration does not state how and when the bans described in her ¶ 7 were communicated to the Debtor, and the Trustee has no proof that they were ever received by the Debtor.

1. Regardless, during the Subject Period, the Debtor did not sell any product that contained the substances described in the Gibson Declaration at ¶ 7, either because the Debtor did not sell the products described in ¶¶ 9 and 11, or because the products that the Debtor did sell did not contain thee substances described in ¶ 7. TSSOF at ¶ 34 and Exhibits 2 and 3.

24. In ¶ 9 of the Gibson Declaration, Ms. Gibson testifies that the Debtor sold eight Restricted Products during the 2012 Period. During the 2012 Period, the Debtor did not sell any of the four described snoremed products, and did not sell Pragnyl or HGH Pro either. Neither HGH Pro nor Pragnyl contain human growth hormone. Exhibit 23. Human growth hormone cannot be sold in pill or beverage form. It must be injected – as Amazon most certainly knew when it filed the Amazon Declarations. HGH and Pragnyl were Recommended Products. Exhibit 24.

**The Gibson Declaration at Paragraph 11**

25. In ¶11 of the Gibson Declaration, Ms. Gibson testified that the Debtor sold seven Restricted Products during the 2013 Period. During the 2013 Period, the Debtor sold only two products, 15 units of Cloma Pharma and a one single unit of Cylinder Works. The Cloma Pharma was not a banned product and did not contain DMAA. Ashworth Declaration at ¶12. Cylinder Works was a ranked product that Amazon closely monitored . Exhibit 28.

26. In ¶ 11 of the Gibson Declaration, Gibson testified that the Debtor sold human growth hormone when it allegedly sold Deer Antler products during the 2013 Period. The Debtor did not sell Deer Antler products in 2013, having recalled the product in 2012. TSSOF at ¶ 34. The Debtor told its suppliers of Deer Antler products that Amazon had banned the products and that it could not use them. Exhibit 25. The Deer Antler product was a Recommended Product from the Coach and does not contain human growth hormone anyway. Exhibit 26.

27. Neither the May 18, 2015 data production nor the Scorecards show any policy violations by the Debtor during the 2013 Period. Exhibit 22 above and TSSOF at ¶¶ 36 and 37.

///

28. At trial, the Trustee will retain expert witnesses and subpoena the manufacturers of the products described in ¶¶ 9 and 11 of the Gibson Declaration to establish that the products described therein did not contain human growth hormone and/or IGF-1 and/or DMAA. Substantial questions of fact exist as to whether the Debtor sold products described in ¶¶ 9 and 11, and whether the Debtor's account should have been suspended based upon its sale of Maxrize, which the Coach, Althauser, and Flores all pushed and prompted the Debtor to sell.

### The Gibson Declaration at ¶¶ 10 and 12

29. The Gibson Declaration uses the Suppression Notices to allege that Amazon had repeatedly warned the Debtor about its policy violations, and that its continued violations could cause Amazon to terminate the Contract. The Suppression Notices *assured* the Debtor that its selling privileges would remain unaffected if the "Action Required" was taken within the 48-hour compliance window that each and every Suppression Notice contained. Exhibit 10. About a year after the Debtor stopped selling Maxrize, the Debtor received a Suppression Notice. Exhibit 29 and TSSOF at ¶ 27. The Debtor received many Suppression Notices for products it never even sold. TSSOF at ¶ 26. The Trustee will prove at trial that the Suppression Notices alerted sellers to the change in status of a product, and warned against any listing or sale of the product *in the future.*

### The Gibson Declaration at ¶13

30. In ¶ 13, Amazon claims that the Debtor's alleged sales posed a safety risk. Amazon poses a far greater safety risk than the Debtor ever possibly could. Amazon ranks Restricted Products and repeatedly encouraged them to be sold. In August 2013, the Trustee performed an experiment by shopping on Amazon.com. The Trustee found 28 sellers of DMAA, and that Amazon was continuing to closely monitor the sales of this product. Amazon even permitted the Debtor to "add" DMAA to its catalog[4] in August 2013 even after Gibson states that Amazon banned the product in May 2012. Exhibit 30 and TSSOF ¶ 40.

---

[4] The Debtor did not add DMAA to its catalog.

## III. ARGUMENT

### A. *Res Judicata* Does Not Bar Claims 3 and 4

31. The Trustee does not dispute that the Stay Relief Order was a final order and does not contest the elements of *res judicata*. The Trustee does dispute that *res judicata* applies to bar Claims 3 and 4, which are the breach of contract claims. As noted above, the Stay Relief Order was based upon Stipulated Facts, which were limited to resolving the Underlying Motions. The Motion to Alter and Amend was filed to make this point clear, and to avoid any confusion about the application of *res judicata* to Claims 3 and 4.

32. Furthermore, the Stay Relief Order was based upon competing summary judgment motions. In this context, the Court did not decide and could not have decided the disputed issues as to whether Restricted Products had been repeatedly sold during the 2013 Period in violation of the Contract. As the Court will recall, the summary judgment proceedings concerned the interpretation of the Contract upon which Amazon prevailed. This narrow and limited ruling cannot be expanded to cover the multitude of disputed facts that Claims 3 and 4 so obviously present.

33. Moreover, the Underlying Motions were summary proceedings on account of which traditional notions of *res judicata* and claim preclusion do not apply. *In re Orion Pictures Corp.*, 4 F.3d 1095, 1098-110 (2d Cir. 1993). Because they are summary proceedings, prolonged discovery or a lengthy trial with disputed issues were not appropriate. *Id.*; s*ee also In re Docktor Pet Ctr., Inc.*, 144 B.R. 14, 16 (Bankr. D. Mass. 1992) ("[A] motion to assume an executory contract is generally, and should be, a summary proceeding. It is not the place for an extended breach of contract suit.").

34. The bankruptcy court in *In re Lebbos*, 455 B.R. 607, 612-617 (Bankr. E.D. Mich. 2011) found that the order granting relief from the automatic stay did not have preclusive effect on the trustee's claims in the adversary proceeding challenging the subject lien. The court reached this conclusion noting that hearings under Bankruptcy Code §§ 362(d) and 365 are strictly summary in nature, and that

///

neither are designed nor intended to replace adversary proceedings and the substantive and procedural safeguards contained within the rules governing those type of proceedings.

35. The decision in *Grella v. Salen Five Cent Savings Bank*, 42 F.3d 26 (1st Cir. 1994) also is directly on point. There, the court held that claim preclusion could not apply to bar the claims that had been asserted within the adversary proceeding. The court reasoned that contested matters and adversary proceedings are quite different in nature and scope, and that treating contested matters as full blown lawsuits would not be consistent with the Bankruptcy Code's procedural scheme. The First Circuit concluded that the bankruptcy court was not at liberty to adjudicate the substantive merits of either the creditor's claim or any possible defenses or counterclaims in the stay relief action.

36. The summary nature of the Underlying Motions is consistent with the Trustee's decision to stipulate to a limited set of facts to have those motions resolved expeditiously. The Trustee knew and understood that his contract claims against Amazon would require months, if not years, of discovery and pretrial motion practice. In fact, Amazon's definitive data set was not produced until May 18, 2015. Judicial notice should also be taken that Rule 26.1 disclosure statements were not exchanged, that formal discovery orders were not entered, and that no provisions had been made for the retention of experts. The lack of pretrial orders and procedures is consistent with the limited scope of the Underlying Motions as summary proceedings as to which *res judicata* does not apply.

**B.     Disputed Facts Exist on Claims 3 and 4**

37. The Trustee will not repeat the facts shown above, which almost entirely refute everything that Ms. Gibson had to say in her declaration. The Trustee incorporates ¶¶ 22 through 30 above.

**C.     Amazon is Estopped From Terminating the Contract**

38. The Trustee does not believe that the Debtor violated any term of the Contract, so that the doctrines of waiver and estoppel are not applicable. Nevertheless, if the Court believes that some

///

violation may have occurred, then the Trustee will show that Amazon has waived or is estopped from terminating the Contract because of that violation.

39. Estoppel is intended to prevent a contracting party from taking advantage the of conflicting and confusing messages that it sends. It bars a contracting party from terminating a contract based upon behavior that it encourages and accepts. *Flavors of Greater Delaware Valley Inc. v. Bresler's 33 Flavors, Inc.*, 475 F. Supp. 217 (D. Del. 1979). As shown above, the Coach, the Althauser List, and the Flores List all encouraged the sale of the alleged Restricted Products, which bars Amazon from terminating the Contract based upon those alleged sales.

40. In *Flavors*, the plaintiff had defaulted under its contract because it failed to meet its quota of store openings, which failure was used to justify the termination of its contract. Plaintiff contended that defendant had waived the right to enforce the quota provision, and the court agreed because of indications that the contract would not be *strictly* enforced. The court also ruled that once waiver occurred, it could not be rescinded without clear and unequivocal notice thereof. The fact that the defendant sent a notice complaining that the quotas had not been met was ruled insufficient because it did not threaten to terminate the contract in absence of compliance.

41. In *T.G.I.E. Coast Constr. v. Fireman's Fund Ins. Co.*, 600 F. Supp. 178, 182 (S.D.N.Y. 1985) a general contractor encouraged a subcontractor to render performance even though the subcontractor had not met its bonding requirements. The court held that waiver had occurred because the contractor had encouraged the subcontractor to perform, which was inconsistent with the contractor's clear right to terminate the contract.

42. Whether Amazon is estopped from having terminated the Contract is a ***question of fact precluding summary judgment***. *Reserves Dev. Corp. v Esham*, 2009 WL 3765497 (Del. Super. Ct. Nov. 10, 2009); *Aeroglobal Capital Mgmt. LLC v. Cirrus Industries, Inc.*, 871 A.2d 428 (Del. 2005); *Closser v. Penn Mutual Fine Insurance Co.*, 457 A.2d 1081 (Del. 1983); *St. Jones River Gravel Co. v. Hartford Fire Insurance Co.*, 1980 WL 308672 (Del. Super. Ct. July 7, 1980); *George v. Frank A.*

1 | *Robino Inc.*, 334 A.2d 223 (Del. 1975); and *Nathan Miller, Inc. v. Northern Ins. Co. of N.Y.*, 42 Del. 523, 258 (Del. Super. Ct. 1944).

43. Amazon relies upon cases purporting to hold that mixed motives in terminating a contract are not relevant if a clear and undeniable right for the termination exists. These cases are inapposite because the Trustee has shown that Amazon did not have a clear and undeniable right to terminate the Contract, and that any such right was either waived or is subject to estoppel. Regardless, motive does matter even when exercising a unilateral right. *Wilson v. Amerda Hess Corporation*, 773 A.2d 1121(N.J. 2001).

44. In *Wilson*, Hess had the unilateral to set "DTW" prices under the subject contract. Wilson claimed that Hess set the DTW prices in such a fashion as to drive it out of business, and had engaged in double-standard practices for dealing with other franchises and its own corporate stores. The Court held that the granting of summary judgment by the lower court was wrong, and that Wilson was entitled to conduct discovery to show that Hess had exercised the unilateral in bad faith to cause harm to Wilson that was not contemplated by the parties under their contract.

### D. The Economic Loss Rule Does Not Apply to Count 9

45. Simply because the Debtor and Amazon were contracting parties does not preclude the Trustee from asserting tort claims and related tort damages against Amazon. Whether tort claims and tort damages (including punitive damages) are available depend upon the conduct complained about. In Count 9, the Trustee is not seeking damages because Amazon breached its contract with the Debtor that caused the Debtor to suffer economic loss. Rather, Count 9 concerns Amazon's deliberate plans to destroy the Debtor's business to protect its own economic self-interest. The gravamen of Count 9 is that Amazon acted intentionally to destroy the Debtor's business by intentionally withholding the Debtor's inventory monies, and to cast the Debtor as the culpable party in the Tre Milano litigation,[5] knowing that

---

[5] *Tre Milano, LLC v. Amazon.com Inc.*, Case No. BC 460511, Superior Court of the State of California, County of Los Angeles, Central District (the "**Tre Milano Litigation**").

a defunct Debtor would be in no position either to defend itself or to show that Amazon lacked proper inventory controls to prevent counterfeit products from being sold.

46. Between 2008 and 2011, the Debtor was selling millions of units per year, was helping Amazon achieve its growth and revenue goals, and was treated as a select and preferred seller. During this time period, the Debtor received just a few Suppression Notices, but then three game-changing events occurred. First, the Debtor filed Chapter 11 and began questioning the accounting of inventory as a fiduciary to its estate. Second, a Wall Street Journal inquiry was made regarding the Tre Milano Litigation and the claims that Amazon was profiting by allowing the Debtor and other FBA sellers to sell counterfeit products on its FBA platform. Finally, the Debtor was forced to make a formal claim on nearly $4.5 million in lost inventory, due to the lack of response by Amazon for inventory information initiated in the early days of the Chapter 11 filing. Then and only then did the rift between the Debtor and Amazon develop.

47. Intentional torts are clear exceptions to the economic loss rule as Delaware courts have noted. For example, the doctrine does not bar claims for the tort of fraudulent inducement, for interference with business expectancy, or for fraud. *Council of Unit Owners of Sea Colony East Etc. v. Carl M. Freeman Assoc. Inc.*, 1990 WL 177632 (Del. Super. Ct. Oct. 16, 1990); *Bell Helicopter Textron Inc. Tridair Helicopters, Inc.*, 982 F. Supp. 318, 322 (D. Del. 1997). If the risks are not capable of being anticipated and allocated under the contract, then economic loss rule does not apply. *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865 (9th Cir. 2007); *Robinson Helicopter v. Dana Corp.*, 102 P.2d 268, 275-276 (Cal. 2004); *Vanderbeek v. Vernon Corp.*, 50 P.2d 866, 871 (Colo. 2002); *Indemnity Insurance Co. of North America v. American Aviation Inc.*, 891 So. 2d. 532, 543 n.3 (Fla. 2004); *United Int'l Holdings, Inc. v. The Wharf Ltd.*, 210 F.3d 1201, 1226 (10th Cir. 2000); *Cromeens, Holloman, Sibert Inc. v. AB Volvo*, 349 F.3d 376, 398 (7th Cir. 2003).

48. Broadly speaking, the economic loss rule has its origins in the "perfect" bargain, meaning that equally sophisticated commercial enterprises can bargain for and enter into a contract that properly

allocates risks and loss of non-performance. *See* "Independent Duties and Colorado's Economic Loss Rule –Part II", 35 Colorado Law Review, March, 2006. In this case, the Contract was an adhesion – "take it or leave it" – contract. When bargaining positions are far from equal or perfect, the economic loss rule should be applied in very limited circumstances, and certainly not when intentional torts have been alleged against the party that clearly had the superior contracting power and the superior bargaining position. It was not possible for the Debtor to enter into a contract that would enable it to account for risks associated with a deliberate attack by Amazon against its business.

49. The original purpose of the economic loss rule was to keep contract law and tort law distinct. The economic loss rule was not established to condone or insulate intentionally tortious conduct from liability. Amazon had no right to withhold inventory money from the Debtor (conversion), which it continues to do to this day. Amazon had no right to destroy the Debtor's business to protect its own economic interest. These were not rights bargained for in the Contract. Count 9 is not about Amazon's nonperformance on a contract. Count 9 is directed at Amazon's deliberate and intentional acts to destroy the Debtor's business.

### E. Civil Contempt Damages

50. Violations of the automatic stay are subject to civil contempt damages, which include compensatory damages, attorneys' fees, and damages necessary to coerce compliance. *F. J. Hanshaw Enters., Inc. v. Emerald River Dev. Inc.*, 244 F.3d 1128, 1137 (9th Cir. 2001). In *Dyer v. Lindblade*, 322 F.3d 1178, 1193 (9th Cir. 2003), the Ninth Circuit only ruled out the imposition of serious punitive damages in the absence of full due process protections. *Id.* Here, however, those due process concerns do not apply because the Trustee is seeking them in the context of an adversary proceeding, because Amazon has consented to this Court's jurisdiction for all purposes, and because Amazon has waived its rights to a jury. The Court does not need to resolve this issue presently because the Trustee is entitled to punitive damages under Count 9.

///

## IV. CONCLUSION

51. The Trustee has shown that the Motion is not supported by facts because the Amazon Declarations contain material misrepresentations, material errors and material omissions. The Trustee has shown that serious doubt exists as to whether the Debtor breached the Contract once, let alone repeatedly. Moreover, the issues of waiver and estoppel are issues that cannot be decided on summary judgment. Amazon cannot tell the Debtor to do one thing, and then terminate the Contract because the Debtor did that which it was repeatedly encouraged to do. The Trustee is entitled to the benefit of all reasonable inferences, as well as the literal meaning of the Suppression Notices that provided the Debtor 48 hours to take the "Action Required."

WHEREFORE, the Trustee requests that the Motion be denied.

DATED this  22nd  day of June, 2015.

                                        SCHIAN WALKER, P.L.C.

                                        By  /s/   SCOTT R. GOLDBERG, #015082
                                                   Dale C. Schian
                                                   Scott R. Goldberg
                                                   Attorneys for the Trustee

COPY of the foregoing
e-mailed this  22nd  day
of June, 2015, to:

John S. Kaplan, Esq.
Perkins Coie, LLP
1201 Third Avenue, #4900
Seattle, Washington 98101-3099
Attorneys for Amazon Services LLC
jkaplan@perkinscoie.com

Richard M. Lorenzen, Esq.
Perkins Coie, LLP
2901 North Central Avenue, #2000
Phoenix, Arizona 85012-2788
Attorneys for Amazon Services LLC
rlorenzen@perkinscoie.com

  /s/   DEBBI STEPHENS