Mark C. Dangerfield, #010832
Dale C. Schian, #010445
Kenneth N. Ralston, #034022
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Email: mark.dangerfield@gknet.com
Email: dale.schian@gknet.com
Email: ken.ralston@gknet.com
Telephone:    (602) 530-8000
Facsimile:    (602) 530-8500
Attorneys for Trustee Timothy H. Shaffer
Email: bkdocket@gknet.com

Richard M. Lorenzen (Bar No. 006787)
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
Email: RLorenzen@perkinscoie.com
Telephone: 602-351-8000
Facsimile: 602-648-7000

John S. Kaplan (*Pro Hac Vice*)
Eric J. Weiss (*Pro Hac Vice*)
Mallory Gitt Webster (*Pro Hac Vice*)
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Email: JKaplan@perkinscoie.com
Email: EWeiss@perkinscoie.com
Email: MWebster@perkinscoie.com
Telephone: 206-359-8000
Facsimile: 206-359-9408
Attorneys for Amazon Services, LLC

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>POTENTIAL DYNAMIX, LLC,<br><br>Debtor.<br><hr>TIMOTHY H. SHAFFER, Chapter 11 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>AMAZON SERVICES, LLC,<br><br>Defendant. | Case No. 2:11-BK-28944-DPC<br><br>Chapter 11<br><br>Adv. No. 2:13-ap-00799<br><br>**Joint Pretrial Statement**<br><br>DATE:      February 16, 2021<br>TIME:       9:00 AM<br>Location:   230 North First Avenue<br>            Phoenix, Arizona<br>            Courtroom 603, 6th Floor<br><br>(Zoom Remote Video) |

1

# TABLE OF CONTENTS

**Page**

I.  NATURE OF THE CASE ................................................................ 1
    A.  Trustee's Statement .................................................... 1
    B.  Amazon's Statement ................................................... 2
    C.  Jurisdictional Statement ............................................ 14
II.  UNDISPUTED MATERIAL FACTS ......................................... 14
III.  CONTESTED MATERIAL FACTS ASSERTED BY TRUSTEE ...................... 18
IV.  CONTESTED MATERIAL FACTS ASSERTED BY AMAZON ...................... 49
V.  MATERIAL ISSUES OF LAW ................................................ 91
    A.  Agreed Issues of Law .............................................. 91
    B.  Trustee's Statement of the Issues of Law and Amazon's Response ........... 99
    C.  Amazon's Statement of the Issues of Law and the Trustee's Response ..................................................... 107
VI.  TRUSTEE'S WITNESSES ................................................. 116
VII.  AMAZON'S WITNESSES ................................................ 116
VIII.  STIPULATIONS REGARDING WITNESSES ............................. 118
IX.  STIPULATED EXHIBITS ................................................ 118
X.  TRUSTEE'S EXHIBITS ................................................... 118
XI.  AMAZON'S EXHIBITS .................................................. 119
XII.  DEPOSITION DESIGNATIONS ......................................... 119
    A.  Trustee's Deposition Designations ............................. 119
    B.  Amazon's Deposition Designations. ............................ 119
XIII.  PARTIES ESTIMATE OF TIME NEEDED FOR TRIAL ................. 120
XIV.  CERTIFICATION REGARDING EXHIBITS ........................... 120

1   The Chapter 11 Trustee Timothy Shaffer (the "Trustee") and Amazon Services, LLC

2   ("Amazon") hereby file this Joint Pretrial Statement.

3   **I.      NATURE OF THE CASE**

4           **A.      Trustee's Statement**

5           In this action, the Trustee seeks to recover damages stemming from Amazon's

6   inventory storage and sales services provided to the debtor Potential Dynamics, LLC

7   ("DAB" or "Debtor") through Amazon's Fulfillment By Amazon ("FBA") program between

8   January 1, 2008 and January 31, 2014. Through the FBA program, DAB entrusted inventory

9   to Amazon for which Amazon did not fully account or fully compensate DAB. The Trustee

10  also seeks damages for Amazon's April 2013 violation of the stay imposed by 11 U.S.C. §

11  362(a). The Trustee seeks damages based on breach of contract and for turnover pursuant

12  to 11 U.S.C. § 542.

13          The Amazon Business Services Agreement (the "FBA Agreement") required

14  Amazon to keep track of DAB's inventory and made Amazon strictly liable to pay DAB

15  the replacement cost for any inventory lost or damaged while under Amazon's control.

16  Based on the "M15 Data" produced by Amazon, the parties agree that, while DAB

17  participated in the FBA Program, Amazon received 6,316,249 units of DAB inventory, of

18  which DAB sold 5,978,113 units.

19          The parties' dispute centers on the remaining 338,316 units of inventory. The parties

20  agree that Amazon reimbursed DAB for some of those units, but they disagree on the

21  remaining liability Amazon has. There are several components to that dispute. The first

22  component is "expected ending inventory": the units of inventory that should have been

23  left—but for unknown reasons was not—after accounting for sales, customer returns,

24  inventory returned to DAB, and miscellaneous "adjustments." A second component is

25  inventory "shrinkage": inventory that, based on Amazon's own records, was known to have

26  been lost or damaged. A third category is unpaid "refund reimbursements": reimbursements

1  due DAB when a customer cancelled a sale but Amazon failed to return the unsold inventory

2  to DAB. A fourth category is product sales proceeds that Amazon failed to remit to DAB.

3        In the opinion of the Trustee's expert, Ms. Morones, Amazon remains liable to pay

4  DAB $1,517,447 as the replacement cost for 111,688 units of missing, lost or damaged

5  inventory, net of the $304,276 Amazon has already paid for inventory reimbursements.

6  ($1,821,723 - $304,276). Per Ms. Morones, Amazon is also liable to pay DAB $195,721

7  for unpaid refund reimbursements due DAB and $1,156,495 for inventory sales proceeds

8  not remitted to DAB.

9        In addition to the 111,688 inventory units on which Ms. Morones opined, there are

10  another 147,968 units of inventory that Amazon determined were unsellable, but Amazon

11  says it cannot determine who is liable for such; Amazon identifies this inventory with a

12  "Code Q." DAB contends that, since the Code Q units became unsellable while under

13  Amazon's control, Amazon is also liable for their replacement cost.

14        Finally, DAB contends and Ms. Morones opines that Amazon is liable to DAB for

15  $732,000 of lost profits as a result of Amazon's violation of the bankruptcy stay.

16    **B.    Amazon's Statement**

17        *1.    This Case Is About Allegedly "Lost Inventory" and Whether Amazon
             Reimbursed for Such Loss.*

18  This case is not nearly as complicated as it might seem.

19  This is a simple case involving approximately 38,000 "missing" units of inventory

20  that the Trustee alleges Amazon "Lost" while DAB participated in the Fulfillment by

21  Amazon ("FBA") program. *See* Tr. Ex. 201 ("Compl.") ¶¶ 21–25, 44–46, 56–58 (July 9,

22  2013); Tr. Ex. 223 (DAB's inventory manager identifying "38,040" allegedly missing units

23  in an internal audit); Tr. Ex. 259, Ex. A ("Williams Rpt.") at 8–9, 15–17 (noting that the

24  relevant data shows there are "at most 36,972 units" of inventory at issue; Tr. Ex. 259

25  ("Williams Tr. Decl.") ¶ 31 (same); Tr. Ex. 7 ("Morones Rpt.") (calculating 39,331 units of

26  "expected ending inventory"). That number of units is only about 0.5% of the total 6.3

million inventory units that DAB shipped to Amazon over a six-year period. DAB was a high-volume low-dollar seller, and the inventory units at issue are, for the most part, small items with expiration dates like bottles of supplements and packets of protein powder.

Amazon's policies acknowledge that Amazon is responsible for inventory units that Amazon misplaces in the FBA program, including those approximately 38,000 units at issue. Tr. Ex. 1 ¶ F.4; Tr. Ex. 260 at 1. But as Amazon has explained for years now, Amazon already reimbursed—and in fact over-reimbursed—DAB for the 38,000 units in real time during their business relationship. Williams Rpt. at 8–9, 15–19, 36; Williams Tr. Decl. ¶¶ 6–8, 31. Amazon either paid DAB for lost units or transferred units of the same inventory from Amazon's own inventory account to DAB's account. *Id.* It's right there in the data; the parties don't dispute the figures.

But in 2012, when DAB's inventory manager decided years later to audit DAB's entire inventory history, he concluded that Amazon still owed for the 38,000 units because he mistakenly did not account for the data showing Amazon's reimbursements. Tr. Exs. 223–224; S. Lawcock Dep. 205:21–206:24. He admitted during his deposition that he omitted those reimbursements. S. Lawcock Dep. at 205:21–206:24. It was a simple mistake that Amazon would have immediately explained if DAB had asked.

But instead of asking, DAB's CEO, facing financial decline and corporate collapse, asked his inventory manager how they could inflate the already-mistaken claim. The inventory manager responded that DAB could make a "more dramatic case" for reimbursement by "leaving out the overages" in the data that were favorable to Amazon. Tr. Ex. 223. In other words, DAB could artificially make it look like Amazon owed for even more than 38,000 units if the data that DAB provided Amazon erased all of the inventory overages favorable to Amazon.

And that is precisely what DAB did. Rather than submitting to Amazon a reimbursement claim for the 38,000 units that DAB mistakenly believed it had identified,

DAB submitted to Amazon a claim ten times larger: 391,083 "missing" or "lost/misplaced" units, the vast majority for which DAB *knew* that Amazon was not responsible. *Compare* Tr. Ex. 223 (identifying 38,040 missing units), *with* Tr. Ex. 11 at 5 (making claim to Amazon for total of 391,083 "lost/misplaced" units). DAB valued that claim at $10.5 million. A few months later, DAB submitted another false claim for $4.1 million. Tr. Ex. 10 at 3 (identifying 151,871 "missing units").

Compounding the attempted fraud, DAB's CEO did not inform the Trustee that he had ordered his inventory manager to falsely inflate the reimbursement claim to Amazon. T. Shaffer Dep. (Apr. 29, 2019), at 181:17–183:20, 184:7–10; Tr. Ex. 12. Instead, the Trustee understood that DAB had sent to Amazon its claim for $1 million, which was consistent with DAB's mistaken beliefs that it was still owed for approximately 38,000 "missing" units and that each unit was valued at an average of $27. T. Shaffer Dep. (Apr. 29, 2019), at 181:17–183:20, 184:7–10; Tr. Ex. 12. (The Trustee's understanding is consistent with the allegation in the Complaint. The Trustee's expert has since revised his position to $16.31 per unit, further reducing the Trustee's claim.)

In fact, the Trustee specifically asked the CEO in writing, "When was the exact date(s) when [DAB] submitted the $1,000,000 inventory claim?" Tr. Ex. 12. But rather than reveal that he had instructed his inventory manager to lie to Amazon, the CEO lied this time to the Trustee, providing only the date that DAB submitted the $10.5 million claim— because DAB *never* submitted to Amazon a claim for $1 million. *Id.* The Trustee did not learn of the fraudulent claims until his deposition in April 2019—when Amazon showed him the documents recording the attempted fraud. T. Shaffer Dep. (Apr. 29, 2019), at 184:7–10.

At the time, Amazon did not know that the data DAB had provided had been intentionally modified, and Amazon accepted DAB's reimbursement claims in good faith and even began paying on them. *See* Tr. Ex. 12 (noting that Amazon had paid over $100,000

4

in reimbursements before Amazon "woke up" and "took note"). In a quick, back-of-the-envelope analysis of the $4.1 million claim relying on the false data that DAB provided, Amazon employee Diana Flores determined that the claim was at least 61% percent less than DAB had asserted (at most about $1.6 million) and also said that Amazon needed to further review the claim. Tr. Ex. 10 at 1–2. The Trustee, however, ignored the full message, latching on to the statement that Amazon may have been responsible for some amount of the claim—approximately the same amount that DAB mistakenly thought it was in fact owed for the "missing" units that had already been reimbursed. T. Shaffer Dep. (Apr. 29, 2019) at 40:17–41:10 (claiming that Amazon has "already admitted" that it owed more than $1.5 million for lost inventory based on Ms. Flores's preliminary analysis).

To attempt to unravel what it did not yet know was an attempted fraud, Amazon performed a comprehensive analysis of the Debtor's inventory of its top 100 products, amounting to 62% of the Debtor's total inventory for which there was a potential discrepancy. Tr. Ex. 134 at 16–18 (detailing "Deep Dive" analysis); Tr. Ex. 112 ¶¶ 5–8 (same); J. Ice Dep. at 139:16–140:21, 142:16–144:2, 149:23–150:11, 151:24–152:25, 158:2–159:7, 182:20–185:16, 189:8–25, 193:9–194:12 (same). Amazon referred to this process as a "Deep Dive." Tr. Ex. 112 ¶¶ 5–8. The Deep Dive was intended to serve as a benchmark to assess the potential total reimbursement amount. The Deep Dive consumed approximately two full-time work weeks of two Amazon employees. Tr. Ex. 112 ¶¶ 5–8. The analysis revealed that the potential gross reimbursement amount for those top 100 products was about $27,000. Tr. Ex. 134 at 16–18. And applying the rate from those products to the remaining 38% of the Debtor's inventory showed a total estimated reimbursement amount of approximately $44,000—far even from the $1 million submission the Trustee thought DAB had submitted to Amazon. *Id.*; *see also* Tr. Ex. 12.

Having been told by DAB's CEO that Amazon owed over $1 million for "missing" units (because the reimbursements had been omitted from DAB's original audit), the

1   Trustee did not accept the Deep Dive analysis. So Amazon proceeded to produce in May

2   2015 additional data for the entirety of the Debtor's inventory in the FBA program. This

3   data is what the parties have used throughout the litigation and refer to as the "M15 data."

4   Compiling and producing the M15 data was an even more enormous task than preparing

5   the Deep Dive, requiring hundreds of hours of Amazon staff time and considerable financial

6   expense to retrieve millions of rows of transactional data. T. Bachand Expected Tr. Test.;

7   *see also* Tr. Ex. 112 ¶¶ 9–10. The M15 data is the most complete information known to be

8   available to account for the Debtor's "Lost Inventory" as alleged in the Complaint and

9   dating back to 2008. T. Bachand Expected Tr. Test.; *see also* Tr. Ex. 118 at 6.

10          As Amazon's witnesses, including its expert witness, will testify, the M15 data

11   confirm that Amazon in fact reimbursed the Debtor for the original 38,000 units that DAB

12   thought were "missing" and that the Trustee alleged in his Complaint were "Lost

13   Inventory." Williams Rpt. at 17–19; Williams Tr. Decl. ¶¶ 6–8, 31. Indeed, if there is one

14   constant in this entire adversary proceeding, it is the parties' general agreement on the

15   number of units of "Lost Inventory" before considering Amazon's reimbursements:

16   approximately 38,000. The Trustee's testifying expert, Serena Morones, calculated 39,331

17   units as "Expected Ending Inventory"—the inventory that was allegedly lost at the end of

18   Amazon and DAB's relationship. Morones Rpt. at 13. The Trustee's formerly identified

19   testifying expert, Stephen Ashworth, calculated the same number of units of "Ending

20   Inventory"—39,331. Tr. Ex. 237 at 7. Amazon's rebuttal expert, E. Weiant Williams,

21   calculated 36,972 as the maximum possible number of units that could have been "lost"

22   (before taking into consideration inventory adjustments and reimbursements). Williams

23   Rpt. at 8–9, 15–17; Williams Tr. Decl. ¶ 31. And at the hearing last month on Amazon's

24   motion to exclude Ms. Morones's testimony, the Trustee's counsel stated again that 38,000

25   is the number of inventory units that the data identify as lost.

26          The evidence shows that far from some conspiracy to withhold money from DAB,

DAB's actions led the parties here. DAB was responsible for tracking the inventory that it sent to Amazon over six years but made only passing effort to do so before entering bankruptcy. *See, e.g.*, S. Lawcock Dep. at 22:20–24:15, 57:6–59:1, 62:12–63:10, 78:7–82:13, 91:8–93:23, 113:15–116:16, 144:24–159:7, 159:15–165:15, 165:20–176:4, 188:20–193:20 (DAB's inventory manager describing DAB's limited inventory tracking systems, difficulty with inventory management, and lack of any internal inventory tracking before filing for bankruptcy); T. Reilly Dep. at 38:10–40:18 (DAB's COO testifying that DAB's inventory management processes were "[e]xtremely low quality"); D. Bellino Dep. at 35:18–22, 72:11–73:3, 305:10–13, 312:3–9, 315:20–316:22, 321:2–8, 321:16–21 (DAB's CEO repeatedly testifying that he did not know or could not remember how DAB managed or tracked inventory); Tr. Exs. 203–207, 210–213, 218–221, 230 (exemplifying DAB's history of inventory management issues). DAB submitted to Amazon the fraudulent reimbursement claims and then lied to the Trustee about them. T. Shaffer Dep. (Apr. 29, 2019), at 181:17–183:20, 184:7–10. DAB routinely switched its products between Amazon programs without adequately tracking those changes and failed to provide listings for their products that complied with Amazon's product listing requirements, which left thousands of units with expiration dates sitting in fulfillment centers waiting for DAB to make them available for sale. *See, e.g.*, E. Soder Dep. at 144:9–146:13 (Amazon employee providing examples of DAB's inventory issues); D. Bellino Dep. at 182:15–184:1 (DAB's CEO testifying that DAB routinely switched products between Amazon programs); Tr. Exs. 206, 212–213 (emails detailing DAB's inventory and listing issues). DAB's CEO frequently shipped customers or Amazon the wrong inventory in his haste to "win" sales, and DAB's COO testified that, based on his experience working at DAB, the allegations in the Complaint are "highly unlikely." T. Reilly Dep. at 200:4–201:15 (describing CEO's practice of shipping the wrong inventory), 148:6–149:4 (DAB's COO opining that DAB's lost inventory claim is "highly unlikely"); Tr. Exs. 207, 230 (emails showing DAB making

errors in haste to win sales). As DAB grew rapidly, it could not sustain its growth and in the process failed not only to track its own inventory but also to implement internal controls and comprehend the dynamics of managing inventory and a warehouse. Tr. Ex. 222 at 4–6 (bankruptcy filing detailing DAB's decision to declare bankruptcy). That is why the parties are here, not because of something Amazon did or did not do.

Indeed, in order for the Trustee to be correct, he would have to prove a conspiracy showing that Amazon somehow systematically shortchanged DAB for hundreds of thousands of additional units at millions of dollars over many years without DAB ever noticing or ever reporting it, a feat that would have required the coordination and bad faith of dozens of Amazon employees in Fulfillment Centers throughout the country. There is no basis in the evidence to support any such theory.

### 2. The Trustee's Claims in the Complaint Are for the Allegedly "Lost Inventory."

The main question for the Court at trial is whether Amazon appropriately reimbursed DAB for the allegedly lost inventory units. The answer is yes.

The Trustee alleges in his Complaint that Amazon lost some of DAB's inventory units without adequately reimbursing DAB for the loss, in breach of the parties' agreement. *See* Compl. ¶¶ 44–46, 56–58. The Trustee also asserts a claim for turnover of the allegedly lost inventory units, but the Trustee has not litigated that claim or explained how it differs from the Trustee's contract claim. *Id.* ¶¶ 18–25; 11 U.S.C. § 542.

The Trustee will not, however, be able to prove those claims for the roughly 38,000 lost inventory units at issue. The M15 data show that Amazon more than complied with its contractual requirements by over-reimbursing DAB over the course of their business relationship for certain inventory loss. Williams Rpt. at 8–9, 15–19, 36; Williams Tr. Decl. ¶ 6–8, 31; T. Bachand Expected Tr. Test. Amazon also provided daily records of DAB's inventory and twice provided detailed and resource-intensive "accountings" of that same inventory, one of which was the M15 data itself. T. Bachand Expected Tr. Test; Tr. Ex. 112

¶¶ 5–10 (describing Deep Dive and M15 data production).

The only other issue remaining for the Court—distinct from the issue of "Lost Inventory"—is the amount Amazon owed to DAB for the 15-day period during the automatic stay when Amazon suspended DAB's selling privileges because DAB serially sold prohibited products. Tr. Ex. 231 at 3–7 (citing 11 U.S.C. § 362(a)). On that issue, the Trustee's evidence of DAB's purported damages is ridden with errors and based on inaccurate assumptions.[1] T. Shaffer Expected Tr. Test.; S. Morones Expected Tr. Test.

Amazon will not pursue at trial affirmative claims for damages against the Trustee, consistent with Amazon's counterclaims for setoff and recoupment. Am. Answer, ECF No. 35 (June 13, 2014) at 9–10. Amazon intends, however, to introduce evidence showing that Amazon over-reimbursed DAB for lost inventory units and that Amazon must be credited for those over-reimbursements. Williams Rpt. at 8–9, 15–19, 36; Williams Tr. Decl. ¶¶ 6–8, 31.

### 3. The M15 Data Are the Only Data for the Court to Consider in Evaluating the Trustee's "Lost Inventory" Claims.

The M15 data that account for DAB's inventory units are the sole data (along with the experts' testimony about that data) that the Court must evaluate to assess the loss of inventory units and Amazon's reimbursement for those units. The M15 data cover the entirety of DAB's millions of inventory units in the FBA program over six years. T. Bachand Expected Tr. Test. The M15 data are the most complete information known to be available to account for DAB's inventory units and address the allegations in the Trustee's Complaint. *Id.*; Tr. Ex. 118 at 6.

The M15 data include information for DAB's Receipts, Sales, Returns, Removals,

---

[1] As Amazon has already briefed the Court and will present at trial, Ms. Morones's testimony is unreliable, is inconsistent with generally accepted methods in her field, is not based on sufficient facts or data, does not account for obvious alternative explanations, is derived from incomplete data, and lacks credibility. And as Mr. Williams will demonstrate, her conclusions are also inaccurate.

9

1  Adjustments, and Reimbursements. T. Bachand Expected Tr. Test. That allows the
2  identification of "Lost Inventory" through the following formula: Receipts - Sales + Returns
3  - Removals +/- Adjustments - Reimbursements. *Id.*; Williams Tr. Decl. ¶ 31; Tr. Ex. 256
4  (depicting example inventory calculation using Amazon's inventory formula). The parties
5  agree on that formula and do not dispute the reimbursement figures in the M15 data.

6      Any positive number of units after applying the formula would show units that the
7  parties would expect to still be in DAB's inventory at Amazon and would therefore be lost.

8      Applying the data to the formula shows, however, that Amazon owes nothing more
9  for lost inventory because Amazon over-reimbursed DAB during the business
10 relationship—an outcome consistent with Amazon's practice of reimbursing in real time
11 and reimbursing sellers where there may be ambiguity about fault. Williams Rpt. at 8–9,
12 15–17; Williams Tr. Decl. ¶¶ 6–8, 31; T. Bachand Expected Tr. Test.

13          *4.      Because the Data Show that the Trustee Is Entitled to Nothing for*
                 *Lost Inventory, the Trustee Has Attempted to Assert Several New*
14               *Claims and Irrelevant Issues that the Court Should Disregard.*

15      As Amazon's case chronology shows, once the Trustee recognized that the data show
16 that the he is entitled to nothing because Amazon already over-reimbursed DAB for lost
17 units, the Trustee started to assert new claims that are not in his Complaint and were never
18 covered by written or oral discovery. *See* Tr. Ex. 255 (case chronology identifying key
19 events that resulted in Trustee's untimely claims); Tr. Ex. 258 (chart detailing Trustee's
20 untimely and unpleaded claims and damages theories); Amazon Mot. to Exclude Untimely
21 and Unpleaded Damages Claims and Theories, ECF No. 268 (Nov. 11, 2020). The Court
22 need not—and should not—address those new claims at trial; they should be excluded. Tr.
23 Ex. 258; Amazon Mot. to Exclude Untimely and Unpleaded Damages Claims and Theories,
24 ECF No. 268 (Nov. 11, 2020). They are a distraction and an improper attempt to extract
25 millions of dollars from Amazon to which the Trustee is not entitled.

26

The Trustee has attempted to assert five new claims that are not included in his Complaint: (1) unremitted sales proceeds, (2) unpaid refund reimbursements, (3) damaged and "misreceived" inventory, (4) the return of fees that DAB paid to Amazon for participation in the FBA program, and (5) inventory units to which a "Code Q" adjustment was applied at some point. *See* Morones Rpt. at 13–18 (detailing new claims for unremitted sales proceeds, unpaid refund reimbursements, and damaged and "misreceived" inventory); Trustee's Oct. 26, 2020, Supp. Disc. at 2–5 (adding new claims for return of fees and "Code Q" adjustments); Tr. Ex. 258 (chart detailing Trustee's untimely and unpleaded claims and damages theories). Together, the unpleaded claims (plus prejudgment interest) account for at least $10 million—69%—of the Trustee's now-asserted damages of $14,483,638. Tr. Ex. 258; Trustee's Oct. 26, 2020, Supp. Disc. at 2–5. That means that nearly three-quarters of the Trustee's asserted damages are for claims not in his Complaint and for which no discovery has been exchanged.

To be clear, none of these five new claims or any terms associated with them appear in the Complaint. Tr. Ex. 258. The Trustee's claims in the Complaint are related to "Lost Inventory" (and any damages from the 15-day period that DAB was suspended from selling on amazon.com). *See* Compl. ¶¶ 21–25, 44, 55–58. The Trustee instead identified some of the new claims in a bare March 2019 "second supplemental disclosure" and an October 2020 additional supplemental disclosure—after discovery had closed, without supplementing his prior discovery productions or responses, and when Amazon no longer had an opportunity to conduct discovery on the claims. *See* Tr. Ex. 258; Tr. Ex. 119 at 1–2, Ex. A; Trustee's Oct. 26, 2020 Supp. Disc. at 4–5. The disclosures themselves had almost no details about the new claims, often providing names and figures only. *See* Tr. Ex. 119 at 1–2, Ex. A; Trustee's Oct. 26, 2020 Supp. Disc. at 4–5. Even Ms. Morones has provided no opinions and no analysis about the October 2020 claims for recoupment of fees or for "Code

11

1  Q" units, further confirming that the Trustee has continued to change his approach as the

2  evidence has undermined his positions. *See generally* Morones Rpt.; Tr. Ex. 258.

3       The Trustee also asserts that Amazon did not produce certain data and information,

4  like "settlement reports," that might be relevant to his unpleaded claims. But of course

5  Amazon did not produce such materials because they do not address the claims in the

6  Complaint—the document that controls this proceeding—and the Trustee never sought

7  them in discovery. Amazon could not have been expected to know that the Trustee would

8  years later assert claims in disclosures or know in advance of the disclosures what

9  information could possibly be relevant and proportional to such unpleaded, untimely claims.

10  *See* Tr. Ex. 258 (identifying which of the Trustee's claims are based on an improper data

11  source).

12       The settlement reports are a prime example. Those reports show, among other things,

13  payments that Amazon made to DAB; they do not show how many DAB units may have

14  been "lost." S. Morones Expected Tr. Test.; T. Bachand Expected Tr. Test.[2] That is why

15  Amazon did not produce them or even know until seeing Ms. Morones's report (after

16  written discovery) how the Trustee was attempting to use them. And the settlement reports

17  that the Trustee has used for the untimely unremitted-sales and unpaid-refund claims

18  contain six 48-hour periods for which data provided by the Trustee's former expert witness

19  is missing. Williams Rpt. at 4, 10–11, 25–26; Williams Tr. Decl. ¶¶ 17–18; S. Ashworth

20  Dep. at 56:12–24, 90:21–93:4; 94:8–95:2; J. Cone Dep. at 114:15–121:9; S. Morones

21  Expected Tr. Test. But data covering those six periods in fact exists and Amazon produced

22  them to the Trustee (with Bates numbers). Tr. Exs. 247–252 (missing settlement report text

23  files); Tr. Ex. 254 (detailing $1,363,782 in payments included in the missing Settlement

24  Reports). The Trustee's consulting expert testified that he was simply unable to download

25

26       [2] Amazon intends to offer this testimony only if the Court denies Amazon's motion
to exclude the Trustee's untimely claims.

1  that data because his computer "timed out" when he tried to do so. S. Ashworth Dep. at

2  92:10–93:4. Thus, even though all of the Trustee's experts knew they were missing

3  settlement reports from their own attempt to download them, Ms. Morones did not reveal

4  those omissions in her expert report and then concluded that Amazon must owe DAB

5  money because there was no data in those periods showing payments. S. Morones Expected

6  Tr. Test.; S. Ashworth Dep. at 56:12–24, 90:21–93:4; 94:8–95:2; J. Cone Dep. at 114:15–

7  121:9.

8      Neither the Trustee nor his experts ever requested that Amazon produce those six

9  missing settlement reports. Amazon only learned that the Trustee and his expert were using

10  incomplete data when the Trustee finally produced the incomplete set of settlement reports

11  Ms. Morones relied on in her report. Once the Trustee produced those settlement reports,

12  Amazon's expert was able to identify those omissions. Williams Rpt. at 4, 10–11, 25–26;

13  Williams Tr. Decl. ¶¶ 17–18.

14      Moreover, and more importantly, the settlement reports are not probative of

15  addressing the claim in the Trustee's Complaint that Amazon owes for "Lost Inventory."

16  Tr. Ex. 258. If they were, Amazon would have produced them years ago. The data that is

17  appropriate to address the Trustee's pleaded claim is the M15 data; that is precisely why

18  Amazon compiled and produced the M15 data. T. Bachand Expected Tr. Test.; Tr. Ex. 112

19  ¶¶ 9–10; Tr. Ex. 118 at 6. Accordingly, the Court should not consider the settlement reports

20  in evaluating the Trustee's claim for "Lost Inventory." Tr. Exs. 255, 258; Amazon Mot. to

21  Exclude Untimely and Unpleaded Damages Claims and Theories, ECF No. 268 (Nov. 11,

22  2020).

23      Finally, the Court will likely encounter a host of irrelevant terms and phrases invoked

24  by the Trustee, including "transship," "commingled inventory," "virtual inventory," "ASIN

25  merges," and "proprietary algorithm." Those terms only confuse the issues that are

26  relevant—how many inventory units were lost and reimbursed—and distract from what the

13

1  M15 data show—that Amazon over-reimbursed DAB. The Court need not wade into those

2  issues to address the Trustee's claims in the Complaint.

4      ### C.  Jurisdictional Statement

5      The parties "have stipulated that this Court has jurisdiction to enter final orders in

6  [this] adversary case adjudicating and disposing of all core and non-core claims set forth by

7  the [Trustee] under counts one through nine contained in the [Trustee's] July 9, 2013

8  complaint commencing this action."[3] Stip., ECF No. 60 (May 27, 2015) at 1–2.

9  ## II.  UNDISPUTED MATERIAL FACTS

10      The Parties stipulate to the following facts but reserve the right to object to the

11  admission of any stipulated fact as irrelevant.

12      The Parties stipulate to the following facts but reserve the right to object to the

13  admission of any stipulated fact as irrelevant.

14      1.  Amazon offers for sale products to customers via amazon.com.

15      2.  Amazon also allows third-party sellers to offer products for sale to customers

16  on amazon.com.

17      3.  Debtor Potential Dynamix LLC ("DAB" or the "Debtor") was formed as a

18  retailer or merchant in 2006 in a basement in Springfield, Missouri, by Daniel A. Bellino

19  and Matthew J. Schmidt.

20      4.  On October 13, 2011, DAB filed for Chapter 11 bankruptcy.

21      5.  On January 27, 2012, Mr. Shaffer was appointed as bankruptcy trustee.

22      6.  From 2006 to 2013, DAB sold products on amazon.com via the Amazon

23  Merchant Fulfilled Network ("MFN"). From 2008 to 2013, DAB sold products on

24  Amazon's Fulfillment by Amazon ("FBA") program and the MFN. DAB primarily listed

26      [3] The Court previously dismissed counts four, six, seven, eight, and nine. Order, ECF No. 91 (Sept. 16, 2015) at 2–3.

for sale on amazon.com supplements and personal-care products.

7.  Through the MFN program, sellers offer for sale items on amazon.com but ship items themselves and handle their own customer service.  The Trustee's inventory claims pertain to DAB's participation in the FBA program.

8.  Through the FBA program, third-party sellers ship inventory to Amazon and offer that inventory for sale on amazon.com, and the seller pays Amazon to receive, pick, pack, ship, and provide customer service for the seller's products.

9.  Amazon makes available a seller-accessible web-based interface called Seller Central that provides regular inventory updates to FBA sellers and online reports of sellers' daily product sales and inventory transactions. Seller Central does not provide access to all historical transactional records relating to a seller's account, but it allows sellers to access a host of inventory data.

10.  In May 2015, Amazon produced a dataset to the Trustee that compiled transactional data for DAB's inventory events over products sold by DAB through the FBA program. The M15 data consists of six separate data file sets: receipts, sales, returns, removals, adjustments, and reimbursements.

11.  "Adjustments" describe inventory events such as inventory that has been damaged, destroyed, lost, or found. Amazon's inventory data records and tracks adjustments using "reason codes," which are letters or numbers assigned to identify different types of adjustments. For example, Code "D" represents a destroyed inventory unit adjustment, Code "M" represents a missing inventory unit adjustment, and Code "F" represents a found inventory unit adjustment.

12.  Adjustments can increase or decrease a seller's inventory balance or sometimes have no net effect on a seller's total inventory balance.

13.  Reimbursements are payments by Amazon to a seller or transfers by Amazon of the same inventory to a seller's account.

14. The M15 data show that DAB shipped a large variety of products to Amazon as part of DAB's participation in the FBA program. Amazon assigns a unique number to all of the products sold on amazon.com called an "ASIN." The M15 data show that, between 2008 and 2013, Amazon received 6,316,429 items from DAB with 31,116 ASINs.

15. According to the M15 data, from 2008 to 2013, DAB sold 5,978,113 units through the FBA Program, with gross sales of around $128 million.

16. According to the M15 data, from 2008 to 2013, Amazon received 63,452 customer returns of DAB's products.

17. The parties disagree about how to attribute the Removals identified in the M15 data for purposes of reconciling DAB's inventory. Specifically, the Trustee asserts that inventory units removed to the Debtor or destroyed after January 2014 should not be included in an analysis of DAB's inventory, but Amazon asserts that there is no basis for the Trustee's exclusion of units removed after that date and that any analysis of the Debtor's ending inventory must include all units returned or destroyed after January 2014. The parties disagree about how to interpret and attribute the Adjustments identified in the M15 data for purposes of reconciling DAB's inventory

18. On April 11, 2013, Amazon revoked DAB's privileges to sell products on amazon.com.

19. The Court determined that Amazon was not entitled to revoke DAB's seller privileges during the pendency of the automatic stay without first receiving Court approval and ordered Amazon to restore DAB's selling privileges, which Amazon did on April 26, 2013.

20. In total, DAB was unable to sell on amazon.com for 15 days—from April 11 to April 26.

21. On September 18, 2013, the Court granted Amazon authority to terminate its contract with DAB.

22. In accordance with the Court's order, on October 22, 2013, Amazon terminated its contract with DAB.

23. DAB sold products on amazon.com from April 26, 2013, until October 22, 2013. DAB ceased operations at the end of January 2014.

24. The relationship between Amazon and DAB was governed by the terms of the Merchants@Amazon.com Program Agreement ("MAPA") and the Amazon Services Business Solutions Agreement ("ASBSA") (collectively, the "Agreement"). The parties disagree about the relationship between these two agreements.

25. The MAPA and the ASBSA are valid, enforceable agreements.

26. The ASBSA includes the following provision regarding Amazon's obligation to track inventory received for sale via the FBA program:

> We will keep electronic records that track inventory of Units by identifying the number of Units stored in any fulfillment center.

27. The ASBSA includes the following provision regarding Amazon's responsibility for any loss or damage to inventory:

> If there is a loss of or damage to any Units while they are being stored, we will, as your sole remedy, pay you the Replacement Value (as described and defined in the FBA Guidelines)…. Payment of the Replacement Value is our total lability for any duties or obligations that we or our agents or representatives may have as a bailee or warehouseman, and your only right or remedy that you may have a bailor.

28. The ASBSA also includes the following limitation of liability clause:

> OUR AGGREGATE LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED WILL NOT EXCEED AT ANY TIME THE TOTAL AMOUNTS DURING THE PRIOR SIX MONTH PERIOD PAID BY YOU TO AMAZON IN CONNECTION WITH THE PARTICULAR SERVICE GIVING RISE TO THE CLAIM.

The parties disagree on the applicability, interpretation, and enforceability of this limitation of liability clause.

29. The ASBSA also includes the following disclaimer:

IN ADDITION TO THE DISCLAIMER IN SECTION 7 OF THE BUSINESS SOLUTIONS AGREEMENT, WE HEREBY DISCLAIM ANY DUTIES OF A BAILEE OR WAREHOUSEMAN, AND YOU HEREBY WAIVE ALL RIGHTS AND REMEDIES OF A BAILOR (WHETHER ARISING UNDER UNITED STATES COMMON LAW OR STATUTE OR OTHERWISE), RELATED TO OR ARISING OUT OF ANY POSSESSION, STORAGE OR SHIPMENT OF YOUR PRODUCTS BY US OR OUR AFFILIATES OR ANY OF OUR OR THEIR CONTRACTORS OR AGENTS.

## III. CONTESTED MATERIAL FACTS ASSERTED BY TRUSTEE

### A. Under the FBA Agreement, Amazon was responsible to keep track of PD's inventory and was strictly liable for any inventory lost or damaged while under Amazon's control.

1.     Between 2008 and 2013, DAB sold its products to buyers through Amazon's FBA program. DAB sold a huge variety of merchandise: according to Amazon's M15 Data, DAB sold 31,166 distinct products, all of them generally in the health and beauty category. Amazon assigned a unique number to each product, an "ASIN." An "ASIN" refers to an "Amazon Standard Identification Number."

> *Amazon Response*: The alleged fact is duplicative of facts included in the agreed fact outlined above and is, therefore, unnecessary.

2.     The relationship between Amazon and DAB was in part governed by the terms of the "Amazon Services Business Solutions Agreement," often called the FBA Agreement.

> *Amazon Response*: The alleged fact is duplicative of facts included in the agreed fact outlined above and is, therefore, unnecessary.

3.     Amazon's M15 data show that between 2008 and 2013 DAB sold 5,978,113 units of inventory through the FBA Program, with gross sales of around $128 million.

18

1

> *Amazon Response*: The alleged fact is duplicative of facts included in the
2
> agreed facts outlined above and is, therefore, unnecessary.

3

4    4.    Under the FBA Program, a seller such as DAB shipped its products to a

5  Fulfillment Center warehouse and advertised the products through Amazon's Website.

6

> *Amazon Response*: The alleged fact is duplicative of facts included in the
7
> agreed facts outlined above and is, therefore, unnecessary.

8

9    5.    Once a seller's products arrived in a Fulfillment Center, Amazon agreed to

10  keep track of the seller's inventory. As the FBA Agreement says:

11

12  > We will provide storage services as described in these FBA Service Terms
> once we confirm receipt of delivery. We will keep electronic records that
13  > track inventory of Units by identifying the number of Units stored in any
> fulfillment center.
14

> *Amazon Response*: The alleged fact is duplicative of facts included in the
15
> agreed facts outlined above and is, therefore, unnecessary.
16

17

18    6.    In addition, Amazon agreed to be liable for any loss or damage to the

  inventory:
19

20  > If there is a loss of or damage to any Units while they are being stored, we
> will, as your sole remedy, pay you the Replacement Value (as described
21  > and defined in the FBA Guidelines).... Payment of the Replacement Value
> is our total liability for any duties or obligations that we or our agents or
22  > representatives may have as a bailee or warehouseman, and your only right
> or remedy that you may have a bailor.
23

24  > *Amazon Response*: The alleged fact is duplicative of facts included in the

25  > agreed facts outlined above and is, therefore, unnecessary.

26

1          7.     An FBA Lost and Damaged Inventory Reimbursement Policy document

2    states, among other things, that "Amazon assumes responsibility when your inventory is

3    lost or damaged by a partnered carrier, in an Amazon fulfillment center, or during delivery

4    to a customer." In such cases," the document says, "we will either replace the item with one

5    with the same FNSKU," that is, "Fulfillment Network SKU," or "reimburse you the

6    estimated proceeds of the sale of that same item."

7                   *Amazon Response*: The alleged fact is incomplete, and additional context is

8                   necessary to fully understand the terms of the parties' agreements.

9

10         8.     As detailed in the Amazon FBA Guidelines, Amazon's reimbursement

11   obligation covered the following:

12        •     "Items damaged while in an Amazon fulfillment center";
          •     "Items missing within an Amazon fulfillment center for 30

13             consecutive days";
          •     "Items lost or damaged by the carriers and distributors that we use to

14             deliver products to the customer."

15        •     "Items lost or damaged while being shipped to an Amazon
               fulfillment center using Amazon partnered carriers (small parcel,

16             less than truckload, and full truckload)."

17                  *Amazon Response*: The alleged fact is incomplete, and additional context is

18                  necessary to fully understand the terms of the parties' agreements.

19

20         9.     For its services in storing, shipping and keeping track of PD's inventory, DAB

21   paid Amazon about $33 million.

22                  *Amazon Response*: The alleged fact is not material to this action.

23

24

25

26

**B.** **To help fulfill its duty to keep track of a seller's inventory, Amazon developed and used a complex system of coded "inventory adjustments," and told sellers to rely on such.**

10.     Amazon Fulfillment Centers are huge structures that can store millions of units of inventory. For example, according to an Amazon Website, the FC in Baltimore "spans the equivalent of 28 football fields and can hold millions of items on any given day." https://www.aboutamazon.com/news/company-news/amazons-year-in-photos-2019.     The "Phoenix7" Fulfillment Center off 75th Avenue and I-10 is more than a million square feet, has over three million items, and ships out a few hundred thousand items every week. *See* https://www.bizjournals.com/phoenix/news/2019/10/03/go-behind-thescenes-at-arizonas-largest-amazon.html.

> *Amazon Response*: The alleged fact is not material to this action, and the Trustee has offered no admissible evidence to support the immaterial fact.

11.     Once DAB's inventory was received in a Fulfillment Center, DAB was completely dependent on Amazon for the storage and safekeeping of the products and for keeping track of the amount, location and condition of the inventory. DAB could not thereafter see, touch or handle its merchandise. DAB's sole knowledge about the amount, location and condition of its merchandise would thereafter come from Amazon reports.

> *Amazon Response*: The alleged fact is not material to this action, Amazon disputes the accuracy of the alleged fact, and Amazon is not aware of evidence in the record that supports the alleged fact.

12.     When DAB inventory was received in a Fulfillment Center, it would be processed by Amazon employees – "associates" – using software Amazon developed.

> *Amazon Response*: Amazon agrees with this alleged fact and offered to place this fact on the parties' list of agreed material facts, but the Trustee rejected

1          that request.

2

3          13.    The associates would examine the inventory, either manually count or have a

4   scanner mechanically count the inventory, and answer questions posed by the software

5   about the inventory. If the associates thought the inventory may be damaged, the software

6   would ask them a series of questions, and based on the answers to those questions, the

7   software would assign an Amazon "adjustment code" to the inventory.

8                  *Amazon Response*: The alleged fact is incomplete, and additional context is

9                  necessary to fully understand Amazon's inventory receiving processes.

10

11         14.    Amazon employees would also do periodic inspections and counts of the

12  merchandise in the Fulfillment Center, and make further adjustments to the inventory if

13  needed.

14                 *Amazon Response*: The alleged fact is incomplete, and additional context is

15                 necessary to fully understand Amazon's inventory receiving processes and

16                 adjustments.

17

18         15.    An "Amazon Fulfillment" document on the Amazon Website instructed FBA

19  sellers such as DAB that, in order to "fully reconcile inventory balance," they needed to

20  "gain an understanding of the various inventory events that contribute to [a seller's] ending

21  balance."

22                 *Amazon Response*: The alleged fact is not material to this action.

23

24         16.    One of those "inventory events" that sellers needed to be aware of was

25  "adjustments." "Adjustments" refer to the adjustment codes described in another FBA

26  document titled "Inventory Adjustments." Inventory adjustments, Amazon taught, were

"[c]orrections and updates to [a seller's] inventory in response to issues such as damage, loss, receiving discrepancies, inventory transfers, and so on."

> *Amazon Response*: The alleged fact is duplicative of facts included in the agreed facts outlined above and is, therefore, unnecessary.

17.     Amazon's "Inventory Adjustments" document advised sellers such as DAB that the "Inventory Adjustments" report "shows the history of adjustments to [a seller's] inventory in response to issues such as damage, loss, receiving discrepancies, and inventory transfers." The FBA "Inventory Adjustments" document identifies numerous adjustment codes and their meaning, the most important of which for this case are the following:

Code 5     "Unrecoverable inventory"

Code 6     "Damaged by inbound carrier"

Code D     "Destroyed"

Code E     "Damaged at Amazon Fulfillment center"

Code M     Inventory misplaced

Code F     Inventory found

Code X     "Correction for inbound shipment receiving discrepancies."

Code Q     "Damaged; miscellaneous," which referred to a "decrease of [a seller's] sellable inventory when damage cannot be attributed to a source."

> *Amazon Response*: The alleged fact presents only a portion of the relevant information about reason codes for Adjustments. These shorthand adjustment descriptions are not intended as all-encompassing definitions of the corresponding adjustment. Additional context is necessary to fully understand adjustments.

18.     The adjustment codes identified in the FBA "Inventory Adjustments" document are the same adjustments that show up in the M15 data.

> *Amazon Response*: The alleged fact is not material to this action.

19.     One complicating factor of the inventory adjustments was that, per the FBA Agreement, Amazon was not required to physically mark or segregate inventory units from other inventory units having the same ASIN—even though the inventory was owned by different sellers. Rather, Amazon could and did "commingle" inventory units owned by different sellers.

> *Amazon Response*: The alleged fact is not material to this action, is not a complete description of "commingled inventory," and ignores that the Debtor chose to commingle its inventory with other sellers to reduce its costs and improve shipping times to customers.

20.     As explained by Amazon expert Weiant Williams, Amazon "would put multiple sellers' inventory that was identical into the same [Fulfillment Center] bin." Then, if some of the inventory in the bin became damaged, Amazon developed an "allocation program"—an "algorithm"—that determined which seller's inventory would be reduced due to damage.

> *Amazon Response*: The alleged fact is not material to this action, is not a complete description of "commingled inventory," and ignores that the Debtor chose to commingle its inventory with other sellers to reduce its costs and improve shipping times to customers.

21.     Under the FBA program, Amazon maintained a "Sellers' Central" website that gave sellers access to various reports about the amount and quality of their inventory,

including information about inventory "adjustments" Amazon had made to a seller's inventory, how many units of inventory a seller had sold, what payments Amazon had made to the seller, and what Amazon fees and costs Amazon had retained from a seller's sales proceeds.

> *Amazon Response*: Although the alleged fact is incomplete, and additional context is necessary to fully understand Amazon's Seller Central platform, Amazon agrees that Seller Central provides inventory records to FBA sellers and asserts that the provision of Seller Central satisfied Amazon's contractual obligation to "keep electronic records that track inventory of Units by identifying the number of Units stored in any fulfillment center."

22. Amazon began the FBA program around the same time DAB began to sell its products through that program, and Amazon's programs for keeping track of a seller's inventory evolved over time.

> *Amazon Response*: The alleged fact is not material to this action.

**C.      In 2011, DAB began experiencing business difficulties.**

23. In 2010, DAB was Amazon's largest FBA seller. In early 2011, DAB began to struggle with inventory reporting and management issues related to the FBA program, and was working with Amazon and a third party IT vendor to integrate the Amazon and DAB inventory systems to better track and manage DAB's inventory at Amazon. DAB's bank was then already involved in trying to identify the DAB inventory sitting in Amazon.

> *Amazon Response*: Amazon agrees that DAB struggled with inventory reporting and management issues during its time as an FBA seller and that

25

1    Amazon attempted to assist with DAB's issues. Otherwise, the alleged fact is

2    not material to this action, and Amazon is not aware of admissible evidence

3    in the record to support this fact.

4

5    24.    Automated removal of expiring inventory was one step taken in 2011 to

6    remedy the inventory problems. However, by the end of 2011, that program was just

7    creating more problems.

8    *Amazon Response*: Amazon agrees that DAB opted in to Amazon's

9    automated removal program. Otherwise, the alleged fact is not material to this

10    action, and Amazon disagrees with the alleged fact.

11

12    25.    In October 2011 DAB informed Amazon of some of the problems

13    automated removal of its inventory was causing. It wrote:

14

15    items are being returned with no documentation. . . we've been having a lot
     of inventory go missing from Seller Central and show up at warehouse a

16    week or two later. The packages have no paperwork, and Seller Central has
     no Orders or events documenting their return to us. Its made inventory

17    tracking close to impossible. . . I've searched through all the adjustments,
     orders and returns and none of these SKUs [Stock-Keeping Units barcode]

18    have documentation on Seller Central why the product is missing. It's just
     gone. Based off past experience some of it may show up here in a week or

19    two without paperwork and some of it we'll never see again. We really need
     some kind of system to track what is being sent to back to us.

20
     *Amazon Response*: The alleged fact is not material to this action and is

21    inadmissible hearsay if offered by the Trustee at trial. Although DAB may

22    have written this statement in October 2011, Amazon disputes the accuracy

23    of the statement and is not aware of evidence in the record that supports the

24    statement's accuracy.

25

26

26

1    26.    On October 13, 2011, DAB filed for Chapter 11 bankruptcy.

2           *Amazon Response*: The alleged fact is duplicative of facts included in the

3           agreed facts outlined above and is, therefore, unnecessary.

4

5    27.    On January 27, 2012, Mr. Shaffer was appointed as bankruptcy trustee.

6           *Amazon Response*: The alleged fact is duplicative of facts included in the

7           agreed facts outlined above and is, therefore, unnecessary.

8

9    28.    Between February 2012 and July 2012, DAB's sales grew steadily from about

10   $400,000 a month to about $1,000,000 a month. DAB sales then briefly dropped some, but

11   from November 2012 through March 2013 were stable and growing.

12          *Amazon Response*: Amazon disputes the accuracy of the alleged fact, and

13          Amazon is not aware of evidence in the record that supports the alleged fact.

14          The Trustee testified that DAB's business stabilized in July 2012, and the

15          available sales evidence shows that DAB experienced a steady decline of

16          sales in 2013.

17

18   29.    In November 2012 DAB wrote Amazon, stating: "Amazon also applied

19   constant adjustments as the lose/find/destroy inventory in their warehouse. As a lot of the

20   adjustments are Amazon 'temporarily' misplacing inventory which shortly will be found

21   again or reconciling their own bad receiving counts, it was decided during the original

22   discussion on operating procedures that adjustments would be handled manually..."

23          *Amazon Response*: The alleged fact is not material to this action and is

24          inadmissible hearsay if offered by the Trustee at trial. Although DAB may

25          have written this statement in November 2012, Amazon disputes the accuracy

26          of the statement and is not aware of evidence in the record that supports the

27

1        statement's accuracy.

2

3        30.    As a result of the inventory issues, in December 2012, the Trustee directed

4        DAB to submit a claim to Amazon for inventory reimbursement.

5                *Amazon Response*: Amazon agrees that the Trustee directed DAB to submit a

6                claim for inventory reimbursement to Amazon in December 2012. Otherwise,

7                Amazon disagrees with the alleged fact. As outlined in Amazon's statement

8                of contested facts, the Trustee directed DAB to submit a claim to Amazon for

9                reimbursement for approximately 38,000 units, but DAB submitted a

10               fraudulent reimbursement claim to Amazon for more than 390,000 units.

11

12       31.    In March 2013, Amazon reported a liability to DAB of $1,637,766 on account

13       of 60,658 missing or lost units, but could not tell the Debtor the product types and quantities

14       of each product type that comprised this liability.

15               *Amazon Response*: The alleged fact is not material to this action, Amazon

16               disputes the accuracy of the alleged fact, and Amazon is not aware of evidence

17               in the record that supports the alleged fact. In March 2013, DAB submitted

18               inaccurate, incomplete, and fraudulent data to Amazon and suggested falsely

19               that DAB was missing $4.1 million worth of inventory (in gross revenue).

20               Amazon employee Diana Flores, who served as a DAB account manager and

21               who did not perform inventory reconciliation as part of her duties at Amazon,

22               attempted in good faith to unwind what she did not realize was a fraudulent

23               submission from DAB. Ms. Flores recognized that DAB's own submission

24               was inflated by at least 61%, estimated based on DAB's submission that

25               Amazon may owe DAB $1,637,766 (in gross revenue) for lost inventory, and

26               explicitly informed DAB that Amazon would need to look into the issue

further. Amazon employees who specialize in inventory reconciliation subsequently unwound DAB's attempted (but still not yet revealed) fraud and confirmed that DAB's submission was inaccurate and significantly inflated ("Deep Dive"). Even when viewed in the light most favorable to DAB, the Deep Dive showed that Amazon owed DAB only $44,000.

32.     Amazon later decided that Amazon owed less than that, but internally decided not to pay DAB anything on the claim "until the end."

*Amazon Response*: The alleged fact is not material to this action, Amazon disputes the accuracy of the alleged fact, and Amazon is not aware of evidence in the record that supports the alleged fact.

**D.      Amazon's "Deep Dive" data analysis was limited to only 100 of DAB's 31,000 products.**

33.     In 2013, in order to address the inventory issues DAB was experiencing, Amazon undertook what it called a "deep dive" into DAB inventory data. This so-called "Deep Dive," however, was limited to an analysis of DAB's "top 100" products."

*Amazon Response*: The alleged fact is incomplete, and additional context is necessary to fully understand Amazon's Deep Dive inventory reconciliation. An accurate, complete description of the Deep Dive and the results of the Deep Dive is included in Amazon's statement of contested facts and Amazon's statement of the case.

34.     Since according to the M15 Data, however, DAB sold *31,166* distinct products, the Deep Dive only considered about .03% of them. Amazon claims that its analysis of the 100 products amounted to "68 percent of the Debtor's total inventory, for

1   which there was a potential discrepancy," though the record doesn't support that claim.

2          *Amazon Response*: The alleged fact is incomplete, and additional context is

3          necessary to fully understand Amazon's Deep Dive inventory reconciliation.

4          An accurate, complete description of the Deep Dive and the results of the

5          Deep Dive is included in Amazon's statement of contested facts and

6          Amazon's statement of the case.

7

8      35.    Amazon employee Justin Ice headed the "Deep Dive" effort, but Amazon has

9   not designated either Ice or anyone else to offer expert testimony to support the Deep Dive.

10         *Amazon Response*: Amazon disagrees with the alleged fact, and the alleged

11         fact is incomplete. While Amazon agrees that Justin Ice headed the Deep

12         Dive, Amazon has designated Mr. Ice to testify by deposition about the Deep

13         Dive. Amazon also has documentary evidence available in support of the

14         Deep Dive. Thus, Amazon plans to offer testimony in support of the Deep

15         Dive.

16

17      36.    Mr. Ice was also the Amazon employee involved in gathering the M15 Data.

18   When asked at his deposition whether he found "any inconsistencies" between the Deep

19   Dive data and the M15 data, Ice responded, "Absolutely."

20         *Amazon Response*: The alleged fact is incomplete, and additional context is

21         necessary to fully understand Amazon's Deep Dive inventory reconciliation.

22         An accurate, complete description of the Deep Dive and the results of the

23         Deep Dive is included in Amazon's statement of contested facts and

24         Amazon's statement of the case.

25

26      37.    Ice then explained how there were "multiple databases within Amazon" that

1  had to be checked, that he only learned later about a "sub database that needed to be pulled

2  in," and there were communications issues so that, as to some data, he wasn't able "to get

3  it in time."

4          *Amazon Response*: The alleged fact is incomplete, and additional context is

5                  necessary to fully understand Amazon's Deep Dive inventory reconciliation.

6                  An accurate, complete description of the Deep Dive and the results of the

7                  Deep Dive is included in Amazon's statement of contested facts and

8                  Amazon's statement of the case.

9

10         **E.    Amazon violates the bankruptcy stay by terminating DAB's FBA**

11         **selling privileges, then later permanently terminates DAB's FBA rights.**

12         38.    On April 11, 2013, Amazon improperly terminated DAB's FBA selling

13  privileges, thus violating the Chapter 11 bankruptcy stay. Not until 15 days later on April

14  26 did Amazon reinstate DAB's selling privileges.

15          *Amazon Response*: Amazon agrees that it revoked DAB's seller privileges for

16                  a 15-day period in April 2013. Otherwise, the alleged fact is not material to

17                  this action because the Court has already determined liability for the

18                  automatic stay violation.

19

20         39.    As a result of that termination, DAB's venders, buyers and bankers lost

21  confidence in DAB, and DAB began a downhill slide that it could not overcome.

22          *Amazon Response*: Amazon disputes the accuracy of the alleged fact and is

23                  not aware of evidence in the record that supports the alleged fact.

24

25         40.    On July 9, 2013, the DAB Trustee filed a Complaint against Amazon. In

26  addition to alleging damages flowing from Amazon's violation of the automatic stay, the

1  Complaint alleges that Amazon withheld funds from and failed to remit funds to DAB. The
2  Complaint alleges that Amazon's actions breached its contract with DAB, and that Amazon
3  had failed to "store, maintain, preserve, and account for" DAB's inventory, and that
4  Amazon had failed to compensate DAB for lost inventory. The Complaint further alleges
5  that DAB suffered damages "in an amount to be determined at trial as a result of Amazon's
6  breaches of the Contract."

7            *Amazon Response*: Amazon agrees that the Trustee filed a Complaint against
8            Amazon on July 9, 2013. Otherwise, Amazon disputes the accuracy of the
9            alleged fact and is not aware of evidence in the record that supports the alleged
10           fact. As Amazon detailed in its pending motion to exclude untimely and
11           unpleaded damages claims and theories, the Trustee's Complaint identifies a
12           claim for "lost inventory." The parties spent years reconciling DAB's
13           inventory in order to resolve that claim, only for the Trustee to identify a host
14           of new claims beginning in March 2019 that have little relationship to the
15           original claims for lost inventory. *See* Tr. Ex. 255 (case chronology
16           identifying key events that resulted in Trustee's untimely claims); Tr. Ex. 258
17           (identifying the Trustee's unpleaded and untimely claims). Those claims
18           should be excluded.

19

20      41.    On October 22, 2013, Amazon permanently terminated DAB's selling
21  privileges and asked DAB to submit requests for Amazon to return to DAB its inventory
22  remaining in Amazon Fulfillment Centers. In Amazon parlance, such returns are known as
23  "removals," since the products are removed from Amazon's Fulfillment Center warehouses.

24           *Amazon Response*: Amazon agrees that it terminated DAB's seller privileges
25           on October 22, 2013 because DAB serially sold prohibited products on
26           amazon.com. Otherwise, the alleged fact is incomplete, and additional context

1   is necessary to understand the terms of the termination and Amazon's removal
2   processes.
3
4   42.   From October 1, 2013 through January 22, 2014, DAB sent Amazon removal
5   requests seeking the return of about 87,000 units of DAB inventory. However, as to almost
6   24,000 units of the 87,000 units requested, Amazon inexplicably cancelled DAB's requests
7   and refused to return them. By January 31, 2014, DAB had ceased doing business and had
8   closed its Phoenix warehouse.
9           *Amazon Response*: Amazon disagrees with the alleged fact, the alleged fact is
10          incomplete, and additional context is necessary to fully understand the terms
11          of the termination and Amazon's removal processes.
12
13  43.   Amazon claims that, after January 31, 2014, Amazon belatedly returned
14  12,107 units of DAB inventory, though Amazon has offered no evidence as to where those
15  units were sent or how DAB—a closed company in bankruptcy—received any benefit from
16  the late return of those units. Amazon also admits that, after January 31, 2014, Amazon
17  simply destroyed 7,783 units of DAB inventory.
18          *Amazon Response*: Amazon disagrees with the alleged fact, the alleged fact is
19          incomplete, and additional context is necessary to fully understand the terms
20          of the termination and Amazon's removal processes.
21
22  44.   Amazon also claims that DAB itself, after January 31, 2014, requested the
23  removal of thousands more units of inventory, but the evidence doesn't support that.
24  Instead, as Mr. Weiss himself has asserted, items were removed after January 2014 through
25  an "automated" removal process, "triggered by the time elapsed since deactivation of
26  [DAB's] account in October 2013 (MAR AUTO INACTIV)." 10/30/18 letter from E. Weiss

1   to S. Goldberg at 12.

2       *Amazon Response*: Amazon disagrees with the alleged fact, the alleged fact is

3       incomplete, and additional context is necessary to fully understand the terms

4       of the termination and Amazon's removal processes.

5

6   **F.    Because Amazon didn't keep complete and accurate records of DAB's**
        **inventory transactions going back to 2008, Amazon cobbled together a**
7       **patchwork of data known as the "M15" data and told PD to use that**
        **data for this litigation.**
8

9       45.    Because of the parties' disagreement over what amount was owed DAB for

10  inventory-related losses, and the challenge of proving such given the millions of units DAB

11  had sold and the challenge of managing the inventory of multiple sellers storing goods in

12  the same huge warehouses, in about May 2015 Amazon produced the M15 Data. Amazon

13  said the M15 Data constituted a "comprehensive dataset of all the [DAB] inventory

14  transactions that transpired over the time that [DAB] was on platform."

15      *Amazon Response*: Amazon agrees that it produced he M15 data in May 2015

16      and that it is a comprehensive dataset of DAB's inventory transactions.

17      Otherwise, Amazon disagrees with the alleged fact, the alleged fact is

18      incomplete, and additional context is necessary to fully understand the M15

19      data.

20

21      46.    The M15 Data is a selective compilation of data extracted by Amazon

22  employees from some unnamed "data warehouses." To compile the M15 Data, an Amazon

23  employee, Justin Ice, decided which data should be pulled from which data warehouses.

24  Amazon has never identified what other DAB-related data exists that Mr. Ice chose not to

25  include in the M15 production. Mr. Ice testified, however, that the M15 Data was

26  "absolutely not" a "compilation of all the data that Amazon had regarding the DAB

account."

> *Amazon Response*: Amazon disagrees with the alleged fact, the alleged fact is incomplete, and additional context is necessary to fully understand the M15 data.

47.     Because Amazon did not keep consistent records in the early part of the FBA Program, Amazon, per Amazon Rule 30(b)(6) witness Ms. Bachand, had to "backfill" some of the M15 Data from "multiple different data sources."

> *Amazon Response*: Amazon disagrees with the alleged fact, the alleged fact is incomplete, and additional context is necessary to fully understand the M15 data.

48.     When DAB asked Amazon to admit that the M15 Data was "a complete and accurate accounting" of DAB inventory transactions, Amazon did not do so, but said only that:

> Amazon has made reasonable efforts to identify and produce in the May 2015 Production transaction-level data for the Debtor's units in the [FBA] Program but that the files may not be complete or accurate with respect to every Debtor Unit.

> *Amazon Response*: Amazon disagrees with the alleged fact, the alleged fact is incomplete, and additional context is necessary to fully understand the M15 data. Amazon has repeatedly asserted that the M15 data are the most complete information known to be available to account for DAB's "Lost Inventory."

49.     Concerning the M15 Data, Amazon has also said that, it "consists of multiple data streams compiled across multiple Amazon teams and also likely includes some erroneous entries as a result of employee transcription error." *Id.*

> *Amazon Response*: The alleged fact is incomplete, and additional context is necessary to fully understand the M15 data.

50.     Amazon also said that, during the 2008 to 2013 period, "not all inventory records were maintained in the currently used data warehouse. There may be incomplete information in the May 2015 production from transcribing older inventory tracking resources to the currently used system."

> *Amazon Response*: The alleged fact is incomplete, and additional context is necessary to fully understand the M15 data.

51.     Despite the defects that exist in the M15 Data, Amazon has represented that it "is the most complete information known to be available to account for the Debtor's Units in the Fulfillment By Amazon Program."

> *Amazon Response*: Amazon agrees that the M15 data the M15 data is the most complete information known to be available to account for DAB's "Lost Inventory."

52.     Amazon has further represented that the M15 Data contains "all of the relevant data necessary to evaluate and calculate the Debtor's inventory over time" in the FBA Program.

> *Amazon Response*: Amazon agrees that the M15 data is the most complete information known to be available to account for DAB's "Lost Inventory."

53.     Amazon compiled the M15 Data into six different data files:
> a. Receipts (a seller's inventory units received into an Amazon Fulfillment Center)
> b. Orders (sales of a seller's inventory)
> c. Returns (customer cancellations and returns of purchased inventory)

d.  Removals (inventory units Amazon sent back to a seller)

e.  Adjustments (changes Amazon made to the amount or status of a seller's inventory, such as denoting the inventory as missing, damaged or destroyed)

f.  Reimbursements (amounts paid to a seller to reimburse for lost or damaged inventory, or actual units of inventory given the seller as a replacement for such)

*Amazon Response*: The alleged fact is duplicative of facts included in the agreed fact outlined above and, therefore, unnecessary.

**G.     After analyzing the M15 Data and the Settlement Data from Amazon's Seller Central website, DAB's expert concluded that Amazon did not fully compensate DAB for inventory that DAB had entrusted to Amazon's inventory sales and management services.**

54.     The Trustee engaged Ms. Serena Morones to conduct an analysis of amounts that Amazon may owe DAB resulting from the Amazon's inventory sales and management services that it provided DAB between January 1, 2008 and January 31, 2014.

*Amazon Response*: The alleged fact is not material to this action.

55.     Ms. Morones is a CPA with decades of experience analyzing commercial damages and conducting forensic accounting investigations and business valuations.

*Amazon Response*: The alleged fact is not material to this action.

56.     Morones analyzed two primary categories of Amazon inventory transaction data. The first category, "Settlement Data," represents Amazon data made available to FBA sellers in the ordinary course of business on Amazon's Seller Central website.

*Amazon Response*: Amazon agrees that Ms. Morones analyzed a subset of Settlement Reports as part of her expert report. Because Settlement Reports relate to DAB's untimely payment claims, however, the Settlement Reports are irrelevant to this action and should be excluded pursuant to Amazon's

1   motion to exclude untimely and unpleaded damages claims and theories. *See*

2   Tr. Ex. 258 (claims chart identifying the Trustee's untimely and unpleaded

3   claims).

4

5   57.     The Trustee arranged for the Settlement Data to be downloaded, preserved,

6   and produced in this litigation.

7       *Amazon Response*: Amazon disagrees with the alleged fact, the alleged fact is

8       incomplete, and additional context is necessary to fully understand how the

9       Trustee downloaded, preserved, and produced the Settlement Reports used in

10      this litigation. As outlined in Amazon's statement of contested facts, for

11      example, the Trustee's expert witnesses downloaded and analyzed an

12      incomplete set of Settlement Reports.

13

14  58.     Except for 16-days in 2010, Amazon itself declined to produce any Settlement

15  Data in this case, and Amazon failed to produce the 16 days of 2010 data until long after

16  the close of discovery.

17      *Amazon Response*: Amazon disagrees with the alleged fact, the alleged fact is

18      incomplete, and additional context is necessary to fully understand Amazon's

19      production of Settlement Reports in this case. Amazon did not produce a

20      complete set of Settlement Reports because the Trustee never requested them

21      in discovery.  Both parties understood during discovery that this case was not

22      about payment record. Amazon produced the missing Settlement Reports that

23      Ms. Morones did not include in her analysis in order to rebut Ms. Morones's

24      testimony in the event the Court denies Amazon's motion to exclude untimely

25      and unpleaded damages claims and theories.

26

59.     The Settlement Data served as transactional support for payments made by Amazon to DAB. Settlement Data was sometimes referred to as "Settlement Reports," as well as other names. Amazon itself produced no data showing a complete account of all payments made by Amazon to DAB.

> *Amazon Response*: Amazon disagrees with the alleged fact, the alleged fact is incomplete, and additional context is necessary to fully understand Amazon's production of payment records in this case. Amazon did not produce and was not asked to produce payment data because this case is not about payment records.

60.     The second category of data Morones analyzed was the M15 Data.

> *Amazon Response*:  The alleged fact is not material to this action

61.     The conclusions of Ms. Morones are set forth at pages 1-23 of her May 10, 2019 expert report, and are supported by Schedules 1, 1a, 1b, 2a, 2b, 2c, 3, 4, 5, 6 and 6a attached to her report.

> *Amazon Response*: The alleged fact is not material to this action.

62.     Attachment C to Ms. Morones's report is a 28-page section authored by Jeffrey A. Cone, CPA, who describes how he extrapolated and organized the data from the Settlement Reports and M15 Data that Ms. Morones analyzed. More than 200 pages of additional schedules and exhibits are appended to Attachment C to describe the data accumulation and organization in greater detail.

> *Amazon Response*: The alleged fact is not material to this action.

63.     Based on her analysis of the data and using January 31, 2014 as the cutoff

date, Ms. Morones concluded that there were 39,331 units of inventory that Amazon could not account for; that is, inventory that should have existed at the end of the relationship, but did not.

> *Amazon Response*: Amazon agrees that Ms. Morones reached this conclusion but disagrees with the conclusion. As detailed in Amazon's statement of contested facts, there is no basis for the Trustee's January 31, 2014 cutoff date, and Ms. Morones fails to properly account for reimbursements that Amazon paid to DAB during the lifespan of DAB's business relationship with Amazon.

64. Ms. Morones also concluded that there were an additional 72,357 units of inventory that Amazon accounted for as having been lost, damaged or destroyed while under Amazon's control. The Trustee sometimes refers to this as inventory "shrinkage." Based on the available data, these 72,357 units of inventory shrinkage were not duplicative of the 39,331 units of expected ending inventory for which Amazon could not account.

> *Amazon Response*: Amazon agrees that Ms. Morones reached this conclusion but disagrees with the conclusion on a number of grounds. First, the Trustee's claims for "shrinkage" are unpleaded, untimely, and should be excluded. Second, as explained in Amazon's contested statement of facts and the rebuttal report of Weiant Williams, Ms. Morones misunderstands Amazon's adjustment data, which results in errors in her shrinkage calculation. *See* Tr. Ex. 257 (identifying examples of mistakes that Ms. Morones makes in her "shrinkage" calculation).

65. Ms. Morones's calculation of inventory shrinkage used Amazon's inventory adjustment codes, referred to above, that Amazon instructed FBA sellers to use in keeping

1 track of their inventory.

2    *Amazon Response*: The alleged fact is not material to this action.

3

4   66. While DAB's inventory was in Fulfillment Centers, Amazon had sole control

5 of the inventory, as well as sole control of the inventory adjustments that Amazon

6 periodically made to that inventory. Thus, Morones used Amazon's adjustment figures from

7 the M15 Data to calculate inventory shrinkage.

8    *Amazon Response*: The alleged fact is not material to this action, Amazon

9    disagrees with the alleged fact, and Amazon is not aware of evidence in the

10    record in support of this fact.

11

12   67. Amazon's adjustment codes in the M15 Data showed, for example, 38,371

13 net units of DAB inventory units that Amazon had lost or misplaced. Amazon's adjustment

14 codes in the M15 Data also showed 17,924 DAB inventory units that Amazon destroyed.

15 The M15 Data gives no reason why Amazon destroyed that inventory. The Amazon

16 adjustment codes in the M15 Data also showed 10,317 units of DAB inventory that were

17 damaged and became unsellable while the units were being stored at a Fulfillment Center.

18    *Amazon Response*: Amazon disagrees with the alleged fact, the alleged fact

19    is incomplete, and additional context is needed to fully understand the

20    adjustment codes in the M15 data. As noted in Mr. Williams's rebuttal report,

21    Ms. Morones repeatedly misinterprets Amazon's adjustment codes. Mr.

22    Williams's report properly accounts for adjustments and concludes that the

23    data shows that Amazon over-reimbursed DAB for inventory during the

24    lifespan of DAB's relationship with Amazon.

25

26   68. Ms. Morones conservatively estimated the value of all DAB's unaccounted

1   for, lost, missing or destroyed inventory at $16.31 per unit, which was the average selling
2   price of all DAB units ($22) less Amazon fees of $5.69 or 26.2% per unit.

3           *Amazon Response*: Amazon agrees that Ms. Morones's report adopts this
4                   estimated per-unit reimbursement value.

5

6       69.     Based on Ms. Morones's calculations, Amazon owed DAB $641,521 for the
7   39,331 units of expected ending inventory, plus $1,130,202 for the 72,357 units of lost,
8   damaged or destroyed inventory. However, Morones subtracted from those liability figures
9   $304,276 in reimbursements that she concluded Amazon had already paid.

10          *Amazon Response*: Amazon agrees that Ms. Morones reached this conclusion
11                  but disagrees with the conclusion on a number of grounds. As detailed in Mr.
12                  Williams's rebuttal report, Ms. Morones miscalculates expected ending
13                  inventory, misunderstands Amazon's adjustment data, and misapplies
14                  Amazon's reimbursement data. Thus, even if the court denies Amazon's
15                  motion to exclude the claims for "damaged" or "destroyed" inventory, Ms.
16                  Morones's underlying calculations are unreliable and should be disregarded.
17                  Mr. Williams's report corrects Ms. Morones's errors and presents a much
18                  more accurate inventory reconciliation.

19

20      70.     Ms. Morones also initially concluded that Amazon owed DAB $237,706 for
21   unpaid "refund reimbursements." Refund reimbursements occurred when Amazon charged
22   DAB's account for a cancelled sale, then refunded the charged amount if the buyer failed
23   to return the merchandise. Based on comments from Amazon's rebuttal expert, Morones
24   later adjusted that figure to $195,721, taking account of "Miscellaneous Adjustments" in
25   the M15 Data that appeared to be the same thing as "refund reimbursements."

26          *Amazon Response*: Amazon agrees that Ms. Morones reached this conclusion

but disagrees with the conclusion. The Trustee's claims for "refund reimbursements" are unpleaded, untimely and should be excluded. *See* Tr. Ex. 258 (detailing the Trustee's untimely and unpleaded claims). Additionally, Ms. Morones makes additional errors in calculating this category of damages that are detailed in Mr. Williams's rebuttal report.

71.     In addition, Ms. Morones calculated that Amazon owed DAB $1,156,495 for inventory sales shown in the M15 Data, but for which the Settlement Data showed no corresponding payments.

*Amazon Response*: Amazon agrees that Ms. Morones reached this conclusion but disagrees with the conclusion. The Trustee's claims for unremitted sales proceeds are unpleaded, untimely, and should be excluded. *See* Tr. Ex. 258 (detailing the Trustee's untimely and unpleaded claims). Additionally, Ms. Morones makes additional errors in calculating this category of damages that are detailed in Mr. Williams's rebuttal report.

72.     Amazon much later claimed to have discovered additional Settlement Data that showed about 87% of the missing payments had been made.

*Amazon Response*: Amazon agrees that it produced six Settlement Reports that detail $1,363,782 in payments made from Amazon to DAB that Ms. Morones failed to include in her analysis. Ms. Morones's report did not identify the gaps in the Settlement Reports she analyzed, even though Ms. Morones and two of the Trustee's other experts—Jeffrey Cone and Stephen Ashworth—all testified that they were aware of the gaps. Thus, any delay in producing the missing Settlement Reports was caused by the Trustee's six-year delay in placing his payment claims at issue and Ms. Morones's failure

1    to identify the data gaps in her report.

2

3    73.    Ms. Morones also calculated prejudgment interest on the above liabilities to

4    be $2,906,224.

5            *Amazon Response*: Amazon agrees that Ms. Morones reached this conclusion

6            but disagrees with the conclusion. The primary issue with this calculation is

7            that Ms. Morones's foundational damages calculations are incorrect, which

8            means her interest calculation is also incorrect. Additionally, Mr. Williams

9            concluded that Ms. Morones's interest calculation is inaccurate and unreliable

10           for a number of reasons that are addressed in Amazon's contested statement

11           of the facts.

12

13   74.    Ms. Morones further determined that Amazon was liable for $732,000 in lost

14   profits as a result of Amazon's violation of the bankruptcy stay.

15           *Amazon Response*: Amazon agrees that Ms. Morones reached this conclusion

16           but disagrees with the conclusion. Ms. Morones's underlying report

17           incorrectly states the length of Amazon's automatic stay violation, makes

18           unsupported causal assumptions, uses an inappropriate baseline period, and

19           assumed that DAB's sales would have grown despite evidence showing that

20           DAB's sales were declining since the start of 2013. Mr. Williams cured Ms.

21           Morones's errors and concluded that DAB is owed $47,497 for the violation

22           of the automatic stay.

23

24   75.    Ms. Morones concluded that Amazon owed DAB a total of $6,549,871.

25           *Amazon Response*: Amazon agrees that Ms. Morones reached this conclusion

26           but disagrees with the conclusion for all the reasons set forth in Mr.

44

1    Williams's report and in Amazon's statement of contested facts.

2

3    **H.    Additional adjustment codes in the M15 Data show potential Amazon**
4         **liability Ms. Morones didn't include in her analysis.**

5    76.    According to the Rebuttal Report of Amazon expert Mr. Williams, the M15

6    Data show 166,279 units of DAB Inventory which Amazon designated as "unsellable" by

7    assigning them a "Code Q" adjustment.

8         *Amazon Response*: The alleged fact is not material to this action. The alleged

9         fact provides only a portion of the relevant information about the M15 data,

10        adjustment codes, and Mr. Williams's report. Additional context is necessary

11        to properly understand the M15 data, adjustment codes, and Mr. Williams's

12        report.

13

14   77.    Code Q is defined in Amazon's "Inventory Adjustments" document as

15   "Damaged, miscellaneous," and Code Q is further explained as "a decrease of your sellable

16   inventory when damage cannot be attributed to a source."

17        *Amazon Response*: The alleged fact provides only a portion of the relevant

18        information about adjustment code Q. Additional context is necessary to

19        properly understand the adjustment code Q.

20

21   78.    Amazon Rule 30(b)(6) witness Jeff Moore testified he understood that

22   liability for Code Q damage is "determined on a case-by-case basis." In her conservative

23   analysis, Ms. Morones didn't include any Code Q adjustments in her analysis of Amazon

24   liability.

25        *Amazon Response*: Amazon agrees that Ms. Morones didn't include Code Q

26        adjustments in her analysis. The Trustee did not identify any claim related to

1    Code Q adjustments until October 26, 2020. Otherwise, the alleged fact

2    provides only a portion of the relevant information about adjustment code Q.

3    Additional context is necessary to properly understand the adjustment code

4    Q.

5

6    79.    Under the FBA Agreement, however, Amazon is strictly liable to reimburse

7    DAB for such units unless Amazon can show that the units were not damaged in a

8    Fulfillment Center or otherwise while under Amazon's control. Amazon has offered no

9    evidence in this regard.

10    *Amazon Response*: The alleged fact is not material to this action, Amazon

11    disputes the accuracy of the alleged fact, and Amazon is not aware of evidence

12    in the record that supports the alleged fact. The Trustee's attempt to belatedly

13    introduce a damages claim for Code Q adjustments is untimely, unpleaded,

14    and should be excluded. *See* Tr. Ex. 258.

15

16    80.    Amazon also identified 44,044 of the 63,445 inventory units that came back

17    as "Customer Returns" as "unsellable." Ms. Morones didn't take account of those inventory

18    units in her damage analysis.

19    *Amazon Response*: The alleged fact is not material to this action and Amazon

20    is not aware of evidence in the record that supports the alleged fact.

21

22  **I.    Amazon's rebuttal expert made no attempt to assess Amazon liability**
23  **for inventory shrinkage.**

24    81.    On May 20, 2019, Amazon engaged an expert, Mr. Williams, to draft a

25    rebuttal report.

26    *Amazon Response*: The date that Amazon engaged Mr. Williams is not

46

1    material to this action.

2

3    82.    The scope of Williams's engagement did not include either assessing

4    Amazon's damage liability or preparing an alternative damage analysis—Williams said his

5    "assignment" was simply "to review and rebut Ms. Morones' report…."

6         *Amazon Response*: The alleged fact is not material to this action and Amazon

7         disputes the accuracy of the alleged fact.

8

9    83.    Mr. Williams testified that the information needed to determine "how many

10   units Amazon needed to reimburse [DAB] for" was "not discernible from the M15 data."

11   He also testified that his analysis was "limited by the data which was provided," which he

12   did "not believe…allows for the analysis of trying to translate adjustments back to the final

13   disposition of the product nor to…how and where it was damaged."

14        *Amazon Response*: The alleged fact provides only a portion of the relevant

15        information about the M15 data and Mr. Williams's testimony. Additional

16        context is necessary to properly understand the M15 data and Mr. Williams's

17        testimony.

18

19   84.    However, Williams admitted that "the 38,371 units that were missing from

20   [DAB's] inventory" were "Amazon's responsibility."

21        *Amazon Response*: Amazon disputes the accuracy of the alleged fact, and the

22        alleged fact provides only a portion of the relevant information about the M15

23        data and Mr. Williams's testimony. Additional context is necessary to

24        properly understand the M15 data and Mr. Williams's testimony. As

25        evidenced in Mr. Williams's report, Mr. Williams's primary conclusion is that

26        Amazon over-reimbursed DAB during the lifespan of DAB's participation in

1      the FBA program by more than 8,000 units.

2

3      85.    Williams could not explain how the 28,541 inventory units for which he

4      claims Amazon reimbursed DAB compensated PD for the 38,371 units Amazon lost.

5             *Amazon Response*: Amazon disputes the accuracy of the alleged fact, and the

6             alleged fact provides only a portion of the relevant information about the M15

7             data and Mr. Williams's testimony. Additional context is necessary to

8             properly understand the M15 data and Mr. Williams's testimony.

9

10     86.    Williams also testified that, "because of the complicated nature of

11     adjustments," he just focused on the "adjustments omitted calculation." By that, Williams

12     meant that—while he included in one of his analyses the net *total* adjustments (a negative

13     number that *lessened* Amazon's liability)—his preferred analysis was to simply omit all the

14     M15 adjustment data from his calculations.

15            *Amazon Response*: Amazon disputes the accuracy of the alleged fact, and the

16            alleged fact provides only a portion of the relevant information about the M15

17            data and Mr. Williams's testimony. Additional context is necessary to

18            properly understand the M15 data and Mr. Williams's testimony. Mr.

19            Williams provided an alternative calculation in his report that omits

20            adjustments (which is highly favorable to the Trustee). This alternative

21            calculation shows exactly what happened to 6,279,457 of the 6,316,429 units

22            that DAB shipped to Amazon: 5,978,113 units were sold to customers, 63,452

23            of those sales were returned to Amazon, and 364,796 of the units DAB

24            shipped to Amazon were removed from DAB's inventory. *See* Tr. Ex. 256

25            (depicting Mr. Williams's alternative calculation). Thus, the only question

26            that must be addressed at trial is whether Amazon bears responsibility for the

36,972 units of the 6,316,429 units that DAB shipped to Amazon that are not accounted in DAB's sales, returns, or removals. Mr. Williams's alternative calculation concludes that that even if the Court were to exclude consideration of adjustments data entirely and find that Amazon is responsible for all 36,972 units that were not sold, returned, or removed, Amazon is responsible for only 8,431 units of inventory once reimbursements are appropriately factored into the reconciliation.

## IV. CONTESTED MATERIAL FACTS ASSERTED BY AMAZON[4]

### *DAB struggles with inventory management and recordkeeping*

1.     DAB's problems with Amazon's FBA program and Amazon's inventory tracking system were of its own making. Internal DAB emails, deposition testimony from former DAB employees, and bankruptcy documents filed by the Trustee with this Court show that DAB made poor strategic decisions and—as relevant to this case—developed few internal inventory management or inventory-tracking tools. *See, e.g.*, S. Lawcock Dep. at 22:20–24:15, 57:6–59:1, 62:12–63:10, 78:7–82:13, 91:8–93:23, 113:15–116:16, 144:24–159:7, 159:15–165:15, 165:20–176:4, 188:20–193:20 (DAB's inventory manager describing DAB's limited inventory tracking systems, difficulty with inventory management, and lack of any internal inventory tracking before filing for bankruptcy); D. Bellino Dep. at 35:18–22, 72:11–73:3, 305:10–13, 312:3–9, 315:20–316:22, 321:2–8, 321:16–21 (DAB's CEO repeatedly testifying that he did not know or could not remember how DAB managed or tracked inventory); T. Reilly Dep. at 38:10–40:18 (DAB's COO

---

[4] Although the Trustee's claims are limited to those in his Complaint—recovery for allegedly "Lost Inventory" and any damages from the 15-day period DAB was unable to sell on amazon.com during the automatic stay, Amazon sets forth here facts related to the unpleaded, untimely new claims the Trustee attempts to assert in order to respond to the Trustee.

49

testifying that DAB's inventory management processes were "[e]xtremely low quality"); Tr. Exs. 203–207, 210–213, 218–221, 230 (exemplifying DAB's history of inventory management issues); Tr. Ex. 222 at 4–8 (bankruptcy filing describing reasons for DAB's bankruptcy).

> *Trustee Response:* Amazon seeks to focus on everything but the only issue material to this dispute, which is: what did Amazon do with DAB inventory under Amazon's exclusive control? Whether or not DAB was well managed, whether DAB properly managed inventory ***in the DAB warehouse,*** and whether DAB made poor strategic decisions, has no bearing on Amazon's loss or destruction of DAB inventory ***in Amazon warehouses under Amazon exclusive custody and control***.

2.      Throughout its tenure selling on amazon.com, DAB failed to properly manage or track its inventory and routinely switched its products between FBA and MFN without tracking those changes. *See, e.g.*, E. Soder Dep. at 144:9–146:13; D. Bellino Dep. at 182:15–184:1.

> *Trustee Response:* Amazon contracted to manage the inventory DAB delivered to it. Whether DAB sold inventory to customers via the FBA program, directed Amazon to return the inventory to DAB, or directed Amazon to send the inventory elsewhere is immaterial to Amazon's inability to explain what happened to DAB inventory.

3.      DAB did not produce its own data that identifies the number and type of units it shipped to Amazon, the number and type of units DAB sold on amazon.com, the number and types of units Amazon removed and sent back to DAB, the number and type of units for which Amazon reimbursed DAB, or the payments DAB received from Amazon. T.

50

1  Shaffer Expected Tr. Test.; T. Bachand Expected Tr. Test. The data in this adversary
2  proceeding was stored and produced by Amazon.

> *Trustee Response: The parties agree how many units DAB delivered to*
> *Amazon. That is DAB's burden of proof. Thereafter, Amazon is directly liable*
> *if it is unable to identify what it did with the inventory DAB entrusted to*
> *Amazon's exclusive custody and control*

4.  Throughout DAB's relationship with Amazon, Amazon complied with its contractual obligation under the ASBSA (the "Agreement") to "keep electronic records that track inventory of Units by identifying the number of Units stored in any fulfillment center." Amazon's Seller Central web-based interface housed many inventory records tracking the Debtor's inventory units in Amazon Fulfillment Centers and provided DAB regular inventory updates. T. Bachand Expected Tr. Test.; S. Lawcock Dep. at 91:8–93:23, 98:12–19, 107:12–108:1 (DAB's inventory manager acknowledging that Amazon provided inventory records via Seller Central); T. Reilly Dep. at 114:24–116:2, 123:2–124:19 (DAB's COO testifying about inventory data available in Seller Central).

> *Trustee Response:* The Trustee agrees that Amazon's Seller Central website
> housed many inventory records purporting to track DAB's inventory units,
> and setting forth adjustments to DAB's inventory and payments related to
> DAB's inventory. Seller Central was the contemporaneous business records
> that Amazon provided to permit DAB and other FBA sellers to track their
> inventory. The Trustee preserved the records from Seller Central and spent
> over a year tracking the DAB inventory from Amazon's contemporaneous
> business records made available from Amazon's Seller Central website.

5.  DAB used Seller Central to track its FBA inventory, and Amazon spent countless hours assisting DAB with questions DAB had about the data available on Seller

51

1    Central and reconciling any inventory concerns that DAB identified. S. Lawcock Dep. at
2    91:8–93:23, 98:12–19, 107:12–108:1 (DAB's inventory manager testifying about DAB's
3    use of Seller Central); T. Reilly Dep. at 114:24–116:2, 123:2–124:19 (DAB's COO
4    testifying about DAB's use of Seller Central); D. Bellino Dep. at 37:17–38:20, 72:11–
5    73:21, 92:19–93:14 (DAB's CEO testifying about DAB's use of Seller Central); E. Soder
6    Dep. at 144:9–146:13, 148:7–151:5, 152:12–153:7, 161:13–165:6 (Amazon employee
7    detailing his efforts to assist DAB with inventory management and reconciliation); Tr. Exs.
8    10–11, 204, 206, 220, (exemplifying Amazon's efforts to assist DAB with inventory
9    management and reconciliation).

10           *Trustee Response:* Amazon charged DAB over $33 million dollars to manage
11           it inventory. That was over $5 for every item DAB sold, which amounted to
12           approximately 25% of gross proceeds from what Amazon described as a high-
13           volume seller of low priced goods. When DAB could not reconcile its records
14           with the Seller Central data that Amazon was "building on the fly," Amazon
15           directed DAB to submit a request for reimbursement. When DAB submitted
16           that request in late 2012, Amazon refused to process it. It declined the request
17           and directed DAB to submit individual requests that did not include more than
18           10 products. (DAB had over 30,000 SKU's in its catalog). When DAB
19           complied and began submitting individual requests, Amazon labeled DAB a
20           "spammer," and decided that it was too much work to process those requests.
21           Therefore, Amazon ceased processing the requests, directed DAB to submit
22           a single, consolidated request, and refused to support DAB efforts to reconcile
23           its inventory prior to the bankruptcy filing.

24           6.     At about this same time, Amazon began spamming DAB with hundreds of
25    violation notifications claiming that products that DAB was selling prohibited products,
26    including products promoted for listing to DAB by Amazon. Although Amazon denied a

52

connection, to this day Amazon refused to produce the internal memo that reflects its "business decision to terminate DAB. At the same time, Amazon decided not to reimburse as required by the contract. Instead, opting to "wait til the end." Amazon is responsible for reimbursing sellers only for specific inventory transactions, including when a seller's "inventory is lost or damaged by a partnered carrier, in an Amazon fulfillment center, or during delivery to a customer." T. Bachand Expected Tr. Test.; Tr. Ex. 260 at 1; Tr. Ex. 1 at ¶¶ F-4.

> *Trustee Response:* The Trustee disputes the alleged fact as it applies to DAB. Under the FBA Agreement, Amazon is liable for paying DAB the replacement value for all inventory units lost or damaged by a partnered carrier, in an Amazon fulfillment center, or during delivery to a customer. Amazon was also liable to reimburse DAB for cancelled sales when the buyer failed to return the inventory.

7. When Amazon is responsible for lost or damaged inventory, it either reimburses the seller for that unit or replaces the unit with an identical unit from its own inventory. T. Bachand Expected Tr. Test.; Tr. Ex. 260 at 1; Tr. Ex. 1 at ¶¶ F-4.

> *Trustee Response:* Sometimes Amazon reimbursed sellers for inventory it lost and damaged, however the records reflect there often was no correlation between the value of the item and the amount of reimbursement. Sometimes Amazon substituted product for the product it lost or damaged, but the product was not always identical nor did it necessarily belong to Amazon. Amazon comingled products and considered them to be fungible. That could work as long as the products had identifiable expiration dates, were genuine and the Amazon warehouse worker who "found" the product could distinguish it from among not only DAB's 30,000 plus SKUs, but from all of the SKU's in the Amazon warehouse, return it to the proper bin, and code it appropriately.

1    8.    Amazon is not responsible, however, for other kinds of loss or damage,

2    including defective units; units lost or damaged by customers, distributors, or sellers; and

3    expired units. T. Bachand Expected Tr. Test.; Tr. Ex. 260 at 1; Tr. Ex. 1at ¶¶ F-4.

4        *Trustee Response:* The Trustee disputes the accuracy of the alleged fact.

5        Under the terms of the FBA Agreement and the FBA Guidelines, Amazon is

6        liable, among other things, for any loss or damage to inventory units that

7        occurs while the units are in a Fulfillment Center or are missing from a

8        Fulfillment Center for more than 30 days. Amazon is also responsible for

9        inventory units that are sold but for which Amazon fails to pay DAB, for

10       inventory units that Amazon fails to return to DAB upon DAB's request, and

11       for inventory units that Amazon fails to return to DAB after a cancelled sale

12       of that inventory.  DAB agrees that Amazon is not responsible for "units lost

13       or damages by customers." Perhaps at trial Amazon will explain what that has

14       to do with its liability to DAB.

15   9.    The Agreement required that DAB submit claims for "lost or damaged

16   inventory" units within at most 18 months of the alleged loss or damage. T. Bachand

17   Expected Tr. Test.; Tr. Ex. 260 at 1; Tr. Ex. 1 at ¶¶ F-4.

18       *Trustee Response:* The Trustee disputes this alleged fact. The FBA

19       Agreement itself includes no such time limitation. And although the current

20       version of the FBA Guidelines includes a provision to that effect, that

21       provision was not added until July 8, 2013—one day before DAB filed its

22       complaint in this matter—after DAB had already made claims to Amazon

23       about lost or damaged inventory units. Amazon can't avoid liability by

24       retroactively changing the terms of its agreement with DAB.

25   10.   The Agreement also required that DAB address within at most 90 days the

26   return or disposal of any "Unsuitable" units, including those that were "unsellable or

1  unfulfillable"; "defective, damaged, or lacking required label(s)"; or prohibited from sale

2  under Amazon's policies. T. Bachand Expected Tr. Test.; Tr. Ex. 1 at ¶¶ F-3.2, F-6.3.

3          *Trustee Response:* The alleged fact refers to Section F-6.3 of the FBA

4          Agreement, which relates only to customer returns and is not material to the

5          issues in this lawsuit. After Amazon terminated its contract with DAB, it

6          purported to accept returns from customers years after the products were

7          delivered and seeks to charge those returns back against the DAB inventory

8          it could not locate and return to DAB when it was requested.

9      11.    DAB chose to "commingle" its inventory with identical inventory of other

10  sellers. T. Bachand Expected Tr. Test.; Tr. Ex. 220 at 3 (identifying "DAB's change from

11  commingled to stickered" created inventory reporting issues for DAB),

12          *Trustee Response:* Ms. Bachand has no first hand know of any matter relevant

13          to this trial and is not competent to testify as to what DAB did or did not

14          "chose" to do. Under Section F-4 of the FBA Agreement, Amazon could

15          choose to commingle inventory of different sellers having the same ASIN..

16

17      12.    Sellers choose the commingling option because it allows them to forgo the

18  time-consuming and expensive process of labeling all of their individual inventory units

19  and allows for faster delivery to customers. T. Bachand Expected Tr. Test.

20          *Trustee Response:* Ms. Bachand has no first hand know of any matter relevant

21          to this trial and is not competent to testify as to what DAB did or did not

22          "chose" to do. Under Section F-4 of the FBA Agreement, Amazon could

23          choose to commingle inventory of different sellers having the same ASIN.

24

25      13.    When a customer places an order for a seller's inventory that the seller has

26  chosen to be commingled, that seller is credited for the sale and the physical unit sent to the

customer may be any one of the same items currently in the FC closest to the customer. T. Bachand Expected Tr. Test.

> *Trustee Response:* Ms. Bachand has no first hand know of any matter relevant to this trial and is not competent to testify as to what DAB did or did not "chose" to do. Under Section F-4 of the FBA Agreement, Amazon could choose to commingle inventory of different sellers having the same ASIN.

14.     DAB also routinely shipped different inventory than what it said it was shipping because the incorrect inventory was more readily available. T. Reilly Dep. at 200:4–201:15 (DAB's COO describing CEO's practice of shipping the wrong inventory); S. Lawcock Dep. at 165:20–176:4 (DAB's inventory manager describing example of DAB shipping incorrect items to Amazon); Tr. Exs. 207, 210, 212–213 (examples of DAB's shipment problems).

> *Trustee Response:* The Trustee disputes this fact if Amazon means it to apply to items DAB shipped to Amazon Fulfillment Centers, and the Trustee is not aware of evidence in the record supporting this fact. In addition, if that is what Amazon is claiming, the fact is not material to the litigation. If the statement is intended to refer to DAB's direct sale of products from its own warehouse through the MFN program or otherwise, the statement is not material to this litigation.

> Amazon points to an instance were a customer order a four-packet of an item and DAB did not have that item in stock so it made the decision to send the customer a five-pack of the same item. The Trustee relies on Amazon admissions of the inventory that it received from DAB. Ms. Morones did not count four-packs and five-packs. She counted "units" in aggregate based upon what Amazon admits it received and either did not account for or for which

1    its data reflects Amazon is responsible.

2

3                              *DAB declares bankruptcy*

4        15.    In October 2011, DAB declared bankruptcy because, as it told this Court in

5    its March 2013 Disclosure Statement, it had "changed its operating model" from "Amazon

6    fulfillment"—the FBA program—to "merchant-fulfilled"—MFN, "transitioned without

7    fully recognizing the inadequacies of its internal systems," "encountered difficulty in

8    reconciling its inventory," and failed to establish "[i]nternal controls . . . and inventory

9    losses were heavily sustained as a result." Tr. Ex. 222 at 5–8; T. Shaffer Expected Tr. Test.

10              *Trustee Response:* The alleged fact is not material to this action. Amazon is

11              quoting from the history contained in a Chapter 11 disclosure statement that

12              was never submitted for approval.

13

14       16.    Years later during his deposition, DAB's CEO, Dan Bellino, denied that DAB

15   struggled with the issues identified in that Disclosure Statement. Specifically, he denied that

16   DAB struggled during the economic recession, denied that DAB had administrative

17   inefficiencies, denied that DAB made a strategic decision to change its operating model,

18   denied that DAB underestimated operating a warehouse, and denied that DAB

19   underestimated the adequacy of its inventory controls. D. Bellino Dep. at 170:2–176:17,

20   185:7–201:20, 202:6–203:3.

21              *Trustee Response:* The alleged fact is not material to this action. There is no

22              evidence that Mr. Bellino ever approved or ratified the statement in the

23              disclosure statement and much of what is contained in that document is

24              inconsistent with the memories of DAB employees six years later.

25

26       17.    Mr. Bellino instead testified that the reason for DAB's bankruptcy was the

previously undisclosed reason that Amazon "lost" DAB's inventory. D. Bellino Dep. at 170:2–172:12. Once in bankruptcy, however, the Trustee represented to the Court that his plan for returning DAB to profitability was to re-establish the proven Amazon fulfillment method of operation. Tr. Ex. 222 at 7–8.

> *Trustee Response:* The alleged fact is not material to this action. DAB filed bankruptcy in 2011. Dan Bellino was a cheerleader for Amazon. Whatever internal issues and inefficiencies DAB experienced were undoubtedly exacerbated by significant inventory management issues Amazon inflicted on DAB during 2010. Amazon decisions caused large quantities of DAB inventory to be unavailable for sale for prolonged periods during 2010. The extent and timing of those problems was not revealed until the Trustee analyzed the data.

### *DAB's internal inventory audit shows approximately 38,000 missing units of inventory*

18.     In late 2012, DAB attempted to conduct a historical audit of its FBA inventory based on inventory data available in Seller Central for the years 2008 to 2011. DAB conducted its audit on a year-by-year and product-by-product basis. In other words, DAB attempted to reconcile all inventory transactions for a particular product in a particular year to try to determine the yearly ending inventory balance for that product. S. Lawcock Dep. at 202:13–206:24 (DAB's inventory manager describing historical audit); Tr. Exs. 214–215, 223–224 (historical audit documents).

> *Trustee Response:* The alleged fact is not material to this action. However, The Trustee agrees that, in 2012, DAB attempted to assess the status of its FBA inventory based on inventory data available in Seller Central for the years 2008 to 2011 to try and determine the expected inventory that should have then existed.

1

2          19.    DAB's audit revealed that some products had a positive balance, meaning that

3   the available inventory transactions for that year showed an inventory surplus of that

4   product in DAB's favor, and other products had a negative balance, meaning that the

5   inventory transactions for that year showed that DAB had less inventory of that product

6   than expected. Tr. Ex. 223 (identifying years where DAB had SKU "overages" and other

7   years where DAB's data showed "missing" units); Tr. Ex. 224 (spreadsheet "difference"

8   column highlighting overages and shortages for product SKUs); S. Lawcock Dep. at

9   219:20–223:23 (DAB's inventory manager describing results of historical audit). DAB's

10  audit focused exclusively on inventory events and did not account for reimbursements that

11  Amazon had already paid DAB for lost inventory. Tr. Exs. 223–224; S. Lawcock Dep. at

12  205:21–206:24. In other words, if Amazon had reimbursed DAB for some of the products

13  with negative balances, DAB's audit did not account for those reimbursements.

14          *Trustee Response:* The alleged fact is not material to this action. Amazon is

15          correct that its inventory tracking and accounting was so deficient that it showed

16          significant deficits for some products and "surplus" units of unknown origin for other

17          products. The Trustee's damage calculations request the net and credit Amazon for

18          the overages, DAB did not. While criticizing DAB for shipping a five-pack to a

19          customer who ordered a four-pack, Amazon accused DAB of fraud for not giving

20          Amazon "credit" for adding more units to DAB's inventory than DAB shipped to

21          Amazon. Ms. Morones gave Amazon full credit for those mystery units, but Amazon

22          continued to "find" them more than 90 days after it terminated its contract with DAB.

23

24          20.    Internally, DAB concluded that the net overages and shortages on a yearly

25  basis broke down as follows:

26          2008: 26,362 unit deficit

1   2009: 4,552 unit deficit

2   2010: 2,245 unit surplus

3   2011: 9,371 unit deficit

4   **Total: 38,040 unit deficit**

5   Tr. Exs. 223–224.

6   *Trustee Response:* The Trustee agrees that in December 2012, DAB's Sean

7   Lawcock concluded that these were the net inventory deficits and surpluses for

8   2008 through 2011.

9

10   *DAB submits fraudulent inventory claims to Amazon for 391,083 units of
     missing inventory*

11

12   21.    Although DAB internally identified the purported 38,040-unit deficit, DAB

13   lied to Amazon about the extent of the deficit by submitting to Amazon a fraudulent

14   reimbursement claim. The spreadsheets that DAB sent to Amazon omitted any product with

15   a positive balance. *Compare* Tr. Ex. 217 (DAB audit spreadsheet sent to Amazon for 2012

16   inventory identifying only SKUs with a negative balance), *with* Tr. Exs. 214–215 (DAB

17   audit spreadsheet sent to Trustee for 2008–2011 inventory identifying SKUs with both

18   positive and negative balance) *and* Tr. Exs. 223–224 (DAB audit spreadsheet sent to CEO

19   for 2008–2011 inventory identifying SKUs with both positive and negative balance). In

20   other words, although DAB's internal audit revealed hundreds of products where DAB's

21   data showed that DAB had more product in its inventory than expected, DAB excluded that

22   data from the spreadsheet sent to Amazon. S. Lawcock Dep. at 207:17–215:7, 219:20–

23   223:23 (DAB's inventory manager describing audit information sent to Amazon). As a

24   result, DAB sent data to Amazon that alleged that DAB's inventory balance for 2008–2011

25   was negative 391,083—more than ten times greater than the 38,040-unit negative balance

26   DAB internally identified. Tr. Ex. 11 at 5 (Seller Central ticket opened by DAB's inventory

     manager that identified 26,836 missing units for 2008, 30,267 missing units for 2009,

60

272,036 missing units for 2010, and 61,944 missing units for 2011).

*Trustee Response:* The alleged fact is not material to this action and in any event takes events out of context and inappropriately colors them through use of charged words such as "lied" and "fraudulent," which are legal argument, not facts. The Trustee in December 2012 directed DAB to present a claim to Amazon for the recovery of any inventory that Amazon had not accounted for. He later remembered the magnitude of the missing inventory to be about $1 million.

On December 17, 2012, DAB sent an email to Amazon stating that DAB seemed to be missing 391,083 inventory units from 2008 through 2012. The email asked Amazon to "[p]lease locate this missing inventory," or to provide DAB "with reimbursement for product which was lost/misplaced while being stored at an Amazon warehouse." Amazon, however, did not process that request. Instead, that same afternoon, Amazon asked DAB to "create cases with 10 SKUs / ASINs." DAB advised that this would require "500+ different cases," but Amazon said that they were "closing the case" pending receipt of cases of "10 SKUs / ASINs."

As instructed by Amazon, DAB began submitting requests limited to ten products. Amazon treated those requests as "spam." Internally, Amazon decided to close the cases (cancel the reimbursement requests), but did not communicate that to DAB or implement it internally. By early March 2013, Amazon had processed 487 of the 1,148 cases that DAB submitted. But when Amazon management discovered that the cases were being processed, it asked "How did this get reopened?" and reverted to its prior decision "that **we will NOT support inventory reconciliation that required research on pre-2011 data.**" (bolding in original). It was decided that "DAB can do their

Case 2:13-ap-00799-DPC    Doc 332    Filed 02/05/21    Entered 02/05/21 22:52:33    Desc
Main Document    Page 63 of 122

1    analysis."

2

3        22.    The DAB employee who conducted this audit, Sean Lawcock, specifically

4    asked Mr. Bellino, DAB's CEO, if he should submit the accurate data figures or present a

5    "more dramatic case" to Amazon by omitting any products showing a positive balance. Tr.

6    Ex. 223, S. Lawcock Dep. at 219:20–223:23. Mr. Bellino directed Mr. Lawcock to omit the

7    overages that were favorable to Amazon and submit the more dramatic case. S. Lawcock

8    Dep. at 207:17–215:7; 219:20–223:23.

9            *Trustee Response:* The alleged fact is not material to this action. DAB

10           submitted a claim for the product Amazon lost. There is no evidence that

11           Amazon took any action on this claim. Instead it directed DAB to submit

12           claims for individual products, which DAB did, but Amazon treated it as

13           "spam" and refused to finish processing. Amazon has made no attempt to

14           explain how DAB had "products showing a positive balance" or how it

15           concluded those items were fungible with the units *in different products* that

16           it lost. Nevertheless, the Morones calculations give Amazon full credit for

17           those "positive balances" through January 31, 2014.

18

19       23.    Mr. Lawcock testified that submitting the "more dramatic" audit data was Mr.

20   Bellino's decision, and he admitted that it was not the most accurate reconciliation of

21   DAB's inventory. S. Lawcock Dep. at 207:17–215:7; 219:20–223:23

22           *Trustee Response:* The alleged fact is not material to this action. DAB

23           submitted a claim for "lost" inventory. It did not attempt to provide a

24           "reconciliation" for what Amazon did at its warehouses as it destroyed, lost,

25           found and substituted units.

26

1

2        24.     Mr. Lawcock and Mr. Bellino did not inform the Trustee that they had

3   submitted a fraudulent claim to Amazon for 391,083 missing units. The Trustee directed

4   DAB to submit its claim to Amazon based on the belief that the claim was worth

5   approximately $1 million for the approximately 38,000 units that Mr. Lawcock had

6   calculated (without accounting for reimbursements). T. Shaffer Dep. (Apr. 29, 2019) at

7   181:17–183:20, 184:7–10; Tr. Ex. 216 (Trustee directing DAB to submit inventory claim

8   to Amazon); Tr. Ex. 12 ("When was the exact date(s) when [DAB] submitted the

9   $1,000,000 inventory claim?"). The fraudulent claim that DAB actually submitted to

10  Amazon was for over $10 million in allegedly "missing" inventory. Tr. Ex. 11 at 5

11  (identifying 391,083 "missing" units which, at the time, DAB valued at $27 per unit). The

12  Trustee did not learn about DAB's misrepresentations until the Trustee's April 2019

13  deposition. T. Shaffer Dep. (Apr. 29, 2019) at 184:7–10.

14              *Trustee Response:* The alleged fact is not material to this action, is taken out

15              of context, and is again inappropriately colored by the charged word

16              "fraudulent," which is legal argument, not fact. The claim DAB submitted

17              asked Amazon to locate and resolve discrepancies for 391,083 units of DAB

18              inventory, and mentioned no dollar amount of claimed damage. *See* response

19              to No. 21 above for further detail.

20

21       25.     In the weeks following DAB's submission of its audit data, Amazon paid

22  DAB more than $100,000 in reimbursements before Amazon realized that DAB's data was

23  flawed and incomplete. Tr. Ex. 12 (noting that Amazon had paid over $100,000 in

24  reimbursements before Amazon "woke up" and "took note"). Thus, in February 2013,

25  Amazon advised DAB that its inventory reconciliation was not reliable and that DAB

26  needed to make another effort at reconciling its inventory. Tr. Ex. 220 at 3.

| 1 | *Trustee Response:* The alleged fact is not material to this action. |
| 2 | In any event, the Trustee is not aware of facts in the record supporting the |
| 3 | claim that "[i]n the weeks following DAB's submission of its audit data, |
| 4 | Amazon paid DAB more than $100,000 in reimbursements before Amazon |
| 5 | realized that DAB's data was flawed and incomplete," nor any evidence of a |
| 6 | correlation between Amazon's initial, minimal reimbursement and the larger |
| 7 | attempt to reconcile Amazon's handling of DAB inventory. After demanding |
| 8 | individual submissions of not more than 10 products each (out of over 30,000 |
| 9 | SKUs), Amazon processed the first $100,000 before it "woke up," "took |
| 10 | note" and violated the stay by terminating the DAB contract. |
| 11 | |
| 12 | 26.     Mr. Lawcock forwarded DAB's internal audit results to Mr. Bellino again in |
| 13 | March 2013 and discussed submitting more complete numbers to Amazon, but Mr. Bellino |
| 14 | again directed Mr. Lawcock to lie to Amazon and omit any products with overages |
| 15 | favorable to Amazon. Tr. Ex. 223; S. Lawcock Dep. at 219:20–223:23. Mr. Lawcock |
| 16 | complied and sent Amazon inflated numbers again. S. Lawcock Dep. at 224:5–226:23; Tr. |
| 17 | Ex. 10. This time, for the time period of January 1, 2010, to December 18, 2012, DAB |
| 18 | identified a negative inventory balance of 151,871 units without identifying the |
| 19 | corresponding overages. *Id.* at 3. Based on DAB's then-alleged revenue of $27.00 per unit, |
| 20 | that fraudulent submission was for $4,100,000 in missing revenue. *Id.* |
| 21 | *Trustee Response:* The alleged fact is not material to this action, is taken out |
| 22 | of context, and is again inappropriately colored by the charged word "lie," |
| 23 | which is legal argument, not fact. On March 21, 2013, Mr. Lawcock |
| 24 | submitted an analysis identifying a negative inventory balance of 151,874 |
| 25 | units without identifying the corresponding overages. However, Amazon |
| 26 | immediately recognized the missing data and requested it. DAB submitted |

that information to Amazon that same day.

*Amazon provides preliminary response to DAB's fraudulent claims that significantly reduces number of alleged missing units of inventory*

27.     Amazon asked DAB to submit data showing all products instead of just those with negative balances. Tr. Ex. 10 at 2–3. Once Amazon had that data, an Amazon employee who did not routinely perform inventory accounting as part of her duties at Amazon, Diana Flores, initially analyzed it, identified some errors and inconsistencies, and told DAB that Amazon would need to review the data in closer detail. *Id.* at 1–2. Ms. Flores informed DAB that even her preliminary analysis showed that DAB's $4,100,000 demand was overstated by at least 61%. *Id.* Specifically, Ms. Flores's quick analysis showed that DAB's negative inventory balance for the January 2010 to December 2012 period was no more than 60,658 units, which would amount to $1,637,766 in missing revenue using DAB's estimated—but unsubstantiated—$27.00 revenue per unit figure. *Id.*

> *Trustee Response:* From the very beginning, Amazon's calculations were very close to the Trustee's, yet eight years later, Amazon continues to focus on everything except the liability that it has recognized for many years.

28.     The Trustee attempts to cast Ms. Flores's email as an admission from Amazon that Amazon owes DAB for $1,637,766 for lost inventory. T. Shaffer Dep. (Apr. 29, 2019) at 40:17–41:10 (claiming that Amazon has "already admitted" that it owed more than $1.5 million for lost inventory based on Ms. Flores's preliminary analysis). That argument ignores Ms. Flores's express statement that Amazon needed to review the figures in closer detail, ignores Ms. Flores's limited role with inventory reconciliation, and ignores Ms. Flores's good-faith effort to promptly provide an initial analysis to DAB using DAB's supplied (and intentionally misleading) data, and ignores that Ms. Flores showed that DAB had made some obvious mistakes resulting in a significantly inflated claim. Tr. Ex. 10 at 1–2. Ms. Flores made clear in the email that her analysis was preliminary and that Amazon

1 would follow up with any additional steps needed to resolve this claim. *Id.*

2      *Trustee Response:* The alleged fact is not fact but argument. The Trustee is
3      not relying on Ms. Flores's email to prove its claim. But Ms. Flores's email
4      is evidence that Amazon recognized back in 2013 that DAB was owed money
5      for lost inventory.

6     29.    Less than one week after completing this preliminary analysis, Amazon
7 reviewed DAB's submission in more detail and concluded that there were additional gaps
8 in the data DAB provided. Tr. Ex. 10 at 1–2. Accordingly, Ms. Flores responded to DAB
9 again and advised DAB that Amazon needed to look further into the data that DAB had
10 submitted in order to accurately reconcile DAB's inventory. *Id.* ("Based on our initial
11 research, our team believes there may be some gaps in the reconciliation you provided that
12 account for many of the missing units, and we have a team looking further into this
13 matter.").

14      *Trustee Response*: The alleged fact is not material to this action. The Trustee
15      disputes the accuracy of the alleged fact and is not aware of evidence in the
16      record that supports the alleged fact. But Ms. Flores's email is evidence that
17      Amazon recognized back in 2013 that DAB was owed money for lost
18      inventory.

19

20          <u>*Amazon's "Deep Dive" analysis shows Amazon owes $44,000 in*</u>
21          <u>*reimbursements*</u>

22     30.    With the continued unreliability of DAB's submissions, Amazon performed
23 its own detailed analysis of DAB's inventory data—referred to by the parties as the "Deep
24 Dive." Tr. Ex. 134 at 16–18 (detailing "Deep Dive" analysis); Tr. Ex. 112 ¶¶ 5–8 (same);
25 J. Ice Dep. at 139:16–140:21, 142:16–144:2, 149:23–150:11, 151:24–152:25, 158:2–159:7,
26 182:20–185:16, 189:8–25, 193:9–194:12 (same). The Deep Dive was an "accounting" of
the Debtor's inventory units.

66

*Trustee Response:* Amazon continues to rely on its own self-serving statements in its discovery responses as though they were admissible evidence. The Deep Dive is neither admissible nor supported by admissible testimony. It is admittedly inconsistent with other Amazon statements concerning its accounting for the DAB inventory, but Amazon made no attempt to reconcile those discrepancies and refused to respond to discovery requests for an explanation. The Trustee disputes that the Deep Dive was either a "detailed analysis of DAB's inventory data" or an "accounting" of DAB's inventory units. The Trustee is not aware of record evidence supporting those assertions. DAB sold 31,166 different products. The Deep Dive looked at inventory information concerning only 100 of those products (about .03% of them) and there is no evidence that Amazon looked at or considered inventory adjustment data related to those products.

Moreover, as stated by Amazon's Justin Ice—who was involved in gathering the data for both the Deep Dive and the M15 Data—there were "absolutely" inconsistencies between the Deep Dive data and the M15 Data. As Ice explained, there were "multiple databases within Amazon" that had to be checked, and he only learned later about a "sub database that needed to be pulled in," and there were communications issues so that, as to some data, he wasn't able "to get it in time."

31. The Deep Dive identified DAB's top 100 products for which there was a potential discrepancy and attempted to reconcile the inventory counts for those products using any data that was available to Amazon. Although DAB sold thousands of different products via amazon.com, those 100 products represented 62% of the alleged inventory discrepancies that DAB identified. Tr. Ex. 134 at 16–18 (detailing "Deep Dive" analysis);

1    Tr. Ex. 112 ¶¶ 5–8 (same); J. Ice Dep. at 139:16–140:21, 142:16–144:2, 149:23–150:11,

2    151:24–152:25, 158:2–159:7, 182:20–185:16, 189:8–25, 193:9–194:12 (same).

3            *Trustee Response: See* response to No. 30 above. The Trustee disputes any

4            use of the Deep Dive data because Amazon has no expert testimony to explain

5            either the actual methodology used or the inconsistencies between it and the

6            M15 Data. For example, the alleged fact states that the Deep Dive focused on

7            the "top 100 products for which there was a potential discrepancy." It's not

8            clear what that even means. For example, who determined when there was a

9            "potential" discrepancy, and what criteria were used to identify such? The

10           Trustee is also not aware of record evidence supporting the conclusion that

11           the 100 products chosen "represented 62% of the alleged inventory

12           discrepancies that DAB identified."

13                   In addition, Amazon says that the M15 Data is the data that should be

14           used in this action, not the Deep Dive data.

15

16   32.     Amazon's Deep Dive analysis revealed that it owed, at most, $27,000 in gross

17   reimbursements to DAB for the top 100 products. Tr. Ex. 134 at 16–18. Applying that

18   discrepancy rate to the remaining percentage of DAB's total inventory discrepancies,

19   Amazon estimated that it owed DAB $44,000 in gross reimbursements. *Id.*

20           *Trustee Response:* Amazon cites its self-serving statements and letters from

21           its counsel as thought they were admissible evidence. They are not. When that

22           fails, Amazon relies on a "representative" without first-hand knowledge to

23           testify that Amazon must be right. Amazon submitted a single Rule 26

24           disclosure in this matter identifying fourteen Amazon employees with

25           knowledge. None of them will testify at trial and Ms. Bachand in not on the

26           list, nor was she employed by Amazon at the time. The Trustee disputes the

68

accuracy of the alleged fact and is not aware of evidence in the record that supports the alleged fact. The Trustee disputes the validity of the statistical methodology of the Deep Dive, which would require expert analysis and testimony which Amazon has not proffered. The Amazon employee who performed the Deep Dive testified that his task was merely to find the inventory. If Amazon applied an adjustment code that indicated Amazon destroyed or lost the inventory, the employee "accounted" for it as it had been removed from the DAB ending balance. The Trustee describes those inventory events as "Shrinkage" and seeks compensation from Amazon for that Shrinkage.

33.     Despite the significant amount of effort that Amazon poured into performing the Deep Dive and explaining the results of the Deep Dive to the Trustee, the Trustee cast aside the results of the Deep Dive and clung to the March 2013 email from Ms. Flores that was explicitly not intended to be a full-scale reconciliation of DAB's inventory. T. Shaffer Dep. (Apr. 29, 2019) at 40:17–41:10 (claiming that Amazon has "already admitted" that it owed more than $1.5 million for lost inventory based on Ms. Flores's preliminary analysis).

*Trustee Response:* This is attorney argument which is inconsistent with the facts. The Trustee primarily relies on the expert analysis and conclusions of Ms. Morones for its damage claim in this matter.

### *Amazon produces the M15 data, which show that Amazon over-reimbursed DAB for lost inventory*

34.     The Trustee's refusal to accept the results of the Deep Dive forced Amazon to provide the Trustee with the inventory data that is currently at the heart of this action—the M15 data. The M15 data include millions of lines of inventory data for the entirety of the Debtor's inventory units in the FBA program over a six-year period. T. Bachand

1   Expected Tr. Test.; *see also* Tr. Ex. 112 ¶¶ 9–10. The M15 data are the most complete
2   information known to be available to account for DAB's "Lost Inventory." T. Bachand
3   Expected Tr. Test.; see also Tr. Ex. 118 at 6.

4               *Trustee Response:* This is attorney argument, not fact. Nevertheless, because
5               Amazon claims that the M15 data is "the most complete information known
6               to be available," the Trustee's expert has relied on the M15 data in her expert
7               analysis, along with the Seller Central Settlement Reports.

8

9       35.    The Trustee now alleges that Amazon systematically lost millions of dollars
10  of DAB's inventory over a seven-year period without anyone at DAB noticing until this
11  case was initiated. DAB's former COO, Thomas Reilly, reviewed the Trustee's allegations
12  and testified that they were "highly unlikely." T. Reilly Dep. at 148:6–149:4 (DAB's COO
13  opining that DAB's lost inventory claim is "highly unlikely"). Mr. Reilly further testified
14  that he did not trust Mr. Bellino because Mr. Bellino had questionable integrity. *Id.* at
15  15:20–18:21, 32:25–34:12, 36:4–37:9, 148:6–149:4.

16              *Trustee Response:* The Trustee does not allege that Amazon
17              "systematically"—that is, intentionally, using some method or plan—lost
18              DAB's inventory "without anyone at DAB noticing until this case was
19              initiated." The Trustee asserts that Mr. Reilly's testimony lacks any
20              foundation and is not material to this action. Mr. Reilly worked for DAB for
21              only several months in late 2010 and early 2011. When he was deposed nine
22              years later, Amazon briefly showed him a copy of the Trustee's complaint
23              filed long after Mr. Reilly had left the company. It was in that context that
24              Mr. Reilly made his off-the-cuff "unlikely" comment. That testimony lacked
25              any personal knowledge or basis; it was inadmissible speculation.

26

1    36.    The Trustee's theory is inconsistent with the data and other evidence. T.

2    Bachand Expected Tr. Test.; Williams Rpt.; Williams Tr. Decl. ¶¶ 5–13; S. Morones

3    Expected Tr. Test.

4            *Trustee Response:* The Trustee does not know what "theory" this fact is

5            alluding to. The Trustee's damage analysis, however, is fully consistent with

6            the data and other evidence.

7

8    37.    After initially disclosing three testifying expert witnesses—one for inventory

9    calculations, one for generally accepted industry standards for inventory accounting, and a

10   third for stay-violation claims, the Trustee withdrew all three of those testifying experts. T.

11   Shaffer Expected Tr. Test. In their place, the Trustee disclosed and produced the report of

12   a new, single expert witness, Serena Morones, on May 10, 2019. Morones Rpt.

13           *Trustee Response:* The Trustee agrees that it engaged Ms. Morones and that

14           she submitted her expert report dated May 10, 2019. Whether or not the

15           Trustee engaged or consulted other experts before her is not material to this

16           action.

17                   The Trustee engaged Stephen Ashworth and Cathie Cameron to

18           analyze the Seller Central data. When DAB presented its analysis of the Seller

19           Central records to Amazon, Amazon disavowed the accuracy of the Seller

20           Central records.

21                   Amazon claimed Seller Central records are incomplete and

22           Amazon had additional data that needed to be considered. Amazon spent

23           approximately six months creating a data set that it delivered in May 2015

24           (the "M15" or "May 15" data). Amazon admitted the M15 data was

25           incomplete and likely inaccurate, but said it was the best it could do.

26           The M15 data was presented in a way that made it almost impossible to

analyze. It included multiple data sets, but used incomplete and inconsistent identifiers across the data sets that made them largely unusable without significant analysis and processing. Stephen Ashworth performed that analysis on a product by product basis for over 6.3 million units. The Trustee engaged Kurt Spendlove to confirm the Ashworth analysis, which he tested and validated. However, the processing and detangling of the M15 data was too large of a project for Spendlove to undertaker. Therefore, Morones engaged Jeff Cone who spent nearly a year working with Morones to analyze the M15 data and sort it into a useable form.

38.    Ms. Morones opined that Amazon owes $641,521 for DAB's expected ending inventory—the inventory "Lost" or "unaccounted" at the end of the Debtor's relationship with Amazon. Morones Rpt. at 11–12, 20. More specifically, Ms. Morones alleges that DAB had 39,331 units of expected ending inventory and that the net reimbursement price for each unit is $16.31. *Id.*

*Trustee Response:* The Trustee agrees that Ms. Morones's expert report shows that 39,331 units of DAB inventory that should have existed as of January 31, 2014 were not accounted for by Amazon. The Trustee also agrees that Ms. Morones used a net price per unit of $16.31, after deducting assumed Amazon fees and costs.

39.    Amazon's rebuttal expert, E. Weiant Williams, reviewed the M15 data and Ms. Morones's calculations and concluded that DAB's expected inventory unit balance was 20,405 units:

| Receipts (+): | 6,316,429 |
|---|---|
| Sales (–) | (5,978,113) |
| Customer Returns (+) | 63,452 |
| Removals (-) | (364,796) |
| Adjustments (+/-) | (16,567) |
| **Total** | **20,405** |

Williams Rpt. at 8, 15–17, 36; Williams Tr. Decl. ¶¶ 6–8, 31.

     *Trustee Response:* Mr. Williams's object was only to "review and rebut" the opinions of Ms. Morones, and not to assess the damages owed DAB. The Trustee agrees, however, that one Mr. Williams's two analyses showed an expected inventory unit balance of 20,405. However, Mr. Williams testified that he didn't think that analysis was sound insofar as it deducted 16,567 units for "adjustments," because he didn't understand and could not explain Amazon's "software corrections codes"—Codes 1, 2, and J—and that led him to be "uncomfortable with adjustments as a whole." That led to his "decision" to do the analysis excluding adjustments.

     40.    Mr. Williams concluded that the M15 data show that Amazon should be credited for at least 28,541 inventory reimbursements paid to DAB. Williams Rpt. at 8–9, 15–19; Williams Tr. Decl. ¶¶ 8, 31. Thus, Mr. Williams's primary conclusion is that Amazon over-reimbursed DAB by more than 8,000 units, which is consistent with Amazon's policy of erring on the side of reimbursing sellers when an inventory dispute arises. Williams Rpt. at 8–9, 15–19, 36; Williams Tr. Decl. ¶¶ 8, 31.

     *Trustee Response:* The Trustee disputes that Mr. Williams's "primary conclusion" was that Amazon over-reimbursed DAB by more than 8,000 units. As the Trustee stated in response to No. 39 above, Mr. Williams backed off of that conclusion

because he was uncomfortable with the software correction codes. Moreover, Mr. Williams's conclusions on Amazon's potential liability are not helpful, because he testified that the information needed to determine "how many units Amazon needed to reimburse [DAB] for" was "not discernible from the M15 data."

41.     Although reconciliation of DAB's expected ending inventory should include inventory adjustments, Amazon recognizes that understanding and reconciling adjustments in the M15 data is likely the most complex piece of inventory reconciliation. Mr. Williams performed an inventory calculation that omits those adjustments, resulting in an alternative calculation that is favorable for DAB, not Amazon. Williams Rpt. at 8–9, 15–18, 36; Williams Tr. Decl. ¶¶ 9, 31.

> *Trustee Response:* The Trustee agrees that, in assessing Amazon's liability to DAB, the adjustments shown in the M15 data need to be accounted for. Since Mr. Williams's preferred calculations ignore those adjustments, they are not reliable.

42.     Mr. Williams concluded that 36,972 units were unaccounted in DAB's inventory if adjustments are omitted from the reconciliation:

| Receipts (+): | 6,316,429 |
| Sales (–) | (5,978,113) |
| Customer Returns (+) | 63,452 |
| Removals (-) | (364,796) |
| **Total** | **36,972** |

Williams Rpt. at 15–17; Williams Tr. Decl. ¶ 31; Tr. Ex. 256 (demonstrating Mr. Williams's maximum ending inventory calculation).

1    *Trustee Response:* The Trustee admits that the above summarizes one part of one of

2    Mr. Williams's analyses.

3

4    43.    The M15 data show exactly what happened to 6,279,457 units of the

5    6,316,429 units that DAB shipped to Amazon: 5,978,113 units were sold to customers,

6    63,452 of those sales were returned to Amazon, and 364,796 of the units DAB shipped to

7    Amazon were removed from DAB's inventory (i.e., either returned to DAB or destroyed at

8    the DAB's request to avoid paying for shipping or long-term storage). Williams Rpt. at 15–

9    17; Williams Tr. Decl. ¶ 31; Tr. Ex. 256 (demonstrating Mr. Williams's maximum ending

10    inventory calculation). Thus, the only question is whether Amazon bears responsibility for

11    the 36,972 units of the 6,316,429 units that DAB shipped to Amazon that are not accounted

12    in DAB's sales, returns, or removals. Williams Rpt. at 15–17; Williams Tr. Decl. ¶¶ 6–9,

13    31; Tr. Ex. 256.

14          *Trustee Response:* The Trustee disputes the conclusion that "the only question

15          is whether Amazon bears responsibility for the 36,972 units of the 6,316,429

16          units that DAB shipped to Amazon that are not accounted in DAB's sales,

17          returns, or removals." In addition to other issues set forth in the Trustee's

18          supplemental disclosures and Ms. Morones's report, one must consider

19          known inventory shrinkage: lost, damaged, or destroyed inventory as shown

20          by the Amazon adjustment codes.

21

22    44.    As outlined above, Mr. Williams determined that when adjustments and

23    reimbursements are appropriately factored into DAB's inventory reconciliation, the M15

24    data show that Amazon over-reimbursed DAB by approximately 8,000 units. Williams Rpt.

25    at 8–9, 15–19, 36; Williams Tr. Decl. ¶¶ 8, 31.

26          *Trustee Response:* The Trustee disputes this statement. *See* Trustee Response

1          to Nos. 39 and 40 above.

2

3          45.    Mr. Williams also determined that even if the Court were to exclude

4    consideration of adjustments data entirely and find that Amazon is responsible for all 36,972

5    units that were not sold, returned, or removed, Amazon is responsible for only 8,431 units

6    of inventory once reimbursements are appropriately factored into the reconciliation. Thus,

7    using DAB's proposed net reimbursement amount of $16.31 per unit, Amazon's maximum

8    exposure for "Lost Inventory"—using assumptions favorable to DAB—is $137,516.

9    Williams Rpt. at 8–9, 15–18, 36; Williams Tr. Decl. ¶¶ 6–9, 31.

10                    *Trustee Response:* The Trustee disputes this statement for the all the reasons

11                    set forth in Ms. Morones's expert report and in the Trustee's Motion for

12                    Partial Summary Judgment. The alleged fact ignores inventory adjustments

13                    that show at least 72,357 units of lost, damaged or destroyed inventory as

14                    determined by Ms. Morones, as well as about 150,000 additional units of

15                    unsellable inventory marked as Code Q.

16

17         46.    The different inventory reconciliations that Amazon has performed

18    throughout this case are consistent with each other when the purpose of the reconciliation

19    is considered. Ms. Flores's email was a preliminary analysis aimed at highlighting some of

20    the fundamental flaws in DAB's fraudulent data submission. That back-of-the-envelope

21    reconciliation showed that DAB had over-estimated its lost revenue by at least 61%, but it

22    was never intended to be a holistic reconciliation of DAB's inventory. *See* Tr. Ex. 10 at 1–

23    2. The Deep Dive took a closer look at DAB's top 100 products with alleged negative SKU

24    balances and estimated that Amazon owed DAB approximately $44,000 in reimbursements.

25    Although the Deep Dive was much more thorough than Ms. Flores's analysis, it, too, was

26    only an estimate based on a sampling of DAB's products. Tr. Ex. 134 at 16–18 (detailing

"Deep Dive" analysis); Tr. Ex. 112 ¶¶ 5–8 (same); J. Ice Dep. at 139:16–140:21, 142:16–144:2, 149:23–150:11, 151:24–152:25, 158:2–159:7, 182:20–185:16, 189:8–25, 193:9–194:12 (same). Finally, at the Trustee's insistence, Amazon produced and reconciled the M15 data. This full-scale inventory reconciliation shows that Amazon does not owe for any lost inventory because Amazon has already over-reimbursed the Debtor for such inventory.

> *Trustee Response:* The alleged fact is attorney argument. There is no meaningful comparison between Ms. Flores's analysis, the Deep Dive data, and the M15 data.

47.     Mr. Williams identified two primary problems with Ms. Morones's analysis of expected ending inventory and her conclusion that DAB's expected ending inventory was 39,331 units:

> a. *First*, the Trustee's counsel instructed Ms. Morones to exclude any inventory transactions that occurred after January 31, 2014. Williams Rpt. 8–9, 16–17; S. Morones Expected Tr. Test. There is no contractual or factual support for this cutoff date. T. Shaffer Dep. (Apr. 24, 2019) at 55:6–11 (claiming that January 31, 2014 cutoff was selected because it was the "contractual cutoff date"); Tr. Ex. 152 (containing no contractual cutoff date for Amazon to remove DAB's inventory). Instead, the Trustee's counsel simply pulled this cutoff date from thin air and explicitly instructed Ms. Morones to add it to her expert report because adding a cutoff date produces favorable numbers for DAB. S. Morones Expected Tr. Test.; Morones Rpt. at 13 (stating, without citation, that "I understand from Counsel for [DAB] that by January 31, 2014, Amazon should have either removed and returned, or reimbursed any inventory unaccounted for"); Tr. Ex. 241 at 1–2 (email from DAB's

counsel instructing expert to impose cutoff date based on Amazon termination letter). DAB continued to submit removal requests to Amazon in 2014 and Amazon continued to remove DAB's inventory and make adjustments to that inventory after January 31, 2014, as it was entitled to do. T. Bachand Expected Tr. Test.; Williams Rpt. 8–9, 16–17. Because units removed or adjusted after January 31, 2014 are accounted for in the data and not "lost," Mr. Williams' inventory reconciliation accounts for these inventory transactions. Williams Rpt. 8–9, 16–17.

> *Trustee Response:* The Trustee disputes the alleged fact, much of which is merely attorney argument. The Trustee instructed Morones to use January 31, 2014 as the cutoff date because by that time Amazon had terminated DAB's FBA selling privileges, DAB had asked Amazon to return all of DAB's Fulfillment Center inventory, and DAB had closed its warehouse and ceased operations. Any inventory units Amazon belatedly returned thereafter would not have benefitted DAB.

> The Trustee disputes that "DAB continued to submit removal requests to Amazon" after January 31, 2014. DAB did not. However, post-1/31/14, Amazon itself may have automatically, if belatedly, destroyed DAB inventory or sent DAB inventory somewhere, but such did not benefit DAB. Indeed, between October 1, 2013 and January 31, 2014, Amazon unilaterally cancelled DAB requests for the return of about 24,000 units of DAB inventory.

b.  *Second*, Ms. Morones failed to adequately account for reimbursements. The M15 data shows that Amazon reimbursed DAB for 41,911

inventory units. Williams Rpt. at 18. Mr. Williams determined, however, that it was appropriate to offset only 28,541 of those units to avoid duplicating other transactions. Williams Rpt. at 8–9, 15–19; Williams Tr. Decl. ¶¶ 8, 31. Mr. Williams's reconciliation factors in these reimbursements. Williams Rpt. at 8–9, 15–19; Williams Tr. Decl. ¶¶ 6–9, 31.

>*Trustee Response:* The Trustee disputes that Ms. Morones failed to adequately account for reimbursements. As shown in her expert report, Ms. Morones summed the Amazon reimbursements and credited Amazon with the total amount of $304,276 dollars for such.

### *The Trustee's new, unpleaded claims for "damaged" and "mis-received" inventory are flawed and should be excluded as unpleaded and untimely*

48.     Separate from her ending expected inventory calculation, Ms. Morones states that "Based on instruction from Counsel for [DAB], I understand that Amazon is liable to reimburse [DAB] for inventory items damaged, lost, or stolen while the units were under Amazon's custody." Morones Rpt. at 13. Ms. Morones opines that 72,357 units of inventory—a total value of $1,180,202—fall into this damages category. *Id.* at 13–16.

>*Trustee's Response:* The Trustee agrees with this fact.

49.     As a threshold matter, Trustee has not asserted claims for "damaged" or "misreceived" inventory. *See* Amazon Mot. to Exclude Unpleaded and Untimely Claims and Damages Theories, ECF No. 268 (Nov. 20, 2020); Tr. Ex. 255 (case chronology describing key events that resulted in the Trustee's untimely and unpleaded damages claims and theories); Tr. Ex. 258 (chart detailing the Trustee's unpleaded and untimely damages

1    claims and theories). The Trustee initiated this action for allegedly "Lost Inventory," not to

2    determine which party was responsible for damage to inventory dating back more than ten

3    years. *See* Compl. ¶¶ ¶¶ 21–25, 44–46, 56–58.

4                    *Trustee Response:* The Trustee disputes that his damage claim is limited to

5                    "lost inventory" using Amazon's interpretation of that phrase. In addition to

6                    alleging damages flowing from Amazon's violation of the automatic stay, the

7                    Complaint seeks the recovery of "Lost Inventory," which the Complaint

8                    broadly defines to mean Amazon's failure "to account for inventory worth in

9                    excess of $1.5 million that the Debtor has shipped to Amazon for storage

10                   pending sale on the Amazon Platform and shipping by Amazon to the

11                   Debtor's customers." The term thus requires an accounting for all 6,316,429

12                   units of inventory that the M15 data show that DAB shipped to Amazon,

13                   whether one calls such inventory lost, damaged, destroyed, misreceived, or

14                   unpaid for. The Complaint also alleges that Amazon withheld funds from and

15                   failed to remit funds to DAB. The Complaint further alleges that Amazon's

16                   actions breached its contract with DAB, and that Amazon has failed to "store,

17                   maintain, preserve, and account for" DAB's inventory, and that Amazon had

18                   failed to "compensate" DAB for such Lost Inventory. The Complaint further

19                   alleges that DAB suffered damages "in an amount to be determined at trial as

20                   a result of Amazon's breaches of the Contract."

21

22        50.    On the merits of this category of damages, Mr. Williams identifies two

23    primary objections:

24                    a.  *First*, Ms. Morones's conclusion that Amazon's adjustment data shows

25                        that 72,357 units of inventory were damaged, lost, or stolen while in

26                        Amazon's custody misunderstands Amazon's adjustments data. For

80

reasons explained in detail in Mr. Williams's report, the adjustments data in the M15 data cannot be used to determine with particularity how many damaged, lost, or stolen units for which Amazon is potentially responsible. Williams Rpt. at 9–10, 20–24; Williams Tr. Decl. ¶¶ 10–13; T. Bachand Expected Tr. Test. Amazon's Trial Exhibit 263 demonstrates examples of mistakes that Ms. Morones makes in her calculations as a result of her misunderstanding Amazon's adjustment data. Tr. Ex. 257.

*Trustee Response:* The Trustee agrees that Mr. Williams's report argues that adjustments data in the M15 data cannot be used to determine with particularity how many units of inventory were damaged, lost, or stolen, but the Trustee's expert disagrees with Mr. Williams on this matter. The Trustee notes that the main source of Williams's authority for such statements come not from his analysis but from what an Amazon employee, Ms. Bachand, told him. The Trustee further notes that Ms. Bachand was not working at Amazon when the M15 data were gathered.

b. *Second*, even if the Court were to allow that Ms. Morones's calculation of 72,257 units was somehow plausible, Mr. Williams notes that the M15 data appropriately accounts for those units. Specifically, the alleged lost or damaged units Amazon would be responsible for have been otherwise replaced (16,585 Code N's), Reimbursed (28,541 reimbursements for lost or damaged units), or still reside in Ms. Morones's calculated Expected Ending Inventory (39,331 units). Thus, even if more than 72,000 units were lost or damaged in Amazon's

possession, the data allows for more than 84,000 units that could reasonably account for them. Williams Rpt. at 9–10, 20–24; Williams Tr. Decl. ¶ 13; T. Bachand Expected Tr. Test.; S. Morones Expected Tr. Test. Amazon's Trial Exhibit 263 also demonstrates examples of mistakes that Ms. Morones makes in her calculations as a result of her misunderstanding Amazon's adjustment and reimbursement data. Tr. Ex. 257.

*Trustee Response:* The Trustee disputes the alleged fact. DAB's general practice was to remove unsellable items from its inventory, and available data show that, as of December 31, 2013, there were only 752 units of unsellable inventory in DAB's account (excluding expired units). As for the 16,585 units of inventory that, per the M15 data, Amazon transferred into DAB's account, Amazon neglected to say that Amazon also transferred 24,633 units *out* of DAB's account, giving a net deficit of over 8,000 units. That is just what Amazon criticized Mr. Bellino for doing: making a claim that includes only the favorable facts, while omitting the helpful ones. Amazon offers no evidence beyond speculation that the 39,331 units of expected ending inventory "likely include many of the allegedly lost or damaged units."

*The Trustee's new, unpleaded claims for unremitted sales proceeds and unpaid refunds are flawed and should be excluded as unpleaded and untimely*

51.     Ms. Morones's report also alleges that Amazon is liable for $1,156,495 in "Sales Proceeds Not Remitted to [DAB]." This category of damages alleges that DAB sold millions of dollars of product on amazon.com for which Amazon never paid DAB. Morones Rpt. at 17–18.

1    *Trustee Response:* The Trustee admits that Morones's report alleges that

2    Amazon is liable for $1,156,495 in "Sales Proceeds Not Remitted to [DAB]."

3

4    52.    As a threshold matter, Amazon has moved to exclude this claim because it

5    was not properly pleaded or otherwise timely raised in this proceeding. *See* Amazon Mot.

6    to Exclude Unpleaded and Untimely Claims and Damages Theories, ECF No. 268 (Nov.

7    20, 2020); Tr. Ex. 255 (case chronology describing key events that resulted in the Trustee's

8    untimely and unpleaded damages claims and theories); Tr. Ex. 258 (chart detailing the

9    Trustee's unpleaded and untimely damages claims and theories).

10    *Trustee Response:* The Trustee admits that Amazon has moved to exclude

11    this claim.

12    53.    Because the Trustee did not make a timely claim for unremitted sales

13    proceeds, Amazon was not able to produce comprehensive payment data to show that

14    Amazon did, in fact, pay DAB for all sales that DAB made on Amazon.com. DAB was also

15    unable to produce historical bank records or wire transfer logs showing receipts from

16    Amazon in support of this claim. *See* Amazon Mot. to Exclude Unpleaded and Untimely

17    Claims and Damages Theories, ECF No. 268 (Nov. 20, 2020); Tr. Ex. 255 (case chronology

18    describing key events that resulted in the Trustee's untimely and unpleaded damages claims

19    and theories); Williams Rpt. at 25 (stating that Mr. Williams would have needed additional

20    payment records to adequately rebut DAB's payment claims).

21    *Trustee Response:* For the reasons stated in the Trustee's opposition to

22    Amazon's motion to exclude, the Trustee disagrees with this alleged fact.

23    Under the Fed. R. Civ. P. 8(a), a complaint need only make a "short and plain

24    statement of the claim showing that the pleader is entitled to relief," and a

25    "demand for the relief sought." The Complaint in this matter generally alleges

26    that Amazon has failed "to account for, or compensate the Debtor for"

83

inventory that DAB shipped to Amazon for sale on the Amazon Platform," including Amazon's failure to "store, maintain, preserve, and account for the Debtor's inventory" and for "failing compensate the Debtor" for such. The Complaint thus generally demands damages "in an amount to be determined at trial."

If Amazon has "comprehensive payment data," it should have produced it.

54. Ms. Morones calculated unremitted sales using documents called "Settlement Reports" that DAB and another one of the Trustee's experts allegedly downloaded from Seller Central. Morones Rpt. at 2; S. Morones Expected Tr. Test.; Tr. Ex. 258 (chart detailing the data sources that the Trustee relies on for his unpleaded and untimely damages claims and theories). Although Amazon's Settlement Reports contain some payment information, they do not include sufficient information to reach a reliable conclusion on the amount of payments that Amazon has made to DAB since 2008. T. Bachand Expected Tr. Test.; Williams Rpt. at 25 (stating that Mr. Williams would have needed additional payment records to adequately rebut DAB's payment claims); Tr. Ex. 258.

*Trustee Response:* The Trustee disputes the alleged fact, and is unaware of evidence in the record to support it.

55. Moreover, the Trustee did not download a complete set of the Debtor's Settlement Reports from Seller Central, chose not to disclose that the data was incomplete, and failed to seek a complete set of data from Amazon. S. Ashworth Dep. at 56:12–24, 90:21–93:4; 94:8–95:2; J. Cone Dep. at 114:15–121:9; S. Morones Expected Tr. Test. After receiving Ms. Morones's report and the materials on which she relied, Amazon identified six 48-hour gaps in the Settlement Reports that are unaccounted in Ms. Morones's calculation. Amazon was able to identify Settlement Reports addressing those data gaps,

1   and Mr. Williams concluded that those gaps account for 87% of Ms. Morones's alleged

2   unremitted sales proceeds. Williams Rpt. at 4, 10–11, 25–26; Williams Tr. Decl. ¶¶ 17–18;

3   Tr. Ex. 254 (detailing $1,363,782 in payments included in the missing Settlement Reports).

4   Due to an absence of reliable payment data, however, Mr. Williams is unable to further

5   account for the total amount of payments Amazon made to DAB. Williams Rpt. at 25–26.

6           *Trustee Response:* The Trustee disputes the alleged fact for the reasons set

7                   forth in its responses to Amazon's motions to exclude the report of Ms.

8                   Morones and to exclude allegedly unpleaded or untimely claims.

9

10  56.     Ms. Morones and the co-author of her report, Jeffrey A. Cone, both testified

11  that they were aware of these data gaps but chose not to disclose the gaps in their expert

12  report or request additional information from Amazon. J. Cone Dep. at 114:15–121:9; S.

13  Morones Expected Tr. Test.

14          *Trustee Response:* The alleged fact is not material to this action, and in any

15                  event the Trustee disputes the alleged fact. Morones's report disclosed that

16                  there was a discrepancy of $1,333,324 between the sales data in the M15 data,

17                  and the payment data in the Settlement Reports. Schedule C6 attached to the

18                  report gives more detail as to how that was calculated. Referring to the

19                  discrepancy as a "data gap" is stylistic.

20

21  57.     Ms. Morones's report also identifies $237,706 in "Unpaid Refund

22  Reimbursements" owed to DAB. Morones Rpt. at 16–17. This damages category is also

23  part of Amazon's motion to exclude unpleaded and untimely damages claims and theories,

24  and it is also based on the incomplete set of Settlement Reports that are not sufficiently

25  detailed to identify all reimbursements paid to DAB. *See* Amazon Mot. to Exclude

26  Unpleaded and Untimely Claims and Damages Theories, ECF No. 268 (Nov. 20, 2020); Tr.

1  Ex. 255 (case chronology describing key events that resulted in the Trustee's untimely and

2  unpleaded damages claims and theories); Tr. Ex. 258 (chart detailing the Trustee's

3  unpleaded and untimely damages claims and theories); Williams Rpt. at 11–12, 24–27;

4  Williams Tr. Decl. ¶ 20.

5          *Trustee Response*: The Trustee agrees that Ms. Morones's report identifies

6          $237,706 in Unpaid Refund Reimbursements. The Trustee disputes

7          Amazon's claims for the reasons set forth in its opposition to Amazon's

8          motion to exclude unpleaded and untimely claims.

9

10  58.    Although the absence of reliable payments data prevented Mr. Williams from

11  adequately assessing this unpaid refund reimbursements category of damages, he reviewed

12  the Settlement Reports and identified $41,985 in refund reimbursements that Ms. Morones

13  overlooked and failed to include in her calculations. Thus, even if the Court were to accept

14  Ms. Morones's flawed data and assumptions, this category of damages should be no more

15  than $195,721. Williams Rpt. at 11–12, 24–27,.

16          *Trustee Response:* Assuming the $41,985 identified in the M15 data as

17          "miscellaneous adjustments" has the same meaning as a "refund

18          reimbursement," as Mr. Williams asserts, the Trustee will reduce its claims

19          on that matter by that amount.

20

21          *The Trustee's most recent unpleaded claims for recoupment of Amazon's*
           *fees and "inconclusive" Code Q inventory should be excluded as*

22          *unpleaded and untimely*

23  59.    Since Ms. Morones's report was filed on May 10, 2019, the Trustee's

24  damages calculation has somehow become even more untenable than it was before. The

25  Trustee's October 26, 2020, supplemental disclosures now assert a claim for $14,483,638

26  in damages. Trustee's Oct. 26, 2020, Supp. Disc. at 2–5; Tr. Ex. 255 (case chronology

1  describing key events that resulted in the Trustee's untimely and unpleaded damages claims
2  and theories); Tr. Ex. 258 (chart detailing the Trustee's unpleaded and untimely damages
3  claims and theories). This claim is based on more unpleaded and untimely damages claims
4  and theories that Amazon has not been able to rebut and more flawed data and unreasonable
5  assumptions. It is also based on the Trustee's misunderstandings of the inventory data and
6  Mr. Williams's report.

7  *Trustee Response:* The Trustee disputes that its supplemental disclosure
8  relating to damages should be excluded as either unpleaded or untimely. As
9  set forth above in Response to Nos. 49 and 53, the claims of the Complaint
10  are broad enough to include the damages alleged in the supplemental
11  disclosure, including the Amazon fees and Code Q damages.

12  60.  Specifically, the October 2020 disclosure (coming just months before trial)
13  asserts that the Trustee should be entitled to recoup more than $600,000 in fees paid to
14  Amazon for inventory that "Amazon lost, stole, damaged, destroyed, mismanaged, and
15  misreported." Trustee's Oct. 26, 2020, Supp. Disc. At 4–5 (adding new claim for return of
16  fees); Tr. Ex. 255; Tr. Ex. 258. This claim is not in the Trustee's Complaint and was not
17  included in Ms. Morones's report. *See generally* Compl.; Morones Rpt.; Tr. Ex. 258.

18  *Trustee Response: See* the Trustee's Response to Nos., 49, 53 and 59 above.

19  61.  Additionally, the October 2020 disclosure adds a claim for more than $6.8
20  million for "Code Q" adjustments. Trustee's Oct. 26, 2020, Supp. Disc. at 4–5 (adding new
21  claim for "Code Q" adjustments) Tr. Ex. 255; Tr. Ex. 258. According to the disclosure
22  statement, Code Q adjustments are used to code inventory that is lost or destroyed where
23  the responsibility for the loss is "inconclusive." *Id.* This $6.8 million claim is not in the
24  Trustee's Complaint and was not disclosed in either the Morones report or the second
25  supplemental disclosure statement. *See generally* Compl.; Morones Rpt.; Tr. Ex. 119; Tr.
26  Ex. 258.

1        *Trustee Response: See* the Trustee's Response to Nos., 49, 53 and 59 above.

2

3        <u>*Ms. Morones's prejudgment interest calculation is inaccurate*</u>

4      62.    Ms. Morones's report estimated that Amazon owed $2,906,224 in

5 prejudgment interest. Morones Rpt. at 19.

6        *Trustee Response:* The Trustee agrees with this fact.

7

8      63.    The primary issue with this calculation is that Ms. Morones's foundational

9 damages calculations are incorrect. Any alterations in that calculation or in the damages

10 awarded at trial (if any) will require a revised interest calculation. Williams Rpt. at 12, 27–

11 30; Williams Tr. Decl. ¶ 23.

12        *Trustee Response:* The Trustee agrees with this fact; the prejudgment interest

13        could be higher or lower depending on the outcome of the trial.

14

15      64.    Mr. Williams also concluded that Ms. Morones's initial interest calculation

16 inconsistently describes the starting date for her calculation and that the results of her

17 calculation are inconsistent with the interest amounts stated in her report. Williams Rpt. at

18 28–29; Williams Tr. Decl. ¶ 24.

19        *Trustee Response:* The Trustee agrees that Mr. Williams so concluded, but

20        disagrees that Ms. Moronoes's interest calculation was materially wrong.

21

22      65.    It was also unreliable for Ms. Morones to calculate interest beginning on the

23 "mid-point of [DAB's] relationship with the FBA program." Instead, as Mr. Williams

24 explained, interest should begin to run on the date of the complaint at the time of expected

25 ending inventory, which significantly reduces Ms. Morones's prejudgment interest

26 calculation. Williams Rpt. at 29–30; Williams Tr. Decl. ¶ 24.

*Trustee Response:* The Trustee disagrees with the alleged fact for the reasons stated in the Trustee's opposition to Amazon's motion to exclude Ms. Morones's testimony.

### *Ms. Morones overstates the amount of damages caused by the 15-day violation of the automatic stay*

66.     Finally, Ms. Morones concludes that Amazon's 15-day violation of the automatic stay caused $732,000 in damages to DAB. Morones Rpt. 20–23.

*Trustee Response:* The Trustee agrees that Ms. Morones concluded that Amazon's violation of the automatic stay cause $732,000 in damage to DAB.

67.     Mr. Williams identified four problems with this calculation:

    a.  *First,* Ms. Morones states that Amazon was in violation of the automatic stay for 21 days, which is incorrect. Amazon terminated DAB's seller privileges on April 11, 2013 and restored those privileges on April 26, 2013, which is a 15-day period. Williams Rpt. at 13, 31; Williams Tr. Decl. ¶ 27; Tr. Ex. 231 at 3–7.

        *Trustee Response:* The alleged fact is not material to Ms. Morones's analysis.

    b.  *Second*, Ms. Morones makes causal assumptions that are not supported by any evidence. Ms. Morones's report states that DAB lost credibility with its suppliers as a result of the automatic stay violation, which prevented DAB from returning to a stabilized level of revenues. The Trustee has been unable to identify any evidence in support of this contention, and there are a myriad of other factors that likely explain DAB's declining sales that have nothing to do with Amazon's temporary

1   removal of DAB's seller privileges. Williams Rpt. at 13, 31–32;
2   Williams Tr. Decl. ¶ 28; T. Shaffer Expected Tr. Test.; S. Morones
3   Expected Tr. Test.

4           *Trustee Response:* The Trustee denies that Ms. Morones makes
5   causal assumptions that are not supported by the evidence. Mr.
6   Shaffer's testimony offered evidence of the profound effect the stay
7   violation had on DAB's suppliers, banks, and sales.

9   c.  *Third*, Ms. Morones projected DAB's expected sales using a sales
10  baseline period that is inconsistent with the testimony of the Trustee.
11  *Compare* Morones Rpt. at 21 ("I understand from discussions with
12  Timothy Shaffer, that the Trustee had implemented operational
13  turnaround plans that had improved and stabilized PD's performance by
14  late 2012, and that November 2012–March 2013 represented stabilized,
15  growing revenue."), *with* T. Shaffer Dep. (July 3, 2019) at 78:9–80:20
16  ("Q. You're saying [DAB's business] was stable when DAB hit a
17  million dollars in gross sales? A. And could sustain it, yes. . . . Q. And
18  when did that happen? A. I'm believing that happened July or August of
19  2012."). Using the time period as the Trustee testified, Mr. Williams
20  concluded that any damages would be significantly lower. Williams Rpt.
21  at 34–35; Williams Tr. Decl. ¶ 29;

22          *Trustee Response:* The Trustee disputes the alleged fact and
23  asserts that Ms. Morones's baseline period is consistent with the
24  testimony of the Trustee.

26  d.  *Fourth*, Ms. Morones assumed that DAB would have experienced

90

1  growth if Amazon had not violated the automatic stay, despite evidence
2  showing that DAB's sales had been in decline since the start of 2013.
3  Williams Rpt. at 14, 33; Williams Tr. Decl. ¶ 30;

4  *Trustee Response:* The Trustee asserts that the decline in
5  DAB's sales was a result of Amazon's violation of the stay.

6

7  68.  Mr. Williams cured the errors in Ms. Morones's calculation and concluded
8  that DAB is owed $47,497 for the violation of the automatic stay. Williams Rpt. at 34–35;
9  Williams Tr. Decl. ¶ 26; Tr. Ex. 258 (detailing appropriate measure of damages for
10  automatic stay).

11  *Trustee's Response:* The Trustee acknowledges that Mr. Williams's report
12  concludes that DAB is owed $47,497 for the stay violation, but disagrees with
13  that conclusion for the reasons stated in Ms. Morones's report and the
14  Trustee's testimony.

15

16  **V.**  **MATERIAL ISSUES OF LAW**

17  **A.**  **Agreed Issues of Law**

18  a.  What law applies to the Trustee's breach of contract claims?

19  *i.*  *Trustee's Position*

20

21  The FBA Agreement at General Terms 18 (PD005581), by defining "Governing
22  Law" to mean "the laws of the State of Washington" (PD005583), provides that Washington
23  law governs any dispute arising from the FBA Agreement. The FBA agreement, in turn,
24  governs the parties' dispute.

25  Pursuant to the FBA Agreement, the "FBA Service Terms are part of the Amazon
26  Services Business Solutions Agreement . . . and, unless specifically provided otherwise,

91

concern and apply only to your participation and the FBA. BY REGISTERING FOR OR BY USING FBA, YOU . . . AGREE TO BE BOUND BY THE BUSINESS SOLUTIONS AGREEMENT AND THESE FBA SERVICE TERMS." (PD005602).

The terms of the FBA Agreement govern the parties' relationship as it relates to the FBA. DAB contends, under the FBA Agreement, that Amazon is liable for Units DAB shipped to Amazon during its participation in the FBA. As DAB claims damages for Amazon's breach of the FBA, the FBA Agreement controls and Washington law applies.

The MAPA agreement, on the other hand, governs the MFN program. Trustee is not asserting any breach of contract damages for Amazon's breach of the MAPA agreement or for damages it sustained in the MFN program, only for breach of the FBA Agreement.

ii.     *Amazon's Position*

Section 11.10 of the MAPA includes a choice of law clause that states that Delaware law applies to any dispute that arises out of the MAPA. Accordingly, Amazon asserts that Delaware law applies to the Trustee's breach of contract claims. If, however, the Court disagrees and applies Washington law, Amazon contends that there is no material difference between Washington and Delaware breach of contract law.

b.     Is Amazon liable for breach of contract?

i.     *Trustee's Position*

Under Washington law, to establish liability for breach of contract, the plaintiff "must prove a valid contract between the parties, breach, and resulting damage." *Lehrer v. State, Dep't of Soc. & Health Servs.*, 101 Wash. App. 509, 516, 5 P.3d 722, 727 (2000). Here, Trustee has alleged Amazon breached the FBA agreement and none of Amazon's arguments to the contrary preclude this claim.

1.     *Alleged bad acts of DAB employees does not prelude the trustee from enforcing the contract*

1    This lawsuit involves the FBA which is governed by the FBA agreement. The

2    FBA Agreement, in section F-4, provides that Amazon is responsible to track and ship

3    inventory sent to it by a seller.

4        After sending its inventory to Amazon, however, DAB noticed discrepancies in the

5    inventory it sent to Amazon. In December 2012, Trustee directed DAB to submit a claim

6    for the lost inventory. After months of back and forth negotiations with Amazon, on March

7    21, 2013, DAB submitted an analysis of its lost inventory. The next morning, Amazon

8    requested DAB submit not only the shortages, but also the overages, to which DAB

9    complied. Within a week, Amazon's Flores estimated the inventory liability at $1,637,766.

10       First, DAB did not breach the FBA. Amazon relies on a provision of the FBA which

11   requires DAB to provide accurate and complete "product information." FBA at F-2, S-1.1.

12   These provisions relate to product information as it exists on Amazon's website for sale.

13   For instance, Section S-1.1 prohibits "sexually explicit . . . defamatory or obscene

14   materials." These provisions do not relate to negotiations between Amazon and a seller

15   regarding reimbursements for lost inventory.

16       Moreover, even if DAB's submission was a breach (which it was not), A material

17   breach that excuses a party from performing under a contract must "amount to a substantial

18   or total failure of consideration." *Cartozian & Sons v. Ostruske–Murphy, Inc.*, 390 P.2d

19   548, 551 (Wash.1964) (citing 6 Corbin, Contracts, § 1253, p. 13). The breach must go to

20   "the root or essence of the contract" to be considered a material breach. *DC Farms, LLC v.*

21   *Conagra Foods Lamb Weston, Inc.*, 317 P.3d 543, 550 (Wash. 2014). In other words, it

22   must be "serious enough to justify the other party in abandoning the contract … one that

23   substantially defeats the purpose of the contract." *Park Ave. Condo. Owners Ass'n v. Buchan*

24   *Devs.*, L.L.C., 71 P.3d 692 (Wash. 2003) (footnote omitted; *quoting* 6A Washington Pattern

25   Jury Instructions: Civil 302.03, at 127 (1997)).

26       In no way did Amazon not receive its benefits under the bargain. Amazon is not

1 entitled to cancel the contract due to this alleged "fraud."

2 ## 2. *The Trustee has established breach*

3 Paragraph F-4 of the FBA Agreement states that Amazon would "provide storage

4 services … once we confirm receipt of delivery." The agreement then states: "We [Amazon]

5 will keep electronic records that track inventory of Units by identifying the number of Units

6 stored in any fulfillment center." The agreement then says: "If there is a loss of or damage

7 to any Units while they are being stored, we will, as your sole remedy, pay you the

8 Replacement value (as described and defined in the FBA Guidelines) …."

9 As discussed above, Ms. Morones has calculated that Amazon remains liable to pay

10 DAB $1,517,447 as the replacement cost for 111,688 units of missing, lost or damaged

11 inventory, net of the $304,276 Amazon has already paid for inventory reimbursements.

12 ($1,821,723 - $304,276). Per Ms. Morones, Amazon is also liable to pay DAB $195,721

13 for unpaid refund reimbursements due DAB and $1,156,495 for inventory sales proceeds

14 not remitted to DAB.

15 In addition to the 111,688 inventory units on which Ms. Morones opined, there are

16 another 147,968 units of inventory that Amazon determined were unsellable, but Amazon

17 says it cannot determine who is liable for such; Amazon identifies this inventory with a

18 "Code Q." DAB contends that, since the Code Q units became unsellable while under

19 Amazon's control, Amazon is also liable for their replacement cost.

20 Amazon failed to keep sufficient electronic records of that tracked DAB's inventory.

21 The Deep Dive and M15 Data does not qualify as a proper accounting. The M15 data is

22 merely a selective compilation of data extracted by Amazon employees from unidentified

23 "data warehouses." Moreover, because Amazon failed to keep consistent records in the

24 early part of the FBA program, Amazon, per Amazon Rule 30(b)(6) witness Ms. Bachand,

25 had to "backfill" some of the M15 data from "multiple different data sources." As a result,

26 when the Trustee asked Amazon to admit that the M15 data was "a complete and accurate

94

accounting" of PD's inventory transactions, Amazon demurred, instead admitting only that: Amazon has made reasonable efforts to identify and produce in the May 2015 Production transaction-level data for the Debtor's units in the [FBA] Program but that the files may not be complete or accurate with respect to every Debtor Unit.

### 3. *Trustee's damages claims are accurate*

Trustee's claims are not limited to expected ending inventory. Trustee's evidence will show that Ms. Morones' calculations are reliable. Moreover, as discussed in various briefs in support of his motion for summary judgment and in response to Amazon's motions, Amazon is liable not only for the expected ending inventory, but also for other damages related to Amazon's breach of the FBA Agreement, including accounting for inventory adjustments, shrinkage, unpaid refund reimbursements, inventory sales proceeds not remitted to DAB, and units Amazon determined were unsellable while under Amazon's control.

### ii. *Amazon's Position*

Under Delaware law, to establish liability for breach of contract, "the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."[5] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003); *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003) ("Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."). The Trustee will be unable to carry his burden to prove that Amazon is liable for breach of contract for at least the following reasons:

---

[5] Amazon does not dispute the first element—that an express contract exists in this case.

1.          *DAB's fraud precludes the Trustee from enforcing the contract*

As outlined in Amazon's pending motion for partial summary judgment, DAB committed fraud by submitting false inventory reconciliations to Amazon in December 2012 and March 2013. That fraud precludes DAB from enforcing the underlying agreements. To recover damages for breach of contract," a plaintiff "must establish that it substantially complied with the provisions of the contract." *A & A Air Servs., Inc. v Richardson*, 2006 WL 2382433, at *5 (Del. Ct. Pl. 2006). The "[s]ubstantial failure to live up to the material terms of a valid contract nullifies that contract," *DeMarie v. Neff*, 2005 WL 89403, at *4 (Del. Ch. 2005), and the other "party is excused from performance," *Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*, 2013 WL 3934992, at *11 (Del. Ch. July 24, 2013). DAB had a duty under its agreements with Amazon to provide accurate and complete information about its FBA products to Amazon. DAB did not just fail to provide accurate information to Amazon; DAB intentionally provided misleading data and then hid its actions from the Trustee. By submitting false information to Amazon, DAB materially breached its contract with Amazon, which excuses any alleged nonperformance by Amazon and entitled Amazon to suspend or forfeit payments to DAB. *See DeMarie*, 2005 WL 89403, at *6 (holding that failure to fulfill material provision "entitles [defendant] to avoid the Agreement").

2.          *The Trustee cannot establish breach*

The Trustee will be unable to carry his burden to show that Amazon breached its contractual obligations to reimburse DAB for lost inventory and keep records of DAB's inventory.

*Lost Inventory:* Amazon did not breach its contractual obligation to reimburse DAB for lost inventory. The ASBSA states that "If there is a loss of or damage to any Units while they are being stored, [Amazon] will, as [DAB's] sole remedy, pay [DAB] the Replacement Value (as described and defined in the FBA Guidelines)." Amazon has not breached that

contractual obligation. As detailed above in Amazon's statement of contested material facts, Mr. Williams' reconciliation of the M15 data shows that DAB's expected ending inventory is 20,405 units. In other words, the M15 data shows a total of 20,405 units that Amazon cannot account for over the lifespan of DAB's seven-year relationship with Amazon. However, that number of expected ending inventory does not account for reimbursements. Mr. Williams determined that the M15 data shows that Amazon should be credited for 28,541 reimbursements paid to DAB. Thus, Amazon over-reimbursed DAB for lost or damaged inventory by 8,136 units of inventory and more than complied with its contractual obligation to reimburse DAB for lost inventory.

*"Accounting"*: Amazon also complied with its contractual duties to keep records of DAB's inventory. The ASBSA states that Amazon shall "keep electronic records that track inventory of Units by identifying the number of Units stored in any fulfillment center." Amazon has not breached that contractual obligation. Amazon's Seller Central platform maintained and presented live inventory records to DAB. The information presented on the Seller Central platform was more than sufficient to comply with Amazon's contractual obligation to "keep electronic records" of DAB's inventory. Moreover, Amazon has shown through both the Deep Dive and its production of the M15 data that it kept extensive records of DAB's inventory, and its provision of the data from the Deep Dive and in the M15 dataset more than suffices to satisfy any "accounting" requirements in Amazon's contracts with DAB.

3.  *Even if the Trustee establishes breach, his damages claims are significantly inflated*

Amazon is confident that the Trustee will be unable to carry his burden to establish that Amazon breached the contract, which will render the Trustee's damages calculation moot. If the Court reaches damages, however, then the evidence produced at trial will show that the Trustee's damages calculations—which will be presented via the testimony of

Serena Morones—are significantly inflated, unreliable, and based in large part on claims and theories that are untimely and should be excluded. The only relevant, timely claim in this case is the Trustee's calculation of expected ending inventory. As detailed above, the proper reconciliation of the M15 data (including adjustments) shows that Amazon over-reimbursed DAB by more than 8,000 units of inventory. However, Mr. Williams also provided a simplified calculation that omits adjustments, which is highly favorable to DAB. That alternative calculation shows that the maximum number of expected ending inventory units that could be credited to DAB's account is 36,972 units, and the M15 data show that Amazon reimbursed DAB for 28,541 of those units. Thus, the most favorable case for DAB is that Amazon is liable for 8,431 units of inventory, or $137,516, plus applicable interest.

c.     <u>What is the proper measure of damages for Amazon's violation of the automatic stay?</u>

i.     *Trustee's Position*

The Trustee contends that Amazon is liable for all damages caused by its violation of the automatic stay. Prior to the stay violation, DAB was a profitable growing company ready to successfully emerge from its reorganization. After the stay violation, DAB was unable to return to profitability and consistently lost money until it ceased operations in October 2013.

ii.     *Amazon's Position*

DAB's seller privileges were revoked for 15 days in April 2013—from April 11, 2013 to April 26, 2013. Mr. Williams calculated DAB's lost sales figures for that 15-day period and concluded that DAB is entitled to $47,497 in damages. DAB lacks reliable evidence to prove that the violation of the automatic stay caused DAB to lose sales after April 26, 2013. DAB's business was struggling before Amazon temporarily revoked DAB's seller privileges—its sales declined every month in 2013 before April 2013. Any number

of other factors contributed to any added decline in sales after DAB's seller privileges were restored on April 26, 2013. For example, DAB had historically sold prohibited products on amazon.com, but Amazon limited DAB's ability to sell such products as part of the violation of the automatic stay, which would have cut off one of DAB's revenue streams. Additionally, the fact that DAB was selling prohibited products likely damaged DAB's credibility with suppliers. Ms. Morones also fails to address or consider DAB's historical sales cycle. The Trustee's damages calculation fails to account for any of these causal factors.

        d.     <u>Can the Trustee recover for turnover?</u>

              i.     *Trustee's Position*

Count One of Trustee's Complaint is for turnover under 11 U.S.C. § 542(a). Paragraph 21 in that count asserts that Amazon had "failed to account for Inventory worth in excess of $1.5 million that the Debtor has shipped to Amazon storage pending sale," and defines that as "Lost Inventory." This claim remains independent of Trustee's breach of contract claims and Trustee may assert it regardless of whether Amazon breached the FBA Agreement.

              ii.     *Amazon's Position*

Although the Trustee has pleaded a claim for turnover pursuant to 11 U.S.C. § 542(a), the Trustee has failed to actively litigate that claim or explain how that claim differs from his breach of contract claims. Accordingly, the Trustee's turnover claim is duplicative and unnecessary.

       **B.**       **<u>Trustee's Statement of the Issues of Law and Amazon's Response</u>**

        a.     <u>Who has the burden of proof with respect to the DAB inventory?</u>

              i.     *Trustee's Position*

1      It is not in dispute whether Trustee bears the burden of proof with respect to his

2  breach of contract claim. As Washington law provides: to establish liability for breach of

3  contract, the plaintiff "must prove a valid contract between the parties, breach, and resulting

4  damage." *Lehrer v. State, Dep't of Soc. & Health Servs.*, 101 Wash. App. 509, 516, 5 P.3d

5  722, 727 (2000). Whether there is a valid contract between the parties is not in dispute.

6      It appears, however, that the actual dispute is the point at which Trustee would meet

7  his burden and Amazon must present its defenses. As partially evidenced by the parties'

8  extensive expert debates on the extent of damages, Trustee has met his burden and now the

9  parties primarily dispute the extent of Amazon's liability.

10     First, Trustee has met his initial burden to establish a breach of contract. According

11 to Section F-3.1 of the FBA Agreement, DAB was responsible for "ship[ping] Units to

12 [Amazon] in accordance with applicable Program Policies" and all costs associated with

13 therein.

14     It is not disputed that the M15 data show that Amazon received 6,316,429 items

15 shipped from DAB through the FBA. Moreover, according to the M15 data, from 2008 to

16 2013, DAB sold 5,978,113 units through the FBA Program, with gross sales of around $128

17 million.

18     It is with this evidence that DAB has shown that it has fulfilled its end of the bargain

19 pursuant to the terms of the FBA Agreement. After Amazon received the Units DAB

20 shipped, the remainder of the duties primarily fall to Amazon. Paragraph F-4 of the FBA

21 Agreement states that Amazon would "provide storage services … once we confirm receipt

22 of delivery." The agreement then states: "We [Amazon] will keep electronic records that

23 track inventory of Units by identifying the number of Units stored in any fulfillment center."

24 The agreement then says: "If there is a loss of or damage to any Units while they are being

25 stored, we will, as your sole remedy, pay you the Replacement value (as described and

26 defined in the FBA Guidelines) …."

Moreover, pursuant to Section F-3.2, Amazon, not DAB, must evaluate Units shipped under the FBA Agreement and judge whether it would refuse to accept, return, or dispose of any Units it determined were "Unsuitable."

Finally, under Section F-6.2 the FBA Agreement, regarding customer returns, it was Amazon's responsibility to "receive and process returns of any Amazon Fulfillment Units that were shipped to addresses within Your Elected Country . . ." Under Section F-8.3, if the wrong item was delivered or was damaged or lost, Amazon would determine whether these problems were "caused by you or any of your employees, agents or contractors" and Amazon would elect to do one of the following:

> (a) for any Amazon Fulfillment Unit, (i) ship a replacement Unit to the customer and pay you the Replacement Value (as described in the FBA Guidelines) for the replacement Unit, or (ii) process a refund to the customer and pay you the Replacement Value for the Unit; or (b) for any Multi-Channel Fulfillment Unit, pay you the Replacement Value for the Unit (and you will, at our request, provide us a valid tax invoice for the Replacement Value paid to you).

In short, according to the FBA Agreement, Amazon would control the Units after they were shipped to an Amazon Fulfillment Center. At that point, only Amazon could determine where to ship the Unit and whether the Unit was damaged. Because the products were then under Amazon's sole control, DAB could not make such determinations. DAB no longer had access to its products after shipping them to Amazon.

Under Washington law, "[a] condition precedent is an event occurring subsequent to the making of a valid contract which must exist or occur before there is a right to immediate performance." *Walter Implement, Inc. v. Focht*, 107 Wash. 2d 553, 556–57, 730 P.2d 1340, 1342 (1987). "Proof of performance of an express condition precedent is a burden which must be met by the party who seeks enforcement of the contract. A plaintiff, in order to

1  maintain an action on the contract, must have complied with the conditions precedent

2  contained therein." *Ross v. Harding*, 64 Wash. 2d 231, 240–41, 391 P.2d 526, 533 (1964).

3       To meet its burden, all DAB has to show is that Amazon received DAB's units for

4  the FBA. Here, by providing evidence Amazon received 6,316,429 DAB Units and

5  providing evidence that 5,978,113 of those Units were sold, DAB has shown that it met the

6  conditions under the FBA Agreement to trigger Amazon's duties of fulfillment. It is

7  Amazon's duty, under the terms of the FBA Agreement, to determine whether those Units

8  were unsellable, whether they were damaged, whether they were the correct items, and

9  finally to remit the sales proceeds to DAB once Amazon deducted its fees for its service.

10  Once the disposition of those Units are determined, it is Amazon's duty to pay DAB for the

11  units for which Amazon bears responsibility. As Amazon failed to do so, DAB met its

12  burden to establish breach.

13       Finally, there is the question of Trustee's burden to establish damages. This is where

14  the M15 data and Trustee's expert enters play. It is not disputed that, apparently in

15  fulfillment of its responsibilities under the FBA Agreement, Amazon assigned codes to its

16  inventory in response to issues such as inventory that was damaged, destroyed, lost or

17  found. Amazon's inventory data records and tracks adjustments using "reason codes,"

18  which are letters or numbers assigned to identify different types of adjustments. For

19  example, Code "D" represents an inventory unit that was destroyed, "M" represents a

20  missing inventory unit adjustment, and Code "F" represents a found inventory unit

21  adjustment.

22       Analyzing the M15 data and the codes assigned to DAB's inventory shipped to

23  Amazon, Trustee's expert determined that thousands of Units DAB shipped to Amazon

24  were lost or damaged and Amazon did not pay DAB for these Units. Trustee's expert also

25  showed that Amazon failed to pay DAB for refund reimbursements and inventory Amazon

26  determined was unsellable but could not determine who was responsible.

1    Using Amazon's data, which it was required to compile under the FBA Agreement,

2    Trustee has provided evidence of the extent Amazon failed to pay DAB for Units for which

3    Amazon is liable. It is by highlighting these units in its expert report that Trustee has met

4    its burden to prove it was damaged, as pursuant to the FBA Agreement, Amazon must

5    reimburse Trustee for these Units.

6                              *ii.      Amazon's Response*

7           Throughout this case, the Trustee has offered a series of vague and confusing

8    arguments that the Trustee's breach of contract claim requires Amazon to prove that it did

9    not breach its contract with DAB. In his motion for partial summary judgment, the Trustee

10   attempted to place the burden of proof for his own claims on Amazon's shoulders by

11   referencing "general bailment law" and arguing that Amazon is somehow "strictly liable"

12   for DAB's inventory, *see* Trustee's Mot. for Summ. J., ECF No. 266 at 2–4, 16–17 (Nov.

13   20, 2020); Trustee's Reply ISO Mot. for Summ J., ECF No. 321 at 9 (Jan. 13, 2021) ("Under

14   the contract, Amazon isn't even permitted to prove that it wasn't Amazon's fault."). As

15   Amazon pointed out, these arguments are baseless. Amazon Resp. to Mot. for Summ. J.,

16   ECF No. 306 at 11–12 (Dec. 23, 2020). Simply put, the Trustee is the plaintiff in this action

17   and, as the plaintiff, he bears the burden to prove his own claims. That is a fundamental

18   principle of civil litigation. *See Daystar Const. Mgmt., Inc. v. Mitchell*, 2006 WL 2053649,

19   at *4 (Del. Super. Ct. July 12, 2006) ("The Court begins with the fundamental observation

20   that plaintiff bears the burden of proving its breach of contract claim by a preponderance of

21   the evidence.").

22          The Trustee's latest attempt to avoid basic principles of breach of contract law is

23   equally perplexing.[6] The Trustee at least acknowledges that "[i]t is not in dispute whether

24   _____

25          [6] Amazon notes that the Trustee did not articulate the current iteration of his
     "burden-shifting" argument until late in the evening on February 4, 2021. Thus, Amazon
26   was left with less than 24 hours before this joint pretrial statement was due to review and

Trustee bears the burden of proof with respect to his breach of contract claim." With respect to that point, Amazon wholeheartedly agrees.[7] Unfortunately, however, the Trustee misunderstands what it means to "bear[]" that "burden of proof."

Carrying the burden of proof on a breach of contract claim requires that the Trustee prove each of the elements of breach of contract by a preponderance of the evidence. *See VLIW Tech.*, 840 A.2d at 612 (Del. 2003) (noting that, to establish liability for breach of contract, "the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."). The Trustee appears to argue that because the ASBSA imposes contractual obligations on Amazon, Amazon must prove that it complied with the contract in order to avoid liability for breach of contract. In fact, the Trustee goes as far to say that he must show only that DAB sent products to Amazon in order to shift the burden to Amazon to *disprove* the Trustee's breach of contract claims. *See supra* ("[A]ll DAB has to show is that Amazon received DAB's units for the FBA."). That argument is without support in the contract or the law.

A simple analogy highlights the folly of the Trustee's argument. Imagine that the Trustee hired Amazon to paint his house and Amazon agreed to do so upon receipt of $100, but the Trustee later filed a breach of contract claim against Amazon on the theory that Amazon breached the contract by failing to paint his house. The Trustee could not carry his burden of proof on that claim merely by showing that he sent Amazon $100. Instead, the Trustee would need to establish that he paid Amazon *and* that Amazon did not paint his

---

respond to this argument. If the court intends to give serious consideration to the Trustee's new position on the burden of proof, Amazon requests an opportunity to present a more fulsome response to the Trustee's argument.

[7] However, this new acknowledgement is hard to reconcile with previous positions the Trustee asserted. *See* Trustee's Mot. for Summ. J. at 11 ("Amazon has the burden of proof and affirmative duty to account.").

house.[8] Of course, Amazon would be entitled to argue that it painted the Trustee's house in compliance with the agreement in order to show that the Trustee cannot meet his burden, but the burden never swings to Amazon to prove that it painted the Trustee's house.

The same is true here. The Trustee has asserted that Amazon breached its contractual obligation to store inventory, so he carries the burden to prove Amazon breached that obligation and that the breach caused damages. *See Gregory v. Frazer*, 2010 WL 4262030, at *1 (Del. Ct. Com. Pl. Oct. 8, 2010) (placing the burden on the plaintiff to prove that the defendant did not make payments to the plaintiff for money he borrowed by using the plaintiff's credit card); *Crabtree v. Bowers*, 2000 WL 1224320, at *1 (Wash. Ct. App. 2000) (requiring plaintiff to prove amounts allegedly not paid to him under a contract "[b]ecause damages are an essential element to a breach of contract cause of action"). Amazon is entitled to (and intends to) provide rebuttal evidence showing that the Trustee cannot carry his burden on breach or damages. But there can be no doubt that the burden of proof always rests on the Trustee's shoulders and never swings to Amazon.

        b.     <u>Is Amazon entitled to receive fees due to it under the FBA Agreement?</u>

              i.    *Trustee's Position.*

---

[8] This analogy also highlights the problem with the Trustee's "condition precedent" caselaw. As those cases note, "[a] condition precedent is an event occurring subsequent to the making of a valid contract which must exist or occur before there is a right to immediate performance." *Walter Implement, Inc. v. Focht*, 107 Wash. 2d 553, 556–57, 730 P.2d 1340, 1342 (1987). Just like Amazon would not be obligated to paint the Trustee's house until it received payment of $100, Amazon was obviously not required to store DAB's inventory until it actually received the inventory from DAB. But that truism is meaningless here. DAB has cited no caselaw showing that once a plaintiff establishes that a condition precedent has been met, the burden shifts to the defendant to disprove the plaintiff's breach of contract argument. *See Hunt v. Ellsworth,* 2006 WL 810256, at *4-5 (Wash. Ct. App. 2006) (placing the burden on the plaintiff to prove breach even after the plaintiff proved that they fulfilled an alleged condition precedent in the contract).

The Trustee contends that DAB paid over $33 million in fees to Amazon for DAB's participation in the FBA Program. The fees are approximately 25% of the gross proceeds and more than $5 for every unit DAB sold through the FBA Program. With respect to the lost and missing inventory, Amazon failed to perform the essential terms of the FBA Agreement. It first failed to properly care for the DAB inventory, then failed to maintain proper records and has steadfastly refused to account for the DAB inventory. Amazon improperly shifted the burden of accounting for the DAB inventory to the Trustee and is not entitled to claim fees that it did not earn with respect to the lost and mishandled inventory.

*ii.* *Amazon's Response.*

The Trustee's attempt to slip this damages theory into the pretrial statement is another example of the Trustee artificially inflating his damages demand with claims and theories that were never pleaded in the Complaint or timely placed at issue in this litigation. *See* Tr. Ex. 255 (case chronology describing key events that resulted in the Trustee's untimely and unpleaded damages claims and theories); Tr. Ex. 258 (chart detailing the Trustee's unpleaded and untimely damages claims and theories). Although the Trustee vaguely identified a claim for recoupment of Amazon's fees in his March 4, 2019 second supplemental disclosure statement, the Trustee did not disclose details in support of that claim in the March 2019 disclosure. The fee recoupment claim was not included in the May 10, 2019 expert report from Serena Morones, which Amazon interpreted as a sign that the Trustee had abandoned this untimely claim. However, the Trustee's October 26, 2020 third supplemental disclosure statement—and his inclusion of this irrelevant, untimely claim in this joint pretrial statement—makes clear that the Trustee intends to assert a claim for fee recoupment at trial. The Trustee has yet to clearly define this fee recoupment claim or provide any evidence in support of the amount of damages attributed to this claim. Amazon was not aware of the details of this theory during Ms. Morones's deposition or before Mr.

1    Williams finalized his rebuttal damages report. As such, Amazon had no opportunity to

2    review and respond to this new damages theory—either in discovery, through expert

3    testimony, or in motions practice. This claim should be excluded under the arguments

4    Amazon made in its pending motion to exclude untimely claims and damages theories.

5

6    **C.    Amazon's Statement of the Issues of Law and the Trustee's Response.**

7           a.    Should the Trustee's unpleaded and untimely claims be excluded?

8                 i.    *Amazon's Position*

9    As outlined in Amazon's pending motion to exclude untimely and unpleaded claims,

10   the Court should exclude the Trustee's new claims and damages theories. Only the claims

11   and theories pleaded in a Complaint can be pursued in litigation. *Surfvivor Media, Inc. v.*

12   *Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005) ("Deptula may not proceed on this

13   theory because he failed to reference it in his complaint."); *Olsen v. Idaho State Bd. of Med.*,

14   363 F.3d 916, 929–30 (9th Cir. 2004) (upholding dismissal of a claim where the complaint

15   contained no facts in support of that claim). "[T]he issues for resolution at trial are framed

16   by the claims and theories of liability alleged in the operative complaint." *LaPorta v. BMW*

17   *of N. Am., LLC*, 2019 WL 988675, at *5 (C.D. Cal. Jan. 24, 2019); *see also Shannon*

18   *Fabrics, Inc. v. Jo-Ann Stores, Inc.*, 2015 WL 12752445, at *2 (C.D. Cal. Jan. 6, 2015)

19   (excluding "evidence, testimony, jury instructions, and argument concerning" a theory not

20   pleaded in complaint). The Trustee's current damages claims go well beyond the claims

21   and theories pleaded in the Complaint and rely instead claims identified for the first time in

22   the Trustee's supplemental disclosures and Ms. Morones's expert report—which were

23   provided after the close of discovery. Courts routinely reject claims and theories "identified

24   in" expert reports or discovery disclosures "but not alleged in . . . complaint[s]," because a

25   "disclosure made during discovery" is generally not "an adequate substitute" for a well-

26   pleaded complaint. *Oliver v. Ralphs Grocery Co.,* 654 F.3d 903, 908–09 (9th Cir. 2011);

*see also In re Online DVD- Rental Antitrust Litig.*, 779 F.3d 914, 924 n.3 (9th Cir. 2015) (affirming exclusion of evidence "that supported new, unpled liability theories, even though the evidence had been adduced in discovery").

Since DAB first provided its inventory audit to Amazon in December 2012, this dispute has been about accounting for DAB's "Lost Inventory." Before the Trustee filed this lawsuit, Amazon worked diligently with DAB to try to reconcile the "Lost Inventory" claims. Then the Trustee filed this lawsuit and specifically pleaded claims directed at accounting for DAB's lost inventory: "Amazon has failed to account for Inventory . . . that the Debtor has shipped to Amazon for storage pending sale on the Amazon Platform and shipping by Amazon to the Debtor's customers (*the 'Lost Inventory'*)." Compl. ¶ 21 (emphasis added). After the Trustee filed the Complaint, Amazon completed the Deep Dive, which drilled down and reconciled the top 100 items in DAB's inventory in terms of alleged inventory discrepancies. When the Trustee was not satisfied with the Deep Dive, Amazon produced the M15 data—which includes millions of lines of inventory data and is the most complete set of data that Amazon could produce. As Amazon's case chronology exhibit shows, for six years, this case was about reconciling DAB's inventory. *See* Tr. Ex. 255 (case chronology describing key events that resulted in the Trustee's untimely and unpleaded damages claims and theories).

Although the parties spent the first six years of this case focused on reconciling DAB's inventory, the Trustee began to add new claims and damages theories to his case beginning with the March 4, 2019 second supplemental disclosure statement. Tr. Ex. 255. That disclosure was composed solely of the following one-page chart, without definitions or explanations:

**Potential Dynamix v. Amazon**
Supported Damages as of Cut Off Date 1/31/2014

| | Data Source [a] | Units | Net Ave Price Per Unit [b] | Amount Due from Amazon | Support Sched. or Footnote |
|---|---|---|---|---|---|
| **1. Expected Ending Inventory:** | | | | | |
| Receipts | M'15 | 6,316,429 | | | |
| Sales | M'15 | (5,978,113) | | | |
| Returns | M'15 | 63,445 | | | |
| Removals | M'15 | (344,906) | | | |
| Adjustments | M'15 | (17,524) | | | |
| Total - Expected Ending Inventory | | 39,331 | $16.31 | $641,521 | 1a |
| **2. Adjustment Transaction Damage:** | | | | | |
| Warehouse Damage Adjustments | M'15 | 28,409 | $16.31 | $463,374 | 2a |
| Lost/Found Adjustments | M'15 | 39,253 | $16.31 | $640,249 | 2b |
| Total - Adjustments Damage | | 67,662 | | $1,103,623 | |
| **Total Damage per May 2015 Production** | | 106,993 | | $1,745,143 | |
| **3. Refunds Paid by Amazon Not Returned by Customer** | M'15 & S | | | $163,508 | 3 |
| **4. Sales Proceeds Not Remitted to Potential Dynamix** | | | | | |
| Orders in M'15 data, not in settlement data (c) | M'15 & S | 55,173 | $16.31 | $899,917 | 4 |
| **Total Damages per Comparison of M'15 and Settlement Data** | | 55,173 | | $1,063,424 | |
| **Total Damages** | | | | $2,808,568 | |
| **Less reimbursements paid by Amazon** | | | | ($304,276) | 5 |
| **Net Inventory Damage** | | | | $2,504,292 | |
| **Prejudgement Interest** | | | | $2,422,233 | c,d,e,f |
| **Stay Violation Damges** | | | | $778,000 | 6 |
| **Total Damages** | | | | $5,704,525 | |

Footnotes:

(a) M'15= May 2015 production by Amazon.  "S"= Settlement reports collected by PD and Ashworth.
(b) Average selling price less Amazon fees. See Schedule 1b Av Unit Price
(c) Prejudgment interest rate assumed to be 12% simple.      12%
(d) Interest begin date--midpoint of period (See calculation below.)    1/11/2011
(e) Interest end date    1/31/2019
(f) Per diem interest    $823

Summary

Page 1 of 1

The damages claims for "Warehouse Damage," "Refunds Paid by Amazon Not Returned by Customer," and "Sales Proceeds not Remitted to Potential Dynamix"—which were not described beyond what was included in this chart—went far beyond reconciling DAB's "Lost Inventory." For the first time, the Trustee appeared to be asserting claims for

inventory that Amazon damaged, refunds that Amazon allegedly should not have issued, and even payments to DAB for sales made on amazon.com. And, to make matters worse, the Trustee's refund and unremitted-sales claims were based on "Settlement reports collected by PD and Ashworth" that had not been produced by the Trustee. The disclosure also included a vague statement that the Trustee "disputes Amazon's entitlement to payment of fees associated with the inventory Amazon lost, stole, damaged, destroyed, mismanaged and misreported" without providing any further detail on that claim, including even a simple financial figure.

Ms. Morones's expert report made clear that the scope of the Trustee's new claims was actually broader than the second supplemental disclosure indicated. The report confirmed that the Trustee was alleging that Amazon was liable for damaged inventory, refunds that Amazon issued to DAB's customers without securing a returned product from the customer, and sales proceeds that Amazon allegedly failed to remit to DAB. Ms. Morones also added a claim that was not disclosed in the second supplemental disclosure for "mis-received" inventory, which refers to a "mis-received" adjustment code that Amazon uses when the number of units received at an Amazon FC does not match the number of units listed in the shipping information included with the shipment. The report also noted that the "settlement reports" that Ms. Morones relied on for the Trustee's new refund and sales proceeds claims were a set of data that was produced to her by the Trustee's counsel. Unlike the M15 data, which addresses inventory accounting, the settlement reports are payment records that representatives of the Trustee had obtained from Amazon's Seller Central platform but never produced to Amazon. According to Ms. Morones, these reports "served as transactional support for payments made by Amazon to [DAB]." Up until the Trustee served the second supplemental disclosures and Ms. Morones's report, however, payments made by Amazon to DAB were never a part of this dispute. *See* Tr. Ex. 255.

1    The Trustee's expansion of his damages theories only got worse. On October 26,
2    2020, the Trustee served his third supplemental disclosure statement. That disclosure
3    vaguely asserts that the Trustee should be entitled to recoup more than $600,000 in fees
4    paid to Amazon for inventory that "Amazon lost, stole, damaged, destroyed, mismanaged,
5    and misreported." This claim was not included in Ms. Morones's report. Additionally, and
6    perhaps most shockingly, the Trustee also adds a claim in the disclosure statement for more
7    than $6.8 million for "Code Q" adjustments. According to the disclosure statement, Code
8    Q adjustments are used to code inventory that is lost or destroyed but the responsibility for
9    the loss is inconclusive. This $6.8 million claim was not disclosed in the Morones report or
10   the second supplemental disclosure statement. Amazon has had no opportunity to review or
11   respond to this claim or to the Trustee's threadbare claim for fee recoupment.

12       For years, this case was a straightforward inventory dispute. *See* Tr. Ex. 255. The
13   parties' shared goal was to identify DAB's expected ending inventory and then reimburse
14   DAB if the data showed that Amazon owed additional reimbursements. The parties are
15   prepared to resolve that dispute. The Trustee alleges that the value of that expected ending
16   inventory is approximately $650,000, while Amazon believes that the data shows that it
17   actually over-reimbursed DAB for inventory losses, meaning that Amazon does not owe
18   DAB any reimbursements. The difference between those two inventory counts is what this
19   case has always been about and what it should be about at trial. The problem, however, is
20   that Trustee has repeatedly attempted to ambush Amazon with unpleaded and untimely
21   damages claims and theories. This case was never about damaged inventory, mis-received
22   inventory, or "inconclusive" inventory. It was not about recoupment of Amazon's fees,
23   unpaid refunds, or sales proceeds that Amazon failed to remit to DAB. Those are new claims
24   that should be excluded. *See* Tr. Ex. 258.

25       To be clear, Amazon is not attempting to exclude these claims in hopes to escape
26   liability on a procedural technicality. The Trustee's delay significantly prejudices

1  Amazon's ability to defend itself. Litigating any of the Trustee's new claims would require
2  a significantly different discovery strategy from both parties. For example, establishing
3  liability for damaged inventory would require inquiries into the kind of inventory that was
4  damaged, the state the inventory was in when DAB shipped it to Amazon, the carrier's
5  treatment of the shipment, the nature of the alleged damage, and the context in which the
6  damage occurred. That is a different inquiry that would require much more warehouse-level
7  discovery than the broadscale inventory reconciliation that Amazon undertook through the
8  Deep Dive and the production of the M15 data.

9      As another example, and as Mr. Williams points out in his report, accurate
10  reconciliation of payment history requires historical bank records and wire transfer logs to
11  confirm how much Amazon paid DAB and the times at which Amazon issued payment.
12  Those kinds of records were not produced by either party because this case has never been
13  about payment disputes. And the lack of comprehensive payment records has already
14  resulted in identifiable harm to Amazon. Once the Trustee finally produced the full set of
15  Settlement Reports on which Ms. Morones relied, Amazon discovered that the Trustee was
16  missing settlement reports for at least six 48-hour time periods, and Mr. Williams identified
17  more than $1.3 million in sales proceeds in those missing Settlement Reports that were not
18  accounted in Ms. Morones's report. *See* Tr. Ex. 254. There are surely other holes in the
19  Trustee's payment claims that Amazon will be unable to identify and rebut due to the fact
20  that these claims were not timely placed at issue in this litigation.

21      Ultimately, for the reasons set forth in Amazon's pending motion to exclude
22  unpleaded and untimely damages claims and theories, the Court should exclude the
23  following claims outlined in the Trustee's October 26, 2020 third supplemental disclosure
24  statement: (1) "Warehouse Damage Adjustments," (2) "Mis-Received Adjustments" (3)
25  "Unpaid Refund Reimbursements," (4) "Sales Proceeds Not Remitted to PD, (5)
26  recoupment of Amazon's fees, and (6) "Inconclusive"/Code Q Adjustments. Tr. Ex. 258.

Amazon was not afforded a reasonable opportunity to oppose these claims and will experience significant prejudice if the Trustee is permitted to move forward with these belated, unpleaded claims at trial.

*ii.    Trustee's Response*

In the interests of the Court's resources, Trustee will not attempt to supplement his Response to Amazon's Motion to Exclude Claims and Damages, which Trustee incorporates herein by reference. Instead, Trustee provides a brief summary of his response below.

Rule 9(g), Fed. R. Civ. P. requires specificity if a party claims special damages, but that requirement does not apply to general damages such as the failure to pay amounts due under a contract. Wright & Miller, 5A Fed. Practice & Proc. Civ. § 1310 (4th ed. 2020). Normal notice pleading as contemplated by Rule 8(a), Fed. R. Civ. P. applies. *Id; Zykronix, Inc. v. Conexant Sys., Inc.*, 16-cv-00163-KLM, 2018 WL 2011873 *1-2 (D. Col. April 27, 2018) (amendment not required to add a category of damages); *DeRosier v. Utility Sys., Inc.*, 780 N.W. 2d 1, 4-5 (Ct. App. Minn. 2010) (special damages require specific pleading but general damages do not); *c.f., Gilbert Unified Sch. v. Crosspointe*, LLC, CV000510-PHX-NVW 2012 WL 1564660 *1-2 (D. Ariz. May 2, 2012) (general allegation of contract damages found sufficient).

Trustee's complaint alleges Amazon breached the contract for failing to store, maintain, preserve, and account for DAB's inventory and then failing to compensate DAB for lost inventory. Trustee's complaint encompasses all damages for Amazon's breach of the FBA contract. Amazon is not only for the expected ending inventory, but also for other damages related to Amazon's breach of the FBA Agreement, including accounting for inventory adjustments, shrinkage, unpaid refund reimbursements, inventory sales proceeds not remitted to DAB, and units Amazon determined were unsellable while under Amazon's control.

1  Trustee's breach of contract and accounting allegations encompass all damages disclosed

2  in Ms. Morones report and his disclosure statement. Trustee's claim is as follows: DAB

3  delivered inventory to Amazon as part of the FBA. From there, according to the terms of

4  the FBA Agreement, it was Amazon's responsibility to track, ship, sell, and reimburse DAB

5  for the inventory sold. All of the data regarding DAB's inventory once it reached Amazon

6  has always been in Amazon's possession. All DAB has to prove is that it delivered product

7  to Amazon and the M15 data reflects that Amazon received 6,316,249 units of DAB

8  inventory. The fact that Amazon now complains that it didn't conduct proper discovery to

9  defend itself against Trustee's breach of contract claims is Amazon's fault alone.

10             b.     <u>Should the Court enforce the limitation of liability clause in the</u>
11                   <u>ASBSA and limit Amazon's liability to $2,206,369?</u>

12                  *i.*      *Amazon's Position*

13        As outlined in Amazon's pending motion for partial summary judgment, even if the

14  Trustee can prove his claims at trial, Amazon's liability is limited by contract to "the total

15  amounts during the prior six month period paid by [DAB] to Amazon." That contractual

16  term is valid, binding, and enforceable. *See, e.g.*, *Donegal Mut. Ins. Co. v. Tri-Plex Sec.*

17  *Alarm Sys.*, 622 A.2d 1086, 1090 (Del. Super. Ct. 1992) ("The overwhelming number of

18  courts which have considered [clauses limiting liability] have upheld them."). In the six

19  months preceding the filing of this action, DAB paid Amazon $2,206,369 in fees.

20  Accordingly, Amazon's liability is limited to $2,206,369.

21                  *ii.*     *Trustee's Response*

22        The limitation period Amazon relies upon are in the "General Terms" of the FBA

23  Agreement. The General Terms, however, provide that "[i]f there is any conflict between

24  these General Terms and the applicable Service Terms, the Service Terms will govern."

25        Section F contains the "applicable Service Terms" for the Amazon Fulfillment

26  Services program in which DAB participated. It states: "If there is a loss of or damage to

any Units while they are being stored, we will, as your sole remedy, pay you the Replacement Value (as described and defined in the FBA Guidelines)." Id. at 308. The Agreement then says:

> Payment of the Replacement Value is our total liability for any duties or obligations that we or our agents or representatives may have as a bailee or warehouseman, and your only right or remedy that you may have as a bailor.

That the specific Service Terms override the General Terms becomes even clearer when one refers to the referenced "FBA Guidelines." Those state that "Amazon assumes responsibility when your inventory is lost or damaged by a partnered carrier, in an Amazon fulfillment center, or during delivery to a customer." FBA Lost and Damaged Inventory Reimbursement Policy at 1. "In such cases," the guidelines state, Amazon will either "[r]eplace the item with one with the same FNSKU," or "[r]eimburse you the estimated proceeds of the sale of that same item." *Id.* And if Amazon lacked "enough information to calculate the reimbursement amount for an item," Amazon would "use the default reimbursement value" outlined in a table set out in the guidelines. *Id.* The table shows $20 as the default replacement value for "Health" and "Beauty" items such as DAB sold. Id. at 3. Notably, the FBA Guidelines say nothing about any other damage limitations.

> Hence, the damage limitation in the General Terms ¶ 8 is best read as limiting damages for things other than Amazon's loss of, damage to, or failure to pay for, the very products at the heart of the parties' relationship. Interpreting the damage limitation as suggested by Amazon to take DAB inventory, keep it, or destroy it and yet only be liable to pay back 25% of its value. That conflicts with the more specific statements in F-4 and the FBA Guidelines.

## VI. TRUSTEE'S WITNESSES

1.      Serena Morones. The direct testimony will be by declaration. The substance will be as reflected in her report and prior declaration and to respond to matters raised by Weiant Williams. Ms. Morones will be available for cross-examination.

2.      Timothy Shaffer. The testimony will be live and will testify as to DAB's operations before and after the stay violation.

3.      Tasha Bachand. The testimony will be by deposition. Ms. Bachand was designated pursuant to testify on behalf of Amazon.

4.      Jeff Moore. The testimony will be by deposition. Mr. Moore was designated pursuant to testify on behalf of Amazon.

5.      Justin Ice. The testimony will be by deposition. Mr. Ice is a former Amazon employee who analyzed the DAB inventory.

6.      Eric Soder. The testimony will be by deposition. Mr. Soder is a former Amazon employee who may testify by deposition about Amazon's inventory processes and DAB's inventory management.

7.      Jeff Cone. The direct testimony will be by deposition. The substance will be limited to foundation for the analysis underlying the Morones report. Mr. Cone may respond to matters as a rebuttal witness. If Mr. Cone is called in rebuttal witness he will be available for cross-examination.

4.      Stephen Ashworth. The direct testimony will be by deposition. The substance will be consistent with his prior declaration and limited to foundation for exhibits and to respond as a rebuttal witness. If Mr. Ashworth is called as rebuttal witness he will be available for cross-examination

## VII. AMAZON'S WITNESSES

1.      Tasha Bachand. Ms. Bachand will testify live as to Amazon's FBA program, inventory processes, and the M15 data produced in this action.

1    2.    <u>E. Weiant Williams</u>. Pursuant to the Court's local rules, Mr. Williams's direct

2    testimony will be by declaration and will cover his damages opinions in this case. *See* Tr.

3    Ex. 259.

4    3.    <u>Amazon Records Custodian.</u> To the extent that the Trustee disputes the

5    authenticity of any of Amazon's records, Amazon will present testimony or a declaration

6    from a records custodian to lay foundation as necessary.

7    4.    <u>Sean Lawcock</u>. Mr. Lawcock, DAB's former inventory manager, will testify

8    by deposition as to DAB's inventory management practices, DAB's internal inventory

9    tracking difficulties, and the December 2012 inventory audit that serves as the basis for

10    Amazon's fraud claims.

11    5.    <u>Thomas Reilly</u>. Mr. Reilly, DAB's former COO, will testify by deposition as

12    to DAB's inventory management practices, DAB's internal inventory tracking difficulties,

13    and the credibility of DAB's former CEO and the Trustee's inventory claims in this case.

14    6.    <u>Daniel A. Bellino</u>. Mr. Bellino, DAB's former CEO, will testify by deposition

15    as to DAB's business practices; DAB's participation in the FBA program; DAB's lack of

16    inventory tracking, management, and organization; and DAB's reimbursement claims.

17    7.    <u>Eric Soder</u>. Mr. Soder, an Amazon employee, will testify by deposition about

18    Amazon's inventory processes and DAB's inventory management.

19    8.    <u>Justin Ice</u>. Mr. Ice, an Amazon employee, will testify by deposition about

20    Amazon's inventory processes and accountings—specifically, the Deep Dive and the M15

21    data.

22    9.    <u>Stephen Ashworth</u>. Mr. Ashworth, a consulting expert witness employed by

23    the Trustee, will testify by deposition as to the documents and data he collected from DAB

24    and his coordination with Ms. Morones and Mr. Cone in the development of Ms. Morones's

25    report.

26    10.    <u>Jeffrey A. Cone</u>. Mr. Cone, a consulting expert witness employed by the

Trustee, will testify by deposition as to the data utilized in the expert report of Serena Morones; Mr. Cone's analyses of that data, including the "software programs" he allegedly developed; and Mr. Cone's coordination with Ms. Morones and Stephen Ashworth, the Trustee's consulting expert, in the development of Ms. Morones's report.

11. <u>Jeff Moore</u>. Amazon has designated portions of Mr. Moore's deposition testimony in response to designations offered by the Trustee. Mr. Moore is an Amazon employee who will testify about Amazon's inventory processes.

## VIII. <u>STIPULATIONS REGARDING WITNESSES</u>

The parties have agreed that only Mr. Shaffer, Ms. Morones, Ms. Bachand, and Mr. Williams will testify live. The parties have further agreed that these witnesses will be located in a room alone, without any individuals or attorneys present. The witnesses will have copies of the trial exhibits saved locally to avoid downloading the exhibits live. Finally, the parties have agreed that these witnesses will not access cell phones, messaging apps, or other means to communicate outside of the live video feed while testifying.

All other witnesses shall be considered to be unavailable to testify at trial for purposed of offering their deposition testimony. The parties have no other agreements for the use of declarations or calling live witnesses at trial

## IX. <u>STIPULATED EXHIBITS</u>

The parties' list of joint exhibits is included in the Excel spreadsheet attached to this Joint Status Report as **Exhibit A**. The Parties reserve the right to object to the admission of the following exhibits solely on the grounds of relevancy. All other objections are waived. A party's decision to list an exhibit on its exhibit list shall not be construed as an admission that the exhibit is admissible in evidence.

## X. <u>TRUSTEE'S EXHIBITS</u>

118

1    The Trustee's list of trial exhibits is included in the Excel spreadsheet attached to
2 this Joint Status Report as **Exhibit A**. Amazon has detailed its objections to the admission
3 of the document, if any, in the columns adjacent to each exhibit. Amazon may seek to
4 admit any exhibit on the Trustee's list of exhibits, but all objections to admission are
5 preserved.

6 **XI.  AMAZON'S EXHIBITS**

7    Amazon's list of trial exhibits is included in the Excel spreadsheet attached to this
8 Joint Status Report as **Exhibit A**. The Trustee has detailed his objections to the admission
9 of the document, if any, in the columns adjacent to each exhibit. The Trustee may seek to
10 admit any exhibit on the Amazon's list of exhibits, but all objections to admission are
11 preserved.

12 **XII.  DEPOSITION DESIGNATIONS**

13    **A.  Trustee's Deposition Designations.**

14    As of the filing date of this Joint Status Report, the parties are in the process of
15 finalizing their deposition designations and will provide those designations to the Court
16 promptly once finalized. The Trustee's list of deposition designations will be included in
17 an Excel spreadsheet that the parties will label as **Exhibit B** to this Joint Status Report.
18 Amazon will detail its objections to the admission of the testimony, if any, in the columns
19 adjacent to each designation. The parties will provide copies of the relevant depositions,
20 with designations highlighted, for the Court's review.

21    **B.  Amazon's Deposition Designations.**

22    As of the filing date of this Joint Status Report, the parties are in the process of
23 finalizing their deposition designations and will provide those designations to the Court
24 promptly once they finalized. Amazon's list of deposition designations will be included in
25 an Excel spreadsheet that the parties will label as **Exhibit B** to this Joint Status Report.
26 The Trustee will detail its objections to the admission of the testimony, if any, in the

columns adjacent to each designation. The parties will provide copies of the relevant depositions, with designations highlighted, for the Court's review.

## XIII.  PARTIES ESTIMATE OF TIME NEEDED FOR TRIAL

The parties estimate that they will need four days to complete the trial. The parties propose that the four-days of trial time be divided evenly amongst the parties in a "chess-clock" format, with each party free to use its trial time as it sees fit on opening argument, closing argument, direct examination, cross examination, or introduction of deposition testimony.

## XIV.  CERTIFICATION REGARDING EXHIBITS

Trustee and Amazon, through undersigned counsel, hereby certify that all exhibits listed herein have been exchanged or made available to all other parties for inspection and copying.

RESPECTFULLY SUBMITTED February 5, 2021.

**PERKINS COIE LLP**

**GALLAGHER & KENNEDY, P.A.**

By: /s/ Eric J. Weiss

Richard M. Lorenzen (Bar No. 006787)
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
Email: RLorenzen@perkinscoie.com
Telephone: 602-351-8000
Facsimile: 602-648-7000

John S. Kaplan (*Pro Hac Vice*)
Eric J. Weiss (*Pro Hac Vice*)
Mallory Gitt Webster (*Pro Hac Vice*)
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Email: JKaplan@perkinscoie.com
Email: EWeiss@perkinscoie.com
Email: MWebster@perkinscoie.com
Telephone: 206-359-8000
Facsimile: 206-359-9408
*Attorneys for Amazon Services LLC*

By: /s/ Dale C. Schian

Dale C. Schian
Mark D. Dangerfield
Kenneth N. Ralston
2575 East Camelback Road
Phoenix, Arizona 85004
*Attorneys for Trustee Timothy H. Shaffer*

8442113v1/29611-0001

120