Mark C. Dangerfield #010832
Dale C. Schian, #010445
Kenneth N. Ralston, #034022
mark.dangerfield@gknet.com
dale.schian@gknet.com
ken.ralston@gknet.com
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone: (602) 530-8000
Facsimile: (602) 530-8500
Attorneys for Timothy H. Shaffer, Chapter 11 Trustee

Email for Electronic Service and
Court documents: bkdocket@gknet.com

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br>POTENTIAL DYNAMIX, LLC,<br><br>Debtor. | Case No. 2:11-bk-28944-DPC<br>CHAPTER 11<br>Adv. No. 2:13-ap-00799 |
| TIMOTHY H. SHAFFER, Chapter 11 Trustee,<br>Plaintiff,<br>vs.<br>AMAZON SERVICES LLC,<br>Defendant. | **TRUSTEE'S BRIEF ON BURDEN OF PROOF AND RELATED ISSUES**<br><br>DATE: April 19, 2021<br>TIME: 10:00 a.m.<br>LOCATION: Zoom hearing |

The main issue for decision is the dollar amount Amazon owes DAB. Amazon has liability for violating the automatic stay and for missing, damaged or unpaid for inventory. The fact of damages is undisputed, but the amount is. This brief addresses who has what burdens of proof relating to those damages.

"Burden of proof" is a general term referring to two specific burdens: the burden of producing evidence sufficient to avoid a dismissal or a judgment as a matter of law, and the larger burden of persuading the trier of fact on a particular factual issue, often called the burden of persuasion. 2 McCormick on Evidence, § 336 at 644 (7th ed.) ("McCormick").

The Court's denial of Amazon's motion for judgment as a matter of law shows that the trustee has met the burden of producing evidence. Yet we use the general term "burden of proof" to include both the burden of producing evidence and the burden of persuasion.

We will first discuss the law on the burdens of proof on the unique facts of this case in which the defendant—Amazon—had sole access to and control of the facts relating to DAB's inventory. Second, we'll show that the trustee, using Amazon's data, met his burden by introducing admissible evidence of missing or damaged inventory. We then discuss how Amazon—by denigrating its own data and trying to use inadmissible or incompetent evidence to counter DAB's admissible evidence—failed to meet its burden of proof. Finally, we address the damages from Amazon's violation of the automatic stay.

**I.  General background on burden of proof.**

There are no general, fixed tests for allocating burdens of proof among the parties. Although the burden of proof usually follows the burden to plead a particular matter, that is not always the case. McCormick § 337 at 647. Rather, who has the burden of proof of a particular fact—and the nuances of that burden—must be determined case-by-case based on many factors, including which party has better access to facts and on substantive public policy. *Id.* at 646-53.

We begin with the FBA Agreement itself, Exh. 1.0032.[1] That agreement states: "If there is a loss of or damage to any Units while they are being stored, we will, as your sole remedy, pay you the Replacement Value (as described and defined in the FBA Guidelines)...."

Amazon's agreement to pay for items lost or damaged while being stored is—by its own terms—absolute; it is not based on the cause or source of the damage. Amazon's duty to pay stems from its agreement to "provide storage services" and to "keep electronic records that track inventory," Exh. 1.0031, so if there is loss or damage to inventory while under Amazon's care, Amazon must pay, regardless of fault.

---

[1] Trial exhibits were Bates stamped with the exhibit number followed by a period and then the page number of the exhibit. So "Exh. 1.0032" refers to page 32 of trial exhibit 1.

We note that although these facts present a classic bailment—one party delivering property to another party to hold for a certain purpose—the terms of the FBA Agreement override bailment law. Under normal bailment law, the bailee would only be liable for lost or damaged goods if it failed to exercise ordinary care under the circumstances. *E.g. Chaloupka v. Cyr,* 387 P.2d 740, 742 (Wash. 1963). But Amazon can't make such a defense here, both because of its express undertaking to pay for loss or damage regardless of fault, and because the FBA Agreement waives the application of bailment law.

The quoted terms from the FBA Agreement thus specify the trustee's burden of proof: The trustee must persuade the Court, by a preponderance of the available admissible evidence, that some inventory DAB shipped to Amazon warehouses or "fulfillment centers" for storage and sale was later lost, damaged or destroyed. If trustee does so, he has met his burden. The burden then shifts to Amazon to persuade the Court to the contrary with admissible evidence.

## II. When the defendant is the plaintiff's sole source of information on a fact issue, and the defendant has failed to preserve or produce sufficient evidence on that issue, the defendant may not benefit from that failure.

The facts here affect the applicable burdens of proof. Once DAB sent its inventory to an Amazon warehouse, DAB depended on Amazon to report what happened to that inventory. We liken a fulfillment center to a black box: once DAB's inventory was in the box, DAB had no further access to it. The only thing DAB knew about its inventory was what Amazon disclosed in reports published on the Seller Central website. And as Amazon witness Bachand admitted, *Amazon* decided what data to provide DAB. 19 Feb Tr. at 86.[2]

### A. Under widely accepted precedent, Amazon should not be allowed to benefit from it failures to preserve or produce better evidence.

A key problem posed by this case is the dual impact of the "black box" Amazon warehouse, which limited DAB's knowledge of its inventory to the data Amazon chose to disclose, and the M15 data that Amazon directed the parties to use—which Amazon now says was incomplete and likely contained erroneous data. Exh. 7.0005. Although DAB has

---

[2] The trial took place from February 16 through 19, 2021. We refer to the trial transcript by date and page.

presented admissible evidence from which damages can be quantified, the evidence is admittedly neither perfect nor precise. Sometimes evidence seems in conflict, the effect of some facts remains unclear, and some facts simply don't "add up," both literally and metaphorically.

Although we have found no case that matches these unique facts, a broad body of case law discusses what happens when a defendant in control of pertinent evidence fails to preserve or produce better evidence. From that case law, the Court can distill at least two pertinent principles that apply here: courts will allow proof of damages by "just and reasonable inference" from the available evidence, even if damages can only be approximated; and courts will aid a plaintiff by giving it the benefit of evidentiary doubts, and making every reasonable presumption against the defendant.

> *1.  Courts allow the plaintiff to prove approximate damages based on "just and reasonable inferences" from the defendants' missing or incomplete data.*

In *Eastman Kodak Co. v. S. Photo Materials Co.,* 273 U.S. 359 (1927), the Court affirmed a damage award based on injuries stemming from a violation of anti-trust laws. In response to the defendant's argument that the damage evidence was speculative and uncertain, the Court stated that "a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible." 273 U.S. at 379. The Court found that the evidence sufficed because, "while mainly circumstantial," it showed the extent of the damages "as a matter of just and reasonable inference . . .." *Id.*

The Supreme Court arrived at a similar conclusion in *Story Parchment v. Paterson Parchment Paper Co.,* 282 U.S. 555 (1931), also an anti-trust case. In that case, the court of appeals overturned the plaintiff's jury verdict, concluding the plaintiff had not sustained the burden of proving recoverable damages because the claimed damages stemmed from speculation and conjecture. The Supreme Court reversed. In doing so, the Court noted that although there was uncertainty about the amount of damage, the fact of damage was clear.

The Court also noted that cases occur "in which it is evident that large damages have resulted, but where no reliable data or element of certainty can be found by which to measure with accuracy the amount." 282 U.S. at 564. And when the defendant's own wrongs "preclude the ascertainment of the amount of damages with certainty," it "will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." 282 U.S. at 563. *Cf. Bigelow v. RKO Radios Pictures,* 327 U.S. 251, 280 (1946) (allowing a damage verdict based on a "just and reasonable estimate" when the defendants' acts prevented an exact measure; "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.").

> *2.  When the defendant maintained incomplete data, courts give the plaintiff the benefit of all reasonable doubts that arise as a result of such.*

Courts also give the plaintiff the benefit of evidentiary doubts. This ensures that a defendant can't benefit from his own breach of duty. *Shapiro, Bernstein & Co. v. Remington Records, Inc.,* 265 F.2d 263 (2d Cir. 1959), for example, dealt with a copyright violation when the defendant sold copyrighted records but violated its "statutory duty" to keep track of how many they had sold. The court held that when a defendant "takes away the means of proving the nature and extent of the loss the law will aid a recovery against the wrongdoer and supply the deficiency of proof caused by his misconduct, by making every reasonable intendment against him, and in favor of the injured party." *Id.* at 271 (internal quotation marks and citation omitted).

*United States v. Fabric Garment Co.,* 366 F.2d 530 (2d Cir. 1966) presents similar reasoning. The defendant company made military jackets for the government. The government supplied the fabric, but required the company to return any scraps. The government sued, asserting the company hadn't returned all the scraps. The amount of material furnished and the amount of scrap returned were known, but the difficulty lay in determining the amount rendered unreturnable by the manufacturing process.

The government established "both the fact of conversion and the approximate

amount converted," but a key dispute was how much of the withheld material was "scrap"—which had little value—and how much was the far more valuable "yard goods." The district court put the burden on the *defendant* to prove that the withheld amounts were scrap rather than yard goods, and the appeals court agreed. The court held that such a requirement "was in accordance with the general principle which requires a bailee to account for goods delivered and not returned in accordance with the contract of bailment." 366 F.2d at 536. The rationale was simple: "the bailee, having possession of the goods and working on them, is in a better position to explain what happened to them than is the bailor." *Id.*

The same principle applies here: because Amazon was in possession of the inventory and had a duty to keep track of it, it was in a better position than the trustee to explain what happened. The Court should thus place the burden on Amazon to prove the precise amount of inventory that was lost, damaged or destroyed, and if Amazon can't do so, then the Court should accept the trustee's evidence of damages, even if it's only approximate. *Cf. In re Mueller,* 1994 WL 369573 at *6 (Bankr. D. Neb. June 8, 1994) ("where one party is in peculiar or exclusive possession of knowledge or information regarding a fact…, the burden of going forward with the evidence is placed upon the party with peculiar access to the information, and failure to produce that information raises an inference that the evidence would be unfavorable to the party withholding the evidence."); *Great S. Gas & Oil Co. v. Logan Nat. Gas Fuel Co.,* 155 F. 114, 114-15 (6th Cir. 1907) (holding, where the defendants converted gas from plaintiffs' well, then commingled it with gas from its own wells, defendants must fully compensate the plaintiff; "Having taken no step by which it can account for the property of plaintiff, it must submit to every inconvenience in ascertaining that compensation and all reasonable doubts which arise in that accounting.").

**B. <u>Amazon had the burden to produce competent evidence to refute the trustee's evidence.</u>**

In *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680 (1946), the Supreme Court applied similar principles in a case under the Fair Labor Standards Act. There, employees sued the company under the FLSA, alleging that the company hadn't paid them proper

6

overtime compensation. The district court gave judgment for the plaintiffs, but the Sixth Circuit reversed, holding that the employees failed to meet their burden to prove that they did not receive the wages to which they were entitled, and to show by "evidence rather than conjecture the extent of overtime worked." 328 U.S. at 686. Reversing, the Supreme Court held that the circuit court "imposed upon the employees an improper standard of proof" since it was "the employer who has the duty" under the statute to keep proper payroll records. *Id.* at 686–87. The employer was "in position to know and to produce the most probative facts concerning the nature and amount of work performed." *Id.* at 687.

In those circumstances, the court held that the plaintiff "has carried his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. *Id.* "The burden," the court said, then "shifts to the employer" to either (1) "come forward with evidence of the precise amount of work performed," or (2) "with evidence to negative the reasonableness of the inferences to be drawn from the employee's evidence." *Id.* at 687-88.

Amazon had the duty under the contract to keep track of DAB's inventory, and Amazon was "in position to know and to produce the most probative facts" concerning that inventory. As applied to this case, the trustee met his burden by proving that Amazon didn't fully account to DAB for missing or damaged inventory, and by producing evidence to show the amount and extent of that inventory "as a matter of just and reasonable inference."

**III. The trustee met his burden of proof with admissible evidence showing at least the approximate amount of missing or damaged inventory.**

The trustee met his burden of proof of damages in two ways. First, the trustee offered the expert opinions of Ms. Morones, who concluded that Amazon had liability for 111,688 units of unaccounted for DAB inventory, plus liability for unpaid refund reimbursements and unremitted sales proceeds. Second, DAB presented evidence from Amazon's M15 adjustment data showing that over 200,000 units of DAB inventory were missing or damaged. We briefly discuss each.

### A. Ms. Morones's expert report and declaration provide admissible evidence of damages.

The trustee offered the expert opinions of Morones set forth both in her expert report, Exh. 7, and in her trial declaration, Exh. 172. The table at Exh. 172.0006 summarizes her conclusion, using only M15 data, that Amazon is liable for 111,688 inventory units, comprised of expected ending inventory of 39,331 units, and 72,357 "reimbursable adjustments." This process is reflected in the deposition testimony of Justin Ice, 73:25 – 74:25, who testified that expected ending inventory only doesn't necessarily equate to Amazon's liability. It is necessary to consider Amazon's liability for adjustments also. *Id.*

Morones's calculations used the M15 data through January 31, 2014 since DAB ceased operations before that and Amazon terminated DAB's contract on October 22, 2013. Morones's trial declaration and trial testimony showed that DAB requested the removal of all its known inventory before January 31, but that (1) Amazon inexplicably canceled 23,995 of its removal requests; (2) the M15 data showed more inventory than Seller Central reflected; (3) of the 19,890 units that Amazon claims to have sent back to DAB post-cessation, Amazon destroyed 7,783 of them; and (4) Amazon offered no proof on where Amazon sent the other units, since DAB had ceased operation. That sufficed to meet trustee's burden of proof as to the 19,890 units Amazon returned post-cessation. The burden then shifted to Amazon to prove why it canceled DAB's removal requests, where it sent the units, post-cessation, and how DAB benefited from them.

Although the trustee contends Amazon is also liable for Code Q units, Morones does not include Code Q units in her analysis. She is not a legal expert and limited her testimony to items for which Amazon admitted liability. Since Code Q is defined as damage that "cannot be attributed to a source," she offered no opinion on Code Q liability. Amazon, however, through 30(b)(6) witness Jeff Moore, testified that if a unit, after being first inspected and put on the shelf in a fulfillment center, was later found damaged, Amazon would be responsible. If the unit was given a Code Q rather than Code E, Moore said his "understanding" was that "those are investigated and they're determined on a case-by-case

basis." Moore dep. at 119:16-120:16. Yet Moore said, if a unit, after being initially inspected and received and put on the shelf, was later found damaged in the warehouse, then Amazon should pay. *Id.* 121:21-22. Moore also testified that Amazon's systems had, over the course of time, "continued to evolve," and so he wasn't sure how Code Q worked during DAB's time. *Id.* 122:23-123:5; 120:17-121:6.

Given the facts and case law discussed above, to avoid liability for Code Q units, Amazon had the burden to present admissible evidence showing that Code Q units had not been damaged while being stored. Failing that, then Amazon is liable for them.

Morones's trial declaration table at Exh. 172.0006 also shows Amazon liability for unpaid refund reimbursements totaling $186,247 and unremitted sales proceeds of $172,851. Her expert report, Exh. 7.0018-20; 36-37, gives the reasoning and evidence for such.[3] That table also shows a $305,611 deduction for Amazon reimbursements (detailed at Exh. 7.0039). In addition, Morones's expert report calculated $732,000 of stay violation damages, detailed at Exh. 7.0022-25, 0042.

**B.  The inventory adjustments from the M15 data show more than 200,000 units of missing or damaged inventory.**

Besides Morones's expert opinions, the trustee presented the direct evidence from the inventory adjustments data showing missing and damaged inventory. Amazon documents told DAB that to "fully reconcile inventory balances you must gain an understanding of the various inventory events that contribute to your ending balance," and that "[t]here [was] a report per inventory event to help you identify the key details of the given event." Exh. 148.001. This report showed "corrections and updates to your inventory in response to issues such as damage, loss, receiving discrepancies, inventory transfers, and

---

[3] At trial, Amazon's only evidence on the unpaid refund reimbursements was Bachand's testimony that it was "possible" the shortfall came from sales of "consumables" that customers failed to return, but for which Amazon would not reimburse DAB as a matter of policy. 18 Feb. Tr. at 150:23-151:6. Yet (1) Bachand has no personal knowledge of that for the 2008-2013 period; (2) Bachand cited no written policy or agreement relating to the matter; and (3) Bachand only agreed that it was "possible" that "might" explain the shortfall. Such evidence doesn't meet Amazon's burden of proof.

9

so on." Exh. 2.0001.

The inventory adjustments reports disclosed inventory shrinkage using codes to identify the specific events causing the shrinkage. As described in those reports at the time, the adjustment codes included Code E ("Damaged at Amazon fulfillment center" and for which the "fulfillment center is responsible"), Code Q ("Damaged—Miscellaneous," at a fulfillment center, when "damage cannot be attributed to a source"), and Code D ("Destroyed; Unrecoverable inventory"). Exh. 2.0001-2. The adjustment codes also included Codes M and F, respectively, "Inventory misplaced" and "Inventory found." *Id.*

These inventory adjustment reports were DAB's sole source of knowledge about its inventory shrinkage and the cause of such shrinkage. Amazon says the data from those reports are now part of the M15 data adjustments file, Exh. 131, Amazon0009635. From that file we summarize the main categories of missing or damaged inventory units:

- 10,284 units Code E
- 147,968 units Code Q
- 17,686 units Code D
- <u>39.253 units Code M/F</u>

**Total: 215,191 units[4]**

Given Amazon's agreement to pay the "Replacement Value" for any "loss of or damage to any Units while they are being stored," Exh. 1.0033, these figures—taken directly from the M15 data that Amazon produced—provide additional admissible evidence of damage and thus meet the trustee's burden of proof on damages. Once the trustee met his burden of proof, then the burden shifted to Amazon to disprove such.

**III. Amazon failed to meet its burden of proof because it attempted to counter the trustee's admissible evidence with inadmissible testimony.**

Amazon countered the trustee's straightforward use of the M15 data with explanations from Ms. Bachand about how, in her view, that data was "really used" in the 2008 to 2013 period. Mr. Williams then relied on Bachand's explanations to try to rebut

---

[4] These figures are as of 1/31/14. If one includes the M15's post-cessation data, the total is a little larger: 216,704 units.

10

Ms. Morones's opinions. But Bachand had no personal knowledge of what happened in the 2008 to 2013-time period and was thus incompetent to testify about such. It follows that Williams's opinion (and amended opinion) were flawed to the extent they rely on Bachand.

### A. Bachand was not competent to testify about how to apply the M15 data or how the adjustment codes worked from 2008-2013.

Federal Rule of Evidence 602 provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Bachand did not begin working at Amazon until September 2015. 18 Feb. Tr. at 54:8-11. Any knowledge she may have gained about Amazon's practices during the relevant period are outside her personal knowledge and are thus improper grounds for lay witness testimony. Only experts may rely on facts or data that an expert in their field would reasonably rely on, even if the source of such information would be otherwise inadmissible. Fed. R. Evid. 703. Bachand, however, was not identified as an expert witness (or even as a person with knowledge, *see* Exh. 104.0002-03). She is a lay witness who may not testify on matters outside her personal knowledge. While she was identified as an Amazon-designated 30(b)(6) witness, that rule only permits an *adverse* party to use her deposition testimony.

At trial, Bachand said she gained knowledge about Amazon's past practices when she did "deep dives on certain seller accounts" dating to 2011. 18 Feb. Tr. at 65:14-68:17. Bachand then offered testimony to the effect that in the 2008 to 2013-period the adjustment codes were not used as described in Amazon's contemporaneous written policies in the Inventory Adjustments Report document, Exh. 2. Contrary to that document, Bachand said, among other things, that Code Q was *not* used for warehouse- damaged inventory, but was only used for things like defective or expired inventory.

But Bachand didn't disclose what data she uncovered in her "deep dives," and Amazon did not produce the data from them. Nor did Bachand explain how reviewing that data, without more, gave her personal knowledge as to how Amazon used the inventory adjustment codes from 2008 to 2013. Except for the admitted exhibits that Bachand

11

contradicts and testified were "poorly worded," neither the M15 data nor any other data produced details how associates in the Amazon warehouse used Code Q or any other code in the operative period. Nor did Amazon prove that the data Bachand used in the "deep dives" qualified under the "business records" exception to the hearsay rule. Even it if had, Amazon did not offer those records in evidence to permit Bachand to testify from them.

Without personal knowledge not based on inadmissible hearsay, a corporate representative may not testify at trial. *E.g. Union Pump Co. v. Cetnrifugal Tech. Inc.,* 404 F. App'x 899, 907-908 (5th Cir. 2010). The Court should therefore not consider Bachand's testimony about Amazon's practices in the 2008 to 2013 period. For the same reasons, the Court should discount Williams's testimony based on what Bachand told him on those issues.

**B.     Amazon cannot meet its burden by now denying the data it claimed as sufficient and the best available based on Amazon's records.**

At trial, Bachand and Williams downplayed the M15 inventory adjustment data, testifying that it was "confusing," that the contemporary explanations for the codes were wrong, and that the codes "may" overlap each other—even though the contemporaneous descriptions of the codes contain no hint of such. *See, e.g.* 18 Feb. Tr. at 138:4-6; 19 Feb. Tr. at 107:19-108:5; and 130:3-10. Amazon argued that the Court shouldn't even consider the inventory adjustments.

At trial, Amazon elicited inventory adjustment testimony from Bachand using a demonstrative chart, Exh. 264, which presents three hypothetical scenarios to summarize its "double-counting" argument. But the contemporaneous evidence—and other Amazon evidence—conflicts with those scenarios.

Scenario 1 began with a "defective" unit to which Amazon gave a Code Q and changed its disposition to unsellable. But that contradicts the written policy in Exh. 2, because there was a *specific adjustment code* for defective units—Code K, not Q. And per Exh. 2, Code Q is only for damage that "cannot be attributed to a source."

Under Scenario 1, Amazon then destroys the unit. But once the unit became

unsellable because of a Code Q, it would be automatically removed to DAB under DAB's auto removal setting, and *not* destroyed. *See, e.g.,* Exh. 259, Williams Direct Test. at 7, ¶ 32 ("Amazon typically takes unsellable units out of inventory via Removal"). Moreover, the FBA Agreement only allows Amazon to destroy DAB inventory if it first pays DAB for it. Exh. 1.0033 ("if we pay you the Replacement Value of a Unit, we will be entitled to dispose of the Unit…."). So Amazon failed to carry its burden on Scenario 1.

Under Scenario 2 on Exh. 264, a unit is damaged in the warehouse, and given a Code E. Although Williams belatedly claimed that Bachand told him the unit would also be given a Code D adjustment, that directly contradicts the Amazon policy on the use of adjustment codes. Exh. 2. But again, Amazon can't destroy a unit unless it has first paid for it, and if Amazon reimbursed DAB for the unit after it was given a Code E, then—under the express terms of Exh. 2—the "damaged inventory will be transferred to Amazon" using Code O. So no Code D could apply. Thus Amazon failed to carry its burden as to Scenario 2.

In Scenario 3 of Exh. 264, a lost unit is given an M Code (missing), and then Amazon reimburses with an actual unit through Code N. But as both Bachand and Ice testified, the procedure of reimbursing with an actual unit under Code N didn't begin until the end of the DAB period. 18 Feb. Tr. at 68:3-69:5 And Williams's own table of reimbursements shows only 159 "warehouse lost" units reimbursed with actual inventory, instead of dollars. Exh. 5.0071. The admissible evidence thoroughly discredits Amazon's Exh. 264 hypotheticals.

C. **Amazon failed to meet its burden to prove that Amazon's "maximum liability" was limited to 36,972 units.**

At trial, using a demonstrative chart marked as Exh. 263, Amazon argued that its "maximum liability" was limited to the loss of 36,972 units. But Amazon failed to carry its burden to provide sufficient admissible evidence in support of such. Exh. 263 summed four numbers taken from the M15 data, which Amazon said showed its maximum liability:

+6,316,429 Receipts

-5,978,113 Sales

+63,452 Returns

-364,796 Removals

36,972 units total

When the facts behind the numbers are examined, however, they don't support Amazon's position. First, assuming the numbers are accurate, what they show is that there are 401,768 inventory units that weren't sold, and all of those need to be accounted for: 364,796 Removals + 36,972 expected ending inventory = 401,768.

Bachand testified that the M15 Removals data, Exh. 131, AMAZON 9639, showed that, of the 364,796 removals, 84,511 of them were listed as unsellable. 19 Feb. Tr. at 79:7-21. In other words, during the history of the DAB relationship, 84,511 sellable units had their disposition changed to "unsellable," and were shipped back to DAB. Based on the M15 data, most if not all of those 84,511 units would have been Code Q units. We know this because, of the several categories of inventory adjustments that, per Exh. 2, change a unit's disposition from sellable to unsellable, Code Q was the only code with that many adjustments. *See* chart at Exh. 7.0033. The false simplicity of Exh. 263 ignores that in addition to the 39,972 shown, as Bachand testified, the removals include 84,511 units for which the status was changed to unsellable for unknown (Code Q) reasons. Thus, even under Amazon's simplistic approach it faces lability for at least 121,483 units (84,511 + 36,972).

Moreover, the sum of just the 10,284 Code E warehouse damaged units and the 38,253 thousand Code M/F missing inventory units total 49,537: 12,565 *more* than the supposed "maximum" shown on Exh. 263. By itself, that calculation shows that Amazon's chart is just wrong. Amazon has failed to meet its burden of proof to limit its exposure to 36,972.

**D.  Williams's testimony about stay violation damages failed to disprove Ms. Morones's analysis.**

To meet the trustee's burden of proof on stay violation damages, the trustee offered Morones's expert opinion on such. Exh. 7.0022-25; 0042-43. Amazon violated the stay by terminating DAB's selling privileges from April 11 through April 26, 2013. Then, DABs

sales in April plummeted. Using DAB's monthly operating reports, Morones calculated the expected revenues for April as the average of DAB's actual revenues from November 2012 to March 2013. She then projected revenues for May 2013 through October 2013 by growing expected revenues by .2% per month, the expected long term inflation based on the December 2012 Livingston Survey. Again using the reports of actual operations, Morones calculated an average "contribution margin profit rate" from November 2012 to March 2013 of 9.7%. Exh. 7.0043. Applying that figure to DAB's lost revenues, she arrived at lost profits totaling of $732,000.

Amazon used Williams's report to try to rebut that analysis, but Williams's report, while questioning some of Morones's assumptions, offers no admissible evidence contradicting them. Moreover, Williams's alternative analysis looks only to the 15-day period during which DAB closed. It offers no factual basis for looking only at that period.

## CONCLUSION

The Morones report and declaration, Exh. 7 and 172 establish liability for 111,688 units, plus additional losses from unpaid refund reimbursements, unremitted sales proceeds, and stay violation damages. Although Morones did not include Amazon's liability for the unidentified damage to 147,968 units designated Code Q, Amazon's agreement to pay for damage regardless of the source, shows such liability Amazon failed to meet its burden to rebut such evidence, particularly because Amazon was in control of all the data showing the loss and damage of DAB's inventory. Moreover, Amazon's only fact witness, who their expert relies on extensively, lacks any personal knowledge and testified in conflict with the witness with first-hand knowledge (Ice), the witness Amazon designated to testify as to its policies and procedures (Moore) and Amazon's own written document (Exh. 2). Such inadmissible testimony cannot meet Amazon's burden to refute what the data it produced proves.

DATED March 12, 2021.

GALLAGHER & KENNEDY, P.A.

By: *Mark C. Dangerfield*
   Mark C. Dangerfield
   Dale C. Schian
   Kenneth N. Ralston
   2575 East Camelback Road
   Phoenix, Arizona  85016-9225
   *Attorneys for Trustee Timothy H. Shaffer*

| | |
|---|---|
| 1 | **CERTIFICATE OF SERVICE** |
| 2 | I hereby certify that on March 12, 2021, I electronically transmitted the attached |
| 3 | document to the following parties: |

Richard M. Lorenzen, Esq.
Perkins Coie, LLP
2901 North Central Avenue, #2000
Phoenix, Arizona 85012-2788
Attorneys for Amazon Services LLC
rlorenzen@perkinscoie.com

Eric J. Weiss, Esq.
Mallory G. Webster, Esq.
Perkins Coie, LLP
1201 Third Avenue, #4900
Seattle, Washington 98101-3099
Attorneys for Amazon Services LLC
eweiss@perkinscoie.com
MWebster@perkinscoie.com

　　　*/s/Jo Magallanes*

8479158v4/29611-0001