Richard M. Lorenzen (Bar No. 006787)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
Email: RLorenzen@perkinscoie.com
Telephone: 602.351.8000
Facsimile: 602.648.7000

John S. Kaplan (*Pro Hac Vice*)
Eric J. Weiss (*Pro Hac Vice*)
Mallory Gitt Webster (*Pro Hac Vice*)
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Email: JKaplan@perkinscoie.com
Email: EWeiss@perkinscoie.com
Email: MWebster@perkinscoie.com
Telephone: 206.359.8000
Facsimile: 206.359.9408

*Attorneys for Amazon Services LLC*

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>POTENTIAL DYNAMIX LLC,<br><br>    Debtor. | Case No. 2:11-bk-28944-DPC<br><br>Chapter 11<br><br>Adv. No. 2:13-ap-00799 |
| TIMOTHY H. SHAFFER, Chapter 11 Trustee,<br><br>    Plaintiff,<br><br>vs.<br><br>AMAZON SERVICES LLC,<br><br>    Defendant. | **AMAZON SERVICES LLC's POST-TRIAL MOTION TO EXCLUDE PREJUDGMENT INTEREST** |

**POST-TRIAL MOTION TO EXCLUDE PREJUDGMENT INTEREST**

Amazon Services LLC ("Amazon") respectfully requests that the Court deny Plaintiff Timothy H. Shaffer's (the "Trustee") request for prejudgment interest on his inventory claims. In the alternative, Amazon requests that the Court reduce any prejudgment-interest award to account for the significant delays caused by the Trustee and the Debtor Potential Dynamics LLC ("DAB").

## I. INTRODUCTION

For eight years, the Trustee pursued a litigation strategy premised on DAB's fraudulent claim that Amazon lost hundreds of thousands of inventory units that DAB knew Amazon had not lost. Amazon, by contrast, tried time and again to explain how the data confirmed that at most only a fraction of DAB's inventory could be unaccounted. But the Trustee rejected those explanations, leaving Amazon to chase the Trustee's ever-shifting claims, interpretations of the data, and theories of damages. As Amazon showed at trial, the Trustee has not met his burden of proving damages for his inventory claims, but even if he could, the Court should deny any award of prejudgment interest for two reasons.

First, Washington law does not allow the Court to award prejudgment interest because the value of the Trustee's inventory claims cannot be calculated with exactness. Prejudgment interest is unavailable if the factfinder must choose between two experts' competing methods of computing damages, and the Court's assessment of the Trustee's claims requires the Court to exercise such discretion. The Court must evaluate Trustee expert Serena Morones's flawed assumptions about the M15 data, decide between Ms. Morones's and Amazon rebuttal expert E. Weiant Williams's methodologies for calculating damages, and decide whether any damages are warranted based on the available data.

Second, even if prejudgment interest were appropriate, the Court should reduce any award because DAB and the Trustee unreasonably delayed the litigation process and resolution of the case. DAB first wasted significant time by submitting to Amazon fraudulent claims for the reimbursement of hundreds of thousands of missing units, even though DAB knew that the data did not support its claims. DAB's intentional

-2-

misinformation—including misleading the Trustee about the inventory claims—forced Amazon to spend months unraveling what it thought was a good-faith reimbursement claim. DAB's actions also fixed the Trustee on an unsupported litigation position that in turn led him repeatedly to reject Amazon's efforts over the past eight years to compile, analyze, and explain the data; to delay production of an expert report until he retained an expert who would give his preferred opinion; and to then refuse to produce expert documents to which Amazon was entitled. Because the Trustee's delays unnecessarily prolonged this litigation, Amazon should not be financially responsible for them.

## II. BACKGROUND

### A. In 2012 and 2013, DAB Submitted Fraudulent Reimbursement Claims for Millions of Dollars of Inventory, Delaying Resolution of Those Claims.

In 2012, DAB's inventory manager, Sean Lawcock, audited DAB's entire inventory history to determine if Amazon owed DAB for missing inventory units. Trial Exs. 223–224; S. Lawcock Dep. 205:21–206:24. Mr. Lawcock's audit took place many years after most of the inventory transactions had occurred. *See* Trial Ex. 223 (showing audit completed in late 2012). And Mr. Lawcock's audit was incomplete; he admitted in his deposition that he did not account for data confirming the reimbursements that Amazon had already made. S. Lawcock Dep. at 205:21–206:24. Despite even those errors, Mr. Lawcock concluded that Amazon owed DAB for only 38,000 units. Trial Exs. 223–224; S. Lawcock Dep. 205:21–206:24.

With his company in financial decline and nearing collapse, DAB's CEO Daniel A. Bellino asked Mr. Lawcock how DAB could inflate the already-mistaken claim. *See* Lawcock Dep. at 222:5–12, 223:16–18. Mr. Lawcock responded that DAB could make a "more dramatic case" for reimbursement by "leaving out overages" in the data that were favorable to Amazon. Trial Ex. 223. In other words, DAB could artificially make it look like Amazon owed for even more than 38,000 units if the data that DAB provided Amazon erased all of the inventory overages favorable to Amazon.

And that is precisely what DAB did. Rather than submitting a reimbursement claim

-3-

for the 38,000 units that DAB mistakenly believed it had identified, DAB submitted a claim ten times larger: 391,083 "missing" or "lost/misplaced" units. *Compare* Trial Ex. 223 (identifying 38,040 missing units), *with* Trial Ex. 11 at 5 (making claim to Amazon for total of 391,083 "lost/misplaced" units). DAB valued the claim at $10.5 million. Trial Ex. 11 at 5; Trial Ex. 12 at 1 (valuing each "missing" unit at $27). And just a few months later, DAB submitted another false claim for $4.1 million, still significantly more than DAB believed was actually at issue. Trial Ex. 10 at 3 (identifying 151,871 "missing units"). Mr. Lawcock admitted at his deposition that the "more dramatic case" that DAB submitted was not the most accurate representation of the data. S. Lawcock Dep. at 223:19–23.

Compounding the attempted fraud, Mr. Bellino did not inform the Trustee that he had ordered Mr. Lawcock to inflate the reimbursement claim. Instead, the Trustee understood that DAB had sent to Amazon its claim for $1 million, which was consistent with DAB's mistaken belief that it was owed for approximately 38,000 units and that each unit was valued at an average of $27. T. Shaffer Dep. (Apr. 29, 2019), at 181:17–183:20, 184:7–10; Trial Ex. 12. In fact, the Trustee specifically asked Mr. Bellino in writing, "When was the exact date(s) when [DAB] submitted the $1,000,000 inventory claim?" Trial Ex. 12. But rather than reveal that he had instructed his inventory manager to mislead Amazon, Mr. Bellino this time misled the Trustee, providing only the date that DAB submitted the $10.5 million claim. *Id.* The Trustee did not learn of the fraudulent claims until his deposition in April 2019—when Amazon showed him the emails from DAB recording the attempted fraud. T. Shaffer Dep. (Apr. 29, 2019) at 184:7–10.

At the time of DAB's original claim, Amazon did not know that the data DAB had provided had been intentionally modified, and Amazon accepted DAB's reimbursement claims in good faith, expended significant resources investigating the claims, and even began paying on them. *See* Trial Ex. 12 (acknowledging that Amazon had paid over $100,000 in reimbursements before Amazon "woke up" and "took note").

Once in litigation, Amazon continued trying to unravel what it did not yet know was DAB's attempted fraud. In late 2013, Amazon performed a comprehensive analysis of

-4-

DAB's inventory of its top 100 products, amounting to 62% of the total inventory for which there was a potential discrepancy. J. Ice Dep. at 139:16–140:21, 142:16–144:2, 149:23–150:11, 151:24–152:25, 158:2–159:7, 182:20–185:16, 189:8–25, 193:9–194:12 (detailing "Deep Dive" analysis). Amazon referred to this process as the "Deep Dive." *See id.* The Deep Dive served as a benchmark to assess the potential total reimbursement amount that Amazon might owe for the inventory units that the Trustee and DAB claimed that Amazon had lost. *See* Amazon Statement of Facts ("ASOF"), ECF No. 273 (Nov. 20, 2020) ¶ 63. The Deep Dive consumed approximately two full-time work weeks of two Amazon employees. *Id.* The purpose of the Deep Dive was to efficiently determine—for both the Trustee's and Amazon's benefit—whether Amazon might owe DAB for any missing inventory. *See id.*

The analysis revealed that the potential gross reimbursement amount for those top 100 products was about $27,000. *Id.* ¶ 66. And applying the rate from those products to the remaining 38% of the Debtor's inventory showed a total estimated reimbursement amount of approximately $44,000—far even from the $1 million submission the Trustee thought DAB had submitted to Amazon. *Id.*; *see also* Trial Ex. 12. The Trustee refused, however, to accept that result because Mr. Bellino had told the Trustee that Amazon owed DAB over $1 million for "missing" units (again, because Mr. Lawcock had omitted reimbursements from his audit).

Because of the Trustee's refusal, Amazon worked for months to produce in May 2015 additional data—the "M15 data"—for DAB's entire eight-year history in the FBA program. ASOF, ECF No. 273 (Nov. 20, 2020) ¶ 67. Compiling and producing the M15 data was an even more enormous task than preparing the Deep Dive because it required hundreds of hours of Amazon staff time and considerable financial expense to retrieve millions of rows of transactional data. *Id.* ¶ 68. The M15 data is the most complete information known to be available to account for DAB's "Lost Inventory" as alleged in the Complaint and dating back to 2008. *Id.* ¶ 69; Compl., ECF No. 1 (July 9, 2013) ¶ 21.

-5-

**B.  The Trustee Also Delayed by Failing to Produce for Years an Expert Report While He Cycled Through Experts to Find One to Validate His Claims.**

After production of the M15 data, the Trustee disclosed three testifying experts to provide opinions in this case: Stephen A. Ashworth, Cathie Cameron, and Sonoran Capital Advisors. Discl., ECF No. 109 (Apr. 14, 2017). He disclosed those experts on April 14, 2017. *See id.* Both Mr. Ashworth and Ms. Cameron drafted multiple expert reports from 2015 through 2017, but the Trustee sought multiple extensions to produce their reports. Declaration of Eric J. Weiss in Support of Mot. to Excl. Interest ("Weiss Decl.") ¶¶ 2–3. Amazon stipulated to the extensions in another good-faith effort to reach resolution by explaining the data to the Trustee and his experts. *Id.* ¶ 4. But the Trustee used the multiple extensions to search for a new testifying expert, Serena Morones, whom he later disclosed as his new—and only—testifying expert. App. to Employ, Bankr. ECF No. 548 (Apr. 3, 2018) at 2.

Ms. Morones then took another 15 months to prepare the expert report that the Trustee finally produced in May 2019—four years after Amazon produced the M15 data. Trial Ex. 7. Ms. Morones, in turn, engaged yet another expert, Jeffrey A. Cone, to process and analyze the data because she did not have that particular expertise. *See id.* at Attach. C; Weiss Decl. ¶ 7, Ex. B ("Cone Dep.") at 37:17–38:1. Mr. Cone authored the majority of Ms. Morones's report. *See* Trial Ex. 7 at Attach. C (Cone narrative and following schedules). Ms. Morones and Mr. Cone's initial assignment from the Trustee was to attempt to validate Mr. Ashworth's conclusions about the data and missing inventory units. Weiss Decl. ¶ 6, Ex. A ("Morones Dep") at 255:18–24. When they were unable to do so, they pivoted and added theories of damages never revealed during discovery. *Id.* at 137:6–19, 259:13–20.

In short, the multiple changes in experts, multiple changes in what the Trustee tasked the experts with doing, and the multiple extensions sought by the Trustee significantly delayed the case. Those changes and extensions also delayed Amazon from retaining its

-6-

rebuttal expert and producing its own expert report. Amazon could not move forward until it knew who the Trustee's testifying experts would be and on what topics they would opine.

**C.    The Trustee Further Delayed by Refusing to Produce for Months All of the Documents that Ms. Morones Considered in Drafting Her Report.**

Even after the Trustee produced Ms. Morones's report in May 2019, he refused to produce all of the documents that Ms. Morones considered in drafting her report. *See* Mot. to Compel, ECF No. 195 (Sept. 9, 2019); Declaration of Eric J. Weiss in Support of Mot. to Compel, ECF No. 196 (Sept. 9, 2019) ¶ 4. Over the next five months, Amazon was forced to address the Trustee's failure to produce and ultimately to engage the Court's assistance to resolve the issue. *See* Mot. to Compel, ECF No. 195 (Sept. 9, 2019). The Trustee required Amazon to subpoena Ms. Morones and Mr. Cone—his own experts—for the documents, which Ms. Morones and Mr. Cone in turn refused to produce, and Amazon then had to move to compel. *See* Declaration of Eric J. Weiss in Support of Mot. to Compel, ECF No. 196 (Sept. 9, 2019) ¶¶ 16–17. The Trustee also failed to follow the Court rules in responding to Amazon's motion, filing more responses than he was entitled and doing so after the parties' agreed-to deadlines, again delaying the case. *See* Reply, ECF No. 202 (Sept. 20, 2019) at 2; Mot. to Strike, ECF No. 203 (Sept. 23, 2019); Reply, ECF No. 212 (Oct. 7, 2019) at 3.

In the middle of resisting the production of documents, the Trustee's counsel's prior law firm closed and led the Trustee to request that the Court stay the case an additional 30 days. Min. Entry, ECF No. 188 (Aug. 8, 2019) at 2. At the August 8, 2019, hearing on the expert documents, the Trustee agreed to forgo prejudgment interest during the 30-day stay but was unwilling to commit to the Court's inquiry that "any interest award would be paused for any time period in which the Plaintiff is responsible for the delay in the prosecution of this action." Audio Recording, ECF No. 190 (Aug. 8, 2019) at 20:02–21:30; *see also* Min. Entry, ECF No. 188 (Aug. 8, 2019) at 2.

In October 2019, the Court ordered the Trustee to provide the documents considered by Ms. Morones and provided to her by Mr. Cone and Mr. Ashworth. Order, ECF No. 216 (Oct. 25, 2019) at 6. In November and December 2019, the Trustee finally produced—

-7-

roughly seven months after Ms. Morones's report—the documents that should have been provided to Amazon at the latest in May 2019. Weiss Decl. ¶ 5. The Trustee's delay required the Court to push back the pretrial deadlines and the trial date. *See* Min. Entry, ECF No. 188 (Aug. 8, 2019) at 2; Stip., ECF No. 220 (Dec. 12, 2019); Order, ECF No. 222 (Dec. 17, 2019).

**D.    The Trustee Seeks Over $2 Million in Prejudgment Interest on His Inventory Claims—More than the Amount He Seeks for the Claims Themselves.**

The Trustee has requested $2,261,347 in prejudgment interest on his asserted damages for inventory claims.[1] *See* Trial Ex. 172 ¶ 11. That amount is greater than the underlying damages he seeks. *See generally id.*

### III.    ANALYSIS

Prejudgment interest is available under Washington law only when the trier of fact can compute the value of a claim with exactness and without exercising discretion. Here, the Court must necessarily use its discretion to evaluate Ms. Morones's assumptions, decide between Ms. Morones's and Mr. Williams's methods for calculating damages, and decide whether damages might be warranted given the available data. Accordingly, if the Court awards any inventory damages, it should deny prejudgment interest on that award.

The Court also has considerable discretion to reduce prejudgment interest to account for unreasonable litigation delays. Therefore, the Court should in the alternative reduce any prejudgment interest because of the Trustee's unreasonable delays in resolving this case.

**A.    The Court May Not Award Prejudgment Interest Because the Court Must Exercise Discretion in Deciding the Value of the Trustee's Claims.**

Under Washington law, "a party is entitled to prejudgment interest where the amount due is 'liquidated.'"[2] *Weyerhaeuser Co. v. Com. Union Ins. Co.*, 15 P.3d 115, 132 (Wash.

---

[1] The Trustee has not requested prejudgment interest on his claim for damages related to the 15-day period that DAB was unable to sell on amazon.com. *See* Trial Ex. 172 ¶ 11.

[2] The Court determined that Washington law governs the contract between DAB and Amazon. *See* Hearing Mins., ECF No. 358 (Feb. 11, 2021) at 2. Accordingly, the Court should apply Washington law to decide whether to award prejudgment interest. *See In re Palermo*, 739 F.3d 99, 107 (2d Cir. 2014) (observing that bankruptcy courts should "look to the source of the law underlying plaintiff's claims" to decide whether to award prejudgment interest).

-8-

2000). "A claim is liquidated" only if "'the evidence furnishes data which, if believed, makes it possible to compute the amount with *exactness*, without reliance on opinion or discretion.'" *Rekhter v. Dep't of Soc. & Health Servs.*, 323 P.3d 1036, 1047 (Wash. 2014) (quoting *Prier v. Refrigeration Eng'g Co.*, 442 P.2d 621, 627 (Wash. 1968)). A claim is "unliquidated"—and prejudgment interest is unavailable—if the factfinder must decide whether it agrees with the assumptions underlying an expert's opinions because damages in such cases necessarily depend on the factfinder's discretion. *See OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 743 F. App'x 771, 777 (9th Cir. 2018) ("Given that the sales volume data was based in part on an assumption, 'the exact amount [of the damages] cannot be definitively fixed from the facts proved.'" (quotations omitted)).

For the same reason, prejudgment interest is unavailable if the factfinder must choose between two experts' competing methods of computing damages. *See Douglas Nw., Inc. v. Bill O'Brien Sons Constr., Inc.*, 828 P.2d 565, 582–83 (Wash Ct. App. 1992) ("There was disputed testimony here concerning the proper computation method for deriving hourly equipment rates, with experts for both sides giving their opinions. The trial court was thus forced to rely on opinion testimony, and a measure of discretion was involved."); *St. Hilaire v. Food Servs. of Am., Inc.*, 917 P.2d 1114, 1119–20 (Wash. Ct. App. 1996) (observing that "the experts called by each side disagreed as to the amount of damages" and therefore concluding that "the jurors necessarily used opinion and discretion in deciding what amount to award").

The Washington Supreme Court's decision in *Rekhter v. Dep't of Soc. & Health Servs.*, 323 P.3d 1036 (Wash. 2014), is on point and illustrates when a claim is "unliquidated" and prejudgment interest may not be awarded. The issue in *Rekhter* was whether the defendant should have paid healthcare providers under one of two competing formulas. *See id.* at 1040, 1047. To determine the exact amount due under one of the formulas, the jury would have needed individualized data. *See id.* at 1047. The defendant, however, did not have that data, so the parties' experts offered competing estimates of what the data should have been. *See id.* The Washington Supreme Court concluded that the

-9-

estimates, although "sophisticated," were not exact; the jury necessarily had to use discretion to determine how much the defendant should have paid. *Id.* And because "there was no way for the jury to determine . . . what the exact amount of damage was," the court reversed the trial court's award of prejudgment interest. *Id.* The court reasoned that "it would be unfair to hold a defendant accountable for interest on an amount that is unquantifiable and unforeseeable prior to a jury verdict." *Id.*

Prejudgment interest cannot be awarded here because the Court must exercise discretion if it opts to award any inventory damages. First, the Court must decide whether and to what degree it might agree with Ms. Morones's (incorrect) assumptions about the M15 data. Those assumptions include (1) that Adjustment codes do not overlap; (2) that Amazon is always responsible for units that it destroys and identified with a Code D; (3) that units given a Code E are frequently Removed by a seller; (4) that Code Ns never represent manual reimbursements; and (5) that Code Xs represent lost units if those codes were generated more than 30 days after DAB sent units to Amazon. *See* 2/16/21 Trial Tr. at 190:4–7, 203:24–204:5, 207:25–208:1; 2/17/21 Trial Tr. at 89:7–11, 107:15–23; Trial Ex. 7 at 17–18, 116.

Those assumptions are flawed and contested. Ms. Morones herself recognized at trial that some of her assumptions might be flawed, and Mr. Williams directly and persuasively countered those assumptions. *See, e.g.*, 2/16/21 Trial Tr. at 13–20. Mr. Williams showed, for example, that Codes D and Q significantly overlap in the M15 data and confirmed that units given a Code E are almost always taken out of inventory through Code Os, not Removals. Trial Ex. 259 ¶¶ 9, 32; 2/19/21 Trial Tr. at 188:2–189:16. The Court must now evaluate—using its discretion—Ms. Morones's assumptions. *See OTR Wheel Eng'g*, 743 F. App'x at 777 (denying prejudgment interest because the expert witness made assumptions about the data and the jury "applied discretion in choosing to reduce the award from the amount calculated by the expert").

The Court must further decide which method of calculating inventory damages to adopt—Ms. Morones's or Mr. Williams's. *See St. Hilaire*, 917 P.2d at 1119–20 (concluding

-10-

that the factfinder "necessarily used opinion and discretion in deciding what amount to award" because "the experts called by each side disagreed as to the amount of damages"). Ms. Morones offered a methodology that involved calculating Expected Ending Inventory and "Shrinkage" (or "Reimbursable Adjustments"), the collection of codes that represent lost, damaged, and misreceived inventory units. Trial Ex. 172 ¶ 11. Amazon revealed several problems with that calculation, including Ms. Morones's misunderstanding of various Adjustments and the fact that her two calculations impermissibly overlap. Trial Ex. 259 ¶¶ 12–13, 36–39. Amazon also offered Mr. Williams's competing calculations, one that includes Adjustments just as Ms. Morones did and one that more conservatively omits Adjustments and is favorable to the Trustee. *Id.* ¶¶ 8–9. Only Mr. Williams's methodologies are reliable and should be adopted by the Court.

Finally, the Court must also exercise discretion in deciding if damages might be warranted given the available data in this case and if so, what damages are fair given the ambiguities. The M15 data that underlie both experts' opinions constitute the most complete information known to be available to account for DAB's inventory units in the FBA program. ASOF, ECF No. 273 (Nov. 20, 2020) ¶ 69. But because the Trustee expanded his claims beyond just "missing" inventory units to cover damaged and misreceived units—as well as claims and theories for unremitted payments and unpaid refund reimbursements—the M15 data cannot be used as Ms. Morones and the Trustee have tried to use it. Trial Ex. 259 ¶ 12. The Adjustments in the data reflected by various codes, for example, cannot be—now years later—tied back to specific units of inventory or identify to which specific inventory units multiple Adjustments were applied. *See id.* Adjustments therefore cannot simply be added up to arrive at a number of damaged units. *See id.*

In short, to address the Trustee's inventory claims beyond "lost" units, Ms. Morones and Mr. Williams had to interpret what the M15 data show. *See Rekhter*, 323 P.3d at 1047 (recognizing that the experts' methods were "sophisticated" but "ultimately . . . only estimates" requiring discretion to evaluate). The Court must consider the experts' interpretations of the data and decide whether to adopt Mr. Williams's approach, which

-11-

Case 2:13-ap-00799-DPC    Doc 371    Filed 03/12/21    Entered 03/12/21 17:41:12    Desc
Main Document    Page 11 of 15

accounts for ambiguity in the available Adjustments data as best as is possible, or whether to adopt Ms. Morones's approach, which ignores the limitations of the M15 data created by trying to use that data to prove claims and theories beyond those for inventory units.

In evaluating the experts' opinions and the M15 data, the Court will have to use discretion. Accordingly, the Court has no basis for awarding prejudgment interest in this case. *See Douglas Nw.*, 828 F.2d at 582–83; *St. Hilaire*, 917 P.2d at 1119–20.

**B.  Alternatively, the Court Should Reduce Any Award of Prejudgment Interest for the Delays Caused by DAB and the Trustee.**

If the Court decides to award damages and disagrees that the award involves its exercise of discretion, the Court should nevertheless reduce the prejudgment interest that the Trustee has requested. The Court has "discretion to disallow [prejudgment] interest during periods of unreasonable delay in completing litigation that is attributable to claimants." *Colonial Imports v. Carlton Nw., Inc.*, 921 P.2d 575, 583 (Wash. Ct. App. 1983). The Court has also already recognized that Amazon should not be responsible for prejudgment interest during periods when the Trustee failed to prosecute his claims. Audio Recording, ECF No. 190 (Aug. 8, 2019) at 20:02–21:30. Several periods of delay, conservatively totaled at roughly three years, warrant reducing any prejudgment interest.

At the outset, DAB delayed and tainted any chance at a timely resolution by submitting fraudulent reimbursement claims for hundreds of thousands of inventory units and many millions of dollars. Amazon spent months investigating the claims and confirming that they were baseless. But when Amazon tried to explain that, the Trustee—who had been convinced by DAB that Amazon had lost a large number of units—rejected Amazon's explanation and filed suit. The Trustee should not be awarded interest for the pre-suit period—about seven months—during which Amazon was forced to address DAB's false claims and misinformation.[3] *See Colonial Imports*, 921 P.2d at 583.

---

[3] In addition, Mr. Williams showed that Ms. Morones's midpoint methodology of calculating prejudgment interest is inappropriate to use in this case. Trial Ex. 259 ¶ 24; Trial Ex. 5 at 29–30. Accordingly, the Court's consideration of prejudgment interest should not even begin until July 9, 2013, the date that the Trustee filed the Complaint. Trial Ex. 5 at Ex. 9.

-12-

From there, Amazon performed the Deep Dive and compiled the M15 data to show that those units had either not been lost in the first place or had been reimbursed. The time and resources spent on those efforts could have been avoided had DAB not intentionally submitted false information that delayed resolution and committed the Trustee to a litigation course premised on DAB's intentional misinformation. *See id.* at 583 (upholding the disallowance of interest where the plaintiff "pressed a clearly erroneous legal position").

The Trustee then delayed the case for at least two years by not producing an expert report until May 2019. By May 2015, the Trustee had the data necessary for his experts to address the inventory claims, and two years later the Trustee had retained at least two experts to analyze that data. Discl., ECF No. 109 (Apr. 14, 2017). In fact, the experts drafted multiple reports that the Trustee could have used. Weiss Decl. ¶¶ 2–3. But the Trustee discarded those reports, choosing to instead retain Ms. Morones in the hopes that she would validate his flawed theory. The Trustee's delay meant that Amazon could not retain its own rebuttal expert and then produce a rebuttal report until it received the Trustee's expert report. The Trustee-created bottleneck significantly delayed the case, and Amazon should not have to pay interest for the two-year period. *See Seattle-First Nat'l Bank v. Wash. Ins. Guar. Ass'n*, 972 P.2d 1282, 1292 (Wash. Ct. App. 1999) (holding that a multi-year delay in presenting an order of judgment warranted disallowing interest for that period).

The Trustee then refused to produce all of the documents that she and Mr. Cone considered in preparing the report. That refusal caused another five months of stagnation during which the parties could not move any closer to a resolution on the merits. The Trustee also requested a 30-day stay during that period and agreed to forgo prejudgment interest for at least that period. Min. Entry, ECF No. 188 (Aug. 8, 2019) at 2; *see also* Audio Recording, ECF No. 190 (Aug. 8, 2019) at 20:02–21:30. Amazon should not be charged prejudgment interest for this five-month period. *See Minemyer v. R-Boc Representatives, Inc.*, 2012 WL 2423102, at *3 (N.D. Ill. June 26, 2012) (reducing prejudgment interest because of the plaintiff's discovery delays).

-13-

All told, if the Court awards the Trustee inventory damages and concludes that it may award prejudgment interest, it should discount the requested interest by the collective—and conservatively estimated—three-year delay caused by DAB and the Trustee.[4]

## IV. CONCLUSION

For the foregoing reasons, Amazon respectfully requests that the Court deny the Trustee's request for prejudgment interest. In the alternative, Amazon requests that the Court reduce any award of prejudgment interest to account for delays that were unreasonably caused by the Trustee and DAB.

Dated: March 12, 2021

By: s/ Eric J. Weiss
Richard M. Lorenzen (Bar No. 006787)
John S. Kaplan (*Pro Hac Vice*)
Eric J. Weiss (*Pro Hac Vice*)
Mallory Gitt Webster (*Pro Hac Vice*)

*Attorneys for Amazon Services LLC*

---

[4] If the Court awards prejudgment interest, the Trustee will benefit from Washington's generous 12% prejudgment interest rate, but he should not benefit from that high rate during periods of delay that were of his own making. *See Peace Mark (Holdings) Ltd. v. Int'l Watch Grp., Inc.*, 2010 WL 986559, at *4 & n.4 (E.D.N.Y. Feb. 1, 2010) ("[T]he Court is loathe to reward plaintiff for its own inaction by awarding plaintiff prejudgment interest calculated at the much higher New York statutory rate [of 9%] for the entire prejudgment period.").

-14-

# CERTIFICATE OF SERVICE

On this date I caused to be served on each of the attorneys identified below, via the delivery methods indicated below, a copy of the foregoing document, as follows:

| | |
|---|---|
| Dale C. Schian | __X__ Via the Clerk's eFiling Application |
| Mark C. Dangerfield | ____ Via U.S. Mail, 1st Class |
| Kenneth N. Ralston | ____ Via Overnight Delivery |
| **GALLAGHER & KENNEDY, P.A.** | ____ Via Facsimile |
| 2575 East Camelback Road | __X__ Via Email |
| Phoenix, AZ 85016-9225 | ____ Other: _____ |
| dale.schian@gknet.com | |
| mark.dangerfield@gknet.com | |
| ken.ralston@gknet.com | |

*Attorneys for Chapter 11 Trustee*

Dated: March 12, 2021        s/ Mallory Gitt Webster

-15-